## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEVEN D. SLEDGE, et al.** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 06-0742 (PLF)** |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |

## DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT OR, IN THE ALTERNATIVE, TO TRANSFER

Defendant, the United States of America, by and through counsel, respectfully requests that Plaintiff's Third Amended Complaint be dismissed, pursuant to Fed. R. Civ. P. 12(b)(1), for lack of subject matter jurisdiction. Should the court deny Defendant's motion to dismiss, Defendant requests that the Court transfer this action, pursuant to 28 U.S.C. § 1404(a), because transfer would promote the interests of justice and an alternative Court would be a more convenient forum. A memorandum of points and authorities in support of Defendant's motion is attached hereto as well as a proposed order consistent with the relief sought.

Respectfully submitted,


/s/
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


/s/
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


/s/
MARIAN L. BORUM, D.C. Bar # 435409
Assistant United States Attorney
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 514-6531
Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STEVEN D. SLEDGE, et al.** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 06-0742 (PLF)** |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, TO TRANSFER

## I. FACTUAL BACKGROUND

On October 15, 2002, at approximately 1:05 p.m., an officer at the Federal Correctional Institution-Allenwood, Pennsylvania ("FCI-Allenwood") observed an unresponsive inmate lying on the floor of cell 109. See Exhibit A, Declaration of Lieutenant James Lyons, ¶ 4. This inmate was identified as Rico Woodland, Register Number 10822-007. Id.[1] As staff responded to the unit and began securing cells, they observed Woodland's cellmate, inmate Jesse Sparks, Register Number 08096-007, with injuries consistent with having had a physical altercation. See id.; Exhibit D, Inmate History (Quarters) for Inmate Jesse Sparks, Register Number 08096-007. See also Exhibit E, Inmate History (Quarters) for Inmate Rico Woodland, Register Number 10822-007. Medical Staff responded to the cell, and Woodland was transported to a local hospital. See

---

[1]On April 20, 1990, Rico Woodland was convicted of Assault with Intent to Kill While Armed, Armed Robbery, Possession of a Firearm During a Crime of Violence or Dangerous Offense, Carrying a Pistol Without a License, Possession of an Unregistered Firearm and Unlawful Possession of Ammunition, and sentenced to a term of fifteen (15) to forty-five (45) years. See Exhibit B, Public Information Data, pp. 3-5. He was sent to FCI-Allenwood on July 11, 2001. See Exhibit C, Inmate History-Adm. Rel., p. 3.

Exhibit A, ¶ 4.  The Federal Bureau of Investigation responded to FCI-Allenwood to investigate. See id.

The investigation revealed that, during the morning of October 15, 2002, Woodland and Sparks engaged in a mutual, physical altercation.  See id. at ¶ 6.  Woodland did not notify the staff of this altercation nor discuss with them any concerns he had about his physical safety.  Id. at ¶ 7.  In addition, Woodland hid from staff the fact that the altercation occurred by cleaning up and changing his clothing.  See Exhibit F, Correspondence from BOP Northeast Regional Office, dated October 24, 2005, regarding Administrative Tort Claim Number TRT-NER-2005-00259. Between 12:41 p.m. and 12:56 p.m., Woodland and Sparks engaged in another physical altercation inside of cell 109.  See Exhibit A at ¶ 8.  During this altercation, Sparks repeatedly kicked Woodland in the upper torso and head while wearing boots.  Id.  The investigation also revealed that inmate Ishmael Ford-Bey held the cell door closed during the fight.  Id.  Another inmate positioned two cell doors at ninety degree angles to interfere with the view of the surveillance cameras on that range.  See Exhibit A at ¶ 9.  This inmate then stopped the unit officer who was about to begin an afternoon census count, and requested a broom and dust pan which were located in a secure room.  Id.  This delayed the unit officer from discovering the fight or Woodland.  Id.[2]

---

[2]On December 11, 2003, a grand jury sitting in Williamsport, Pennsylvania, returned a four-count indictment charging Jesse L. Sparks and Ishmael Ford-Bey with several offenses related to the assault of Woodland.  See Exhibit G, Docket Report, Criminal Action No. 03-cr-00364-MM-1; Exhibit H, Docket Report, Criminal Action No. 03-cr-00364-MM-2.  On June 2, 2005, Sparks was sentenced in the United States District Court for the Middle District of Pennsylvania to ten years followed by three years of supervised release for Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. § 113(a)(6).  See Exhibit I, Public Information Data for Inmate Jesse Sparks, Registration Number 08096-007, pp. 3-5.  On September 28, 2004, Ford-Bey was sentenced in the United States District Court for the Middle District of

On December 13, 2002, Woodland was transferred to the Federal Medical Center, Fort Worth, Texas.  See Exhibit B, p. 2.[3/]  On March 22, 2005, he was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP-Springfield").[4/]  Id. at 1.  Woodland's mother, brother and sister[5/] sought and received approval for a bedside visit with Woodland at USMCFP-Springfield on July 16 and 17, 2005.  See Exhibit J, USMCFP-Springfield Memo Re: Woodland, Rico, July 11, 2005.  Woodland's family members did not show up to visit him on those dates.  See id.  Four months later, on November 12, 2005, at 8:46 a.m., Diane and Teresa Sledge arrived at USMCFP-Springfield unannounced, and requested a bedside visit with Woodland.  See Exhibit K, USMCFP-Springfield, Inmate Visitors Log, November 12, 2005.  Because Diane and Teresa Sledge did not pre-arrange for a bedside visit for November 12, 2005, the duty officer denied their request.  See Exhibit Y, Declaration of Crystal Rinker at ¶ 4.  No staff members were available to "provide constant and immediate visual supervision[,]" as required by policy.  Id.; see Exhibit L, Federal Bureau of Prisons, U.S. Medical Center for Federal Prisoners, Springfield, Missouri, Institutional Supplement, SPG-5267.07e, Section 14(c)(1)("Staff supervising bedside visits in hospital wards must provide constant and immediate visual supervision of inmates and their visitors to prevent security violations.").  Moreover, they did not receive the warden's approval for the visit.  Id., Section

---

Pennsylvania to time served followed by two years of supervised release.  See Exhibit H, p. 5.

[3/]"FTW" on the Inmate Data form is the abbreviation for Fort Worth, Texas.  See Exhibit B.

[4/]"SPG on the Inmate Data form is the abbreviation for Springfield, Missouri.  See Exhibit B.

[5/]Dianne Sledge, Steven Sledge and Teresa Sledge, respectively.

14(c)(1)("Bedside visits must be prearranged by the inmate's unit team and approved by the Warden.").  However, the duty officer offered to arrange a visit during the next few days.  See Exhibit Y at ¶ 4.  Diane and Teresa Sledge refused that offer.  See id.  On January 29, 2006, Woodland passed away.  See Exhibit M, Certificate of Death, Rico Woodland.

        Administrative Claims

On October 15, 2004, Woodland filed an administrative tort claim which was received by the Bureau of Prisons ("BOP") Northeast Regional Office on May 20, 2005.  See Exhibit N, Administrative Tort Claim Number TRT-NER-2005-00259.  Woodland alleged that the Bureau of Prisons failed to protect him from attack, and sought $50,000,000 in damages.  See id.  By letter dated October 24, 2005, Woodland's claim was denied because there was no evidence of negligence on the part of BOP staff.  See Exhibit F, Correspondence from BOP Northeast Regional Counsel.

On November 29, 2006, Plaintiff Steven Sledge submitted an administrative "claim alleg[ing] that the BOP negligently and/or recklessly caused the death of Woodland by failing to protect him from attack."  See id. at ¶ 24, Exhibit O, Administrative Tort Claim Number TNT-NER-2007-01132.  On May 31, 2007, the BOP denied this claim, asserting that the two-year statute of limitations under 28 U.S.C. 2401(b) barred the claim.  See Exhibit P, Correspondence dated May 31, 2007 from Henry Sadowski, Regional Counsel to Steven Sledge.

On November 29, 2006, Plaintiff Steven Sledge submitted an administrative claim alleging that the employees at USMCFP-Springfield negligently and/or recklessly caused Woodland to suffer personal injuries by failing to provide adequate sustenance and/or medical care.  See Exhibit Q; Administrative Tort Claim Number TNT-NCR-2007-01011.  On May 24,

4

2007, the BOP denied this claim on the merits.  <u>See</u> Exhibit R, Correspondence dated May 24, 2007, from Richard W. Schott, Regional Counsel to Steven Sledge.

On November 29, 2006, Woodland's mother, Diane Sledge, submitted an administrative claim for relief alleging that the Missouri Medical Center employees negligently and/or recklessly caused the death of . . . Woodland by failing to provide adequate sustenance and/or medical care . . . ."  <u>See id</u>. at ¶ 26, Exhibit S, Administrative Tort Claim Number TNT-NCR-2007-01012.  The BOP denied this claim on the merits on May 24, 2007.  <u>See</u> Exhibit T, Correspondence dated May 24, 2007, from Richard W. Schott, Regional Counsel to Diane Sledge.

On June 13, 2007, Plaintiff Steven Sledge submitted an administrative claim for relief alleging that Missouri Medial Center employees "arbitrarily prohibited Diane Sledge from visiting her . . . son."  <u>See</u> Exhibit U; Administrative Tort Claim Number TNT-NCR-2007-04530.  On July 20, 2007, the BOP denied this claim on the merits.  <u>See</u> Exhibit V, Correspondence dated July 20, 2007, from Richard W. Schott, Regional Counsel to Thomas F. Connell, Esq.

On June 14, 2007, Plaintiff Dianne Sledge also submitted an administrative claim for relief alleging that Missouri Medial Center employees "arbitrarily prohibited her from visiting her son."  <u>See</u> Exhibit W, Administrative Tort Claim Number TNT-NCR-2007-04531.  On July 20, 2007, the BOP denied this claim on the merits.  <u>See</u> Exhibit X, Correspondence dated July 20, 2007, from  Richard W. Schott, Regional Counsel to Thomas F. Connell, Esq.

<u>District Court Claims</u>

In this Third Amended Complaint, Woodland's personal representative, Steven Sledge,

5

and his mother, Dianne Sledge, have filed six claims for relief against the United States.  Count I is a Pennsylvania personal injury claim by Steven Sledge.  He alleges that the prison employees at FCI-Allenwood owed Woodland a duty of reasonable care.  See Third Amended Complaint at ¶ 40.  Defendant knew or should have know "that individuals at FCI-Allenwood, including Jesse L. Sparks and Ishmael Ford-Bey, posed a specific concrete and immediate threat to Woodland[,]" id. at ¶ 40, and knew or should have known "that Woodland was being attacked by [these] individuals . . . ." Id. at ¶ 41.  Therefore, Defendant breached its duty of care.  Id. at ¶ 39, 42.  Plaintiff asks for damages "in an amount not less than $10,000,000."  Id. at ¶ 42.

Count II is a Pennsylvania wrongful death claim by Steven Sledge.  He alleges that the prison employees at FCI-Allenwood owed Woodland a duty of reasonable care.  Id. at ¶ 48. They knew or should have know that individuals "including Jesse L. Sparks and Ishmael Ford-Bey posed a specific, concrete and immediate threat to Woodland's life[,]" id. at ¶¶ 49, and knew or should have known "that Woodland was being attacked by [these] individuals . . . ." Id. at ¶ 50.  Therefore, they breached their duty of care.  Id. at ¶¶ 48, 51.  Plaintiff asks for "damages in an amount not less than $50,000."  Id. at ¶ 51.

Count III is a Missouri personal injury claim by Steven Sledge.  He alleges that the employees at USMCFP-Springfield in Missouri owed Woodland a reasonable duty of care.  Id. at ¶ 57.  From approximately March 2005 through January 29, 2006, they "knew or should have known that Woodland was not receiving adequate sustenance and care."  Id. at ¶ 58.  Therefore, they breached their duty of care.  Id. at ¶¶ 57, 58.  Plaintiff asks for "damages in an amount not less that $2,000,000."  Id. at ¶ 59.

Count IV is a Missouri wrongful death claim by Diane Sledge.  She alleges that the

employees at USMCFP-Springfield owed Woodland a reasonable duty of care. From March 2005 through January 29, 2005, they "knew or should have known that Woodland was not receiving adequate sustenance and care.". Id. at ¶ 66. Therefore, they breached their duty of care. Id. Plaintiff asks for "damages in an amount not less than $10,000,000." Id. at ¶ 67.

Count V is a Missouri Intentional/Negligent Infliction of Emotional Distress Claim by Steven Sledge. He alleges that the employees at USMC-Springfield in Missouri owed Woodland a duty of reasonable care. They breached that care in November of 2005, by not allowing Woodland's mother to visit him. Id. at ¶ 73. Plaintiffs ask for damages "in an amount not less than $100,000." Id. at 16.

Count VI is a Missouri Intentional/Negligent Infliction of Emotional Distress Claim by Diane Sledge. She alleges that the employees at USMC-Springfield in Missouri intentionally and/or recklessly caused her severe emotional distress, in November of 2005, by not allowing her to visit Woodland. Id. at ¶ 81. She asks for damages "in an amount not less than $100,000." Id. at 16. All of the counts in this Complaint should be dismissed.

## II.  LEGAL STANDARD

A motion to dismiss under Fed. R. Civ. P. 12(b)(1) "presents a threshold challenge to the court's jurisdiction." Gardner v. U.S., 1999 WL 164412, at *2 (D.D.C. Jan. 29, 1999), aff'd, 213 F.3d 735 (D.C. Cir. 2000) and cert. denied, 531 U.S. 1153 (2001) (quoting, Haase v. Sessions, 835 F.2d 902, 906 (D.C. Cir.1987)); see also 4 Wright & Miller: Federal Prac. & Proc. § 1350 (R12)(2002 Supplement)(". . . subject matter jurisdiction deals with the power of the court to hear the plaintiff's claims in the first place, and therefore imposes upon courts an affirmative obligation to ensure that they are acting within the scope of their jurisdictional power.") A court

may resolve a motion to dismiss brought pursuant to Rule 12(b)(1) in two ways.  First, the court

may determine the motion based solely on the complaint.  <u>Herbert v. Nat'l Acad. of Science</u>, 974

F.2d 192, 197 (D.C. Cir. 1992).  Alternatively, to determine the existence of jurisdiction, a court

may look beyond the allegations of the complaint, consider affidavits and other extrinsic

information, and ultimately weigh the conflicting evidence.  <u>See id</u>.; <u>see also</u> <u>Cureton v. United</u>

<u>States Marshal Serv.</u>, 322 F. Supp.2d 23, 2004 WL 1435124, *2 (D.D.C. June 28, 2004).  "At

issue in a factual 12(b)(1) motion is the trial court's jurisdiction - - its very power to hear the

case."  <u>Mortensen v. First Fed. Sav. and Loan Assn</u>, 549 F.2d 884, 891 (3rd Cir. 1977).  Plaintiffs

suing under the Federal Tort Claims Act bear the burden of establishing the court's subject

matter jurisdiction.  <u>United States v. Gaubert</u>, 499 U.S. 315 (1991); <u>Simpkins v. District of</u>

<u>Columbia Gov't</u>, 108 F.3d 366, 370-71 (D.C. Cir. 1997).

### III.  ARGUMENT

**A.  The Federal Tort Claims Act and Application of the Appropriate Law.**

The law is well-settled that the United States, as a sovereign, may be sued only to the

extent that it has consented to suit by statute.  <u>See</u> <u>FDIC v. Meyer</u>, 510 U.S. 471, 475 (1994);

<u>United States v. Testan</u>, 424 U.S. 392, 399 (1976).  A waiver of its immunity must be explicit.[6]

<u>See</u> <u>Honda v. Clark</u>, 386 U.S. 484, 501 (1967).  The FTCA authorizes district courts to hear suits

against the United States

> for money damages ... for injury or loss of property, or personal injury or death
> caused by the negligent or wrongful act or omission of any employee of the
> Government while acting within the scope of his office or employment, under
> circumstances where the United States, if a private person, would be liable to the
> claimant in accordance with the law of the place where the act or omission

---

[6]The exclusive remedy for common law tort claims is the FTCA. 28 U.S.C. § 2679(a).

occurred.

28 U.S.C. § 1346(b);[7] see also <u>Cope v. Scott</u>, 45 F.3d 445, 447 (D.C. Cir. 1995). The FTCA does not create a substantive cause of action against the United States, but provides a mechanism by which a plaintiff may bring a state law tort action against the federal government in federal court.

In the FTCA, "Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred . . . ." <u>Richards v. United States</u>, 369 U.S. 1, 9 (1962). Under the FTCA, the court shall apply the substantive law of one jurisdiction to all the aspects of the FTCA claims. <u>See id</u>.

In deciding what substantive rule of law applies in a FTCA case where the events occurred in different states, the Court conducts a multi-step analysis. <u>Richards</u>, 369 U.S. at 8-12; <u>Hitchcock v. United States</u>, 665 F.2d 354, 359-60 (D.C. Cir. 1981). <u>See also Gould Elecs., Inc. v. United States</u>, 220 F.3d 169, 180 (3d Cir. 2000) (holding that the court must use a two-step choice-of-law analysis when multiple acts or omissions have occurred in more than one state). Under this multi-step analysis, the Court must first determine in which state the act or omission is alleged to have taken place and then apply that state's law. <u>Richards</u>, 369 U.S. at 10; <u>Hitchcock</u>, 665 F2d at 359. Upon making that determination, however, it is necessary for the Court to apply the "whole law" of that state, including its choice-of-law provisions, to the facts of the case. <u>Richards</u>, 369 U.S. at 11. Thus, after deciding which jurisdiction's choice-of-law

_____

[7]Employees of the federal government are defined as "officers or employees of any federal agency, members of the military, and persons acting on behalf of a federal agency in an official capacity." 28 U.S.C. § 2671.

9

provisions control, the Court must determine which state's substantive tort law applies.  Id. at 11-12; Hitchcock, 665 F.2d at 630.  The determination of where the alleged act or omission occurred is therefore of paramount importance, as it establishes the applicable choice-of-law provision, which could ultimately lead the Court to apply another state's substantive law in the case.

Rather than interpreting the phrase "act or omission" to refer to "the place where the negligence had its operative effect," the Richards Court held that courts in multi-state FTCA actions must "look in the first instance to the law of the place where the acts of negligence took place."  Richards, 369 U.S. at 10.[8/]  Thus, in an FTCA claim involving multiple states, the Court must look not to where the government's act or omission effected an injury, but instead to where the act or omission actually took place, and then apply the latter jurisdiction's choice-of-law provision.  Id. at 10, 15-16.  Because the negligent act or omission was the alleged failure to protect Woodland in FCI-Allenwood, which resulted in his injury, Pennsylvania choice of law provisions apply.  But for the injuries caused at FCI-Allenwood, Woodland never would have been hospitalized at USMCFP-Springfield, in Missouri.  Therefore, the law as well as logic compel the application of Pennsylvania choice of law provisions.

---

[8/]  The Richards case concerned an airplane that took off from Oklahoma and crashed in Missouri and, although the injury occurred in Missouri, the alleged negligence of the federal government took place in Oklahoma.  369 U.S. at 3.  Following the crash, the passengers' relatives brought suit in an Oklahoma federal district court.  Id.  Their complaint alleged that the Civil Aviation Agency, a governmental entity, had "negligently failed to enforce the terms of the Civil Aeronautics Act and the regulations thereunder which prohibited the practices then being used by American Airlines, Inc., in the overhaul depots of Tulsa, Oklahoma."  Id.  The Court affirmed that the negligent act or omission according to the FTCA was the government's alleged lack of enforcement of the Civil Aeronautics Act at the Oklahoma depot.  Id. at 5, 10.  The Court further held that Oklahoma's choice-of-law provision, which applies the substantive law of the place where the injury occurred, had correctly led the district court to apply Missouri's substantive tort law in that case.  Id. at 15-16.

However, assuming *arguendo* that the alleged acts or omissions occurred in both Pennsylvania and Missouri, the Richards decision is not instructive. The Supreme Court's holding in Richards, only dealt with the government's alleged negligent act in Oklahoma, and did not provide federal courts with any guidance on choosing which choice-of-law provision applies "when the alleged acts or omissions occur in more than one state." Raflo v. United States, 157 F. Supp.2d 1, 9 (D.D.C. 2001). See also Gould, 220 F.3d at 181 (the FTCA and Richards fail to provide any guidance in this situation). Federal courts are split on the appropriate legal standard, having adopted at least five different approaches. See Raflo, 157 F. Supp.2d at 9 (listing five approaches); Simon v. United States, 341 F.3d 193, 202 (3d Cir. 2003) (same).[9]

The approach taken by the District of Columbia Circuit controls the analysis in this court. See Raflo, 157 F.Supp. 2d at 9. The D.C. Circuit established its rule for determining the applicable choice-of-law provisions in a multi-state FTCA case in Hitchcock v. United States, holding that the court should apply the choice-of-law provisions of the jurisdiction "where the act or omission occurred." 665 F.2d at 359 (quoting Richards, 369 U.S. at 3).[10] When only one act

_____

[9] See Hitchcock, 665 F.2d at 359 (applying the choice-of-law where the "relevant" act or omission occurred); Kohn v. United States, 591 F. Supp. 568, 752 (E.D.N.Y. 1984) (applying the relevant state's choice-of-law provision on an act-by-act basis); Ducey v. United States, 713 F.2d 504, 509 (9th Cir 1983) (applying the choice-of-law provision of the state in which "physical acts" could have prevented injury); Bowen v. United States, 570 F.2d 1311, 1318 (7th Cir. 1978) (applying the choice-of-law provision of either "the place of the last act or omission having a causal effect" or "the place of the act or omission having the most significant causal effect).

[10] In Hitchcock, a government nurse in Virginia inoculated the plaintiff with a rabies immunization that caused an adverse reaction. 665 F.2d at 354-56. Within a year, the plaintiff's initial feelings of weakness in her legs developed into a partial, permanent paralysis. Id. at 356. Although the final alleged negligent act – the vaccination's administration – took place in Virginia, the court stated that the location of the nurse's act is "without significance" given that the "locus of the negligent acts and omissions is . . . established as Washington, D.C." Id. at 359-60. The State Department had failed to give the nurse instructions on how to assess patients'

or omission is alleged, then the court follows the rule in <u>Richard</u>.  However,

> given that there is no clear guidance articulated by <u>Hitchcock</u> regarding the proper standard to follow when relevant acts or omissions occurred in more than one jurisdiction, it seems prudent to elect the choice of law provision belonging to the place where the most substantial portion of the acts occurred.

<u>Raflo</u>, 157 F.Supp.2d at 10.  In this case, the more substantial portion of the acts occurred in

Pennsylvania.  Again, but for the assault in Pennsylvania, Woodland never would not have been

hospitalized in Missouri.  Therefore, Pennsylvania choice of law rules apply.[11]

_____**B.  Pennsylvania's Choice of Law Rules**

_____Under Pennsylvania's choice of law provision, the analysis begins with a "determination

_____

medical history, establish that the vaccination was voluntary and warn patients of risks related to the vaccine.  <u>Id.</u> at 359.  Thus, the court attributed the negligence to the federal government's relevant failure to provide proper training rather than the nurse's subsequent administration of the vaccine.  <u>Id.</u> at 359.  The State Department employees, as the relevant negligent actors in <u>Hitchcock</u>, were located in the District of Columbia, hence the court applied D.C.'s choice-of-law provision.  <u>Id.</u> at 359-60.

[11]Like <u>Hitchcock</u>, <u>Raflo</u> involved a decision between Virginia and District of Columbia choice-of-law provisions.  <u>Raflo</u>, 157 F. Supp. 2d at 10.  The plaintiff, a U.S. Army retiree, brought a medical malpractice claim following the death of his wife.  <u>Id.</u> at 4.  The plaintiff alleged that the death of his wife in the District of Columbia had resulted from repeated misdiagnoses by doctors at a Virginia primary care facility, one of many that the government used to meet its obligations to retired soldiers, and by negligence at military hospitals in both Virginia and the District of Columbia.  <u>Id.</u>  The plaintiff's wife first received treatment at the primary care facility, then the DeWitt Army Community Hospital in Virginia, followed by a return to the primary care facility and a subsequent visit to DeWitt's emergency room.  <u>Id.</u>  She was then transferred to Walter Reed Army Medical Center in the District of Columbia, the location of both the final alleged act of negligence and the injury, namely her wrongful death.  <u>Id.</u> at 4, 10-11.  Although these alleged acts of negligence occurred in both of the two jurisdictions and the final act occurred in the District of Columbia, the court held that a "greater portion" of the relevant negligent acts or omissions - -  including the misdiagnosis at both the primary care facility and DeWitt - - occurred in Virginia.  <u>Id.</u> at 10.  Accordingly, the Court in <u>Raflo</u> found that the act to which the injury was "ultimately attributable" occurred in Virginia.  <u>Id.</u> at 9 (citing <u>Hitchcock</u>, 665 F.2d at 359).  Therefore, Virginia's choice-of-law provision governed the case.  <u>Id.</u>

of the type of conflict that exists between the purported competing bodies of law before we assess the governmental interests of the jurisdictions and their contacts with the dispute. Taylor v. Mooney Aircraft Corp., 464 F.Supp.2d 439, 446 (2006) (citing Kuchinic v. McCrory, 222 A.2d 897, 899-900 (1966)). The "choice of law analysis first entails a determination of whether the laws of the competing states actually differ. If not, no further analysis is necessary." Air Products and Chemicals, Inc. v. Eaton Metal Products Co., 2003 WL 22133839, at *18 (E.D.Pa. 2003).

> A true conflict exists 'when the governmental interests of both jurisdictions would be impaired if their laws were not applied." If a case presents a true conflict, Pennsylvania choice of law rules 'call for the application of the law of the state having the most significant contacts or relationships with the particular issue.' A false conflict arises when 'only one jurisdiction's governmental interest would be impaired by the application of the other jurisdiction's law,' and in that case the law of the only interested jurisdiction applies. In some instances neither jurisdictions interests would be impaired if its laws were not applied. This is the unprovided for case, and when this occurs the courts resort to the principle of lex loci delicti to supply the substantive law.

Taylor, 464 F.Supp.2d at 446 (internal citations omitted). The principle of lex loci delicti provides that the law of the place of injury governs in all tort actions for injuries sustained in other states. Griffith v. United Airlines, 416 Pa. 1, 203 A.2d 796 (1964). [12]

Both Pennsylvania and Missouri have an equal interest in the laws of their jurisdiction being applied when a plaintiff asserts that a decedent was denied a reasonable duty of care within

---

[12] "When the FTCA was passed, the dominant principle in choice-of-law analysis for tort cases was lex loci delicti: courts generally applied the law of the place where the injury occurred." Sosa v. Alvarez-Machain, 542 U.S. 692, 705-06 (2004)(citing Richards, 369 U.S. at 11-12 ("The general conflict-of-laws rule, followed by a vast majority of the States, is to apply the law of the place of injury to the substantive rights of the parties"); Restatement (First) of Conflict of Laws § 379 (1934) (defendant's liability determined by "the law of the place of wrong"); id at n.3, § 377; id at n.1 (place of wrong for torts involving bodily harm is "the place where the harmful force takes effect upon the body.")

its jurisdiction.  <u>See</u> Third Amended Complaint, Counts I - IV.  However, it does not appear that

the governmental interests of either Pennsylvania or Missouri would be impaired if their laws

were not applied.  Therefore, a "true conflict" does not exist.  Further, it does not appear that

either Pennsylvania or Missouri's governmental interest would be impaired by the application of

the other jurisdiction's law.  Therefore, there is no "false conflict."  Finally, neither jurisdiction's

interests would be impaired if its laws were not applied.  Hence, the court must use the principle

of lex loci delecti to supply the substantive law.  This principle calls for the place of the injury to

govern in this tort action.  Because the operative injury is that which took place in FCI-

Allenwood, the substantive law of Pennsylvania applies.

### C.  Wrongful Death and Personal Injury Claims

1) <u>Wrongful Death Claims</u>

Under Pennsylvania's wrongful death statute,

> (a) . . . An action may be brought . . . to recover damages for the death of an
> individual caused by the wrongful act or neglect or unlawful violence of another if
> no recovery for the same damages claimed in the wrongful death action was
> obtained by the injured individual during his lifetime and any prior actions for the
> same injuries are consolidated with the wrongful death claim so as to avoid a
> duplicative recovery.
>
> (b) . . . the right of action created by this section shall exist only for the benefit of
> the spouse, children or parents of the deceased . . .

42 Pa. C.S.A. § 8301.  Under Pennsylvania Rule of Civil Procedure 2202,

> an action for wrongful death shall be brought *only* by the personal representative of the
> decedent for the benefit of those persons entitled by law to recover damages for such
> wrongful death.

(emphasis added).  Accordingly, under Pennsylvania law, Count II, the wrongful death claim of

Plaintiff Steven Sledge as Woodland's personal representative, properly can be brought.  Because

14

an action for wrongful death can *only* be brought by the personal representative, and the substantive law of Pennsylvania applies, the wrongful death claim in Count IV of the Third Amended Complaint, brought by Woodland's mother, Diane Sledge, must be dismissed.[13]

  2) <u>Personal Injury Claims</u>

  In Count I of the Third Amended Complaint, Plaintiff Steven Sledge asserts a "Pennsylvania personal injury claim" asserting that the employees at FCI-Allenwood breached their duty of care to Woodland when they failed to protect him from the attack. <u>See</u> Third Amended Complaint at ¶¶ 40-41. In Count III of the Third Amended Complaint, Plaintiff Steven Sledge asserts a "Missouri personal injury claim" alleging that the employees at USMC-Springfield breached their duty of care to Woodland when they did not provide him with "adequate sustenance and care." <u>See</u> <u>id.</u> at ¶¶ 57, 58. As indicated above, Pennsylvania substantive law applies to these claims as well. <u>See</u> <u>supra</u> at 14.

  In Pennsylvania, "[a]t common law, an action for personal injury did not survive death[.]"

---

  [13]Moreover, it is proper that only one wrongful death claim can survive for the death of one individual. Plaintiffs believe they can assert two wrongful death claims by arguing that the alleged negligent acts or omissions of the employees at FCI-Allenwood caused the death of Woodland, and that the alleged negligent acts or omissions of the employees at USMCFP-Springfield caused the death of Woodland. However, Plaintiffs may not seek a double remedy. Either the alleged negligent acts of FCI-Allenwood employees caused the death of Woodland or the alleged negligent acts of USMCFP-Springfield employees caused his death. Clearly, but for the injuries caused at FCI-Allenwood, Woodland never would have been hospitalized at USMCFP-Springfield. Therefore, logic and the law compel the application of Pennsylvania law. However, even if the choice of law rules determined that Missouri's substantive law applied to this action, one of the wrongful death claims still would fail. Pursuant to Missouri Revised Statutes § 537.080(2), "[o]nly one action may be brought . . . against any one defendant for the death of any one person." Moreover, pursuant to Section 537.080(1), the proper party to sue would be the spouse, children . . . or . . . the father or mother of the deceased. Therefore, Diane Sledge's Missouri wrongful death claim, in Count IV of the Third Amended Complaint, properly could be brought. However, the wrongful death claim in Count II brought by Plaintiff Steven Sledge would fail.

Pennock v. Lenzi, 882 A.2d 1057, 1064 n.8 (Pa.Cmwlth.2005) (citing Moyer v. Phillips, 341

A.2d 441, 442-43 (Pa.Super.1975)).  To counter the common law principle, the Pennsylvania

legislature enacted a survival statute.  This statute provides that "all causes of action or

proceedings real or personal shall survive the death of the plaintiff . . . ."    42 Pa. C.S.A. § 8302

("Survival action").

> With the survival statute, the plaintiff's death does not abate the cause of action as
> it did at common law; rather, the action survives and simply continues in the
> decedent's personal representative.

 Salvadia v. Ashbrook, 923 A.2d 436, 439-40 (Pa. Super. 2007)(citing Tulewicz v. Southeastern

Pennsylvania Transp. Auth., 606 A.2d 427, 431 (Pa. Super. 1992).  Moreover, "all actions that

survive a decedent must be brought by or against the personal representative," id. at 440, and "a

decedent's estate cannot be a party to litigation unless a personal representative exists."  Id.

(citing Marzella v. King, 389 A.2d 659, 660-61 (Pa.Super. 1978)).  Therefore, as Woodland's

personal representative, Plaintiff Steven Sledge appears to be able to bring both personal injury

claims presented in Counts I and III of the Third Amended Complaint.

### D.  Claims Based Upon Actions of Employees at FCI-Allenwood
### (Count I-Personal Injury Claim and Count II-Wrongful Death Claim)

Counts I and II of the Third Amended Complaint allege that the employees at FCI-

Allenwood breached their duty of care to Woodland by failing to protect him.  See Third

Amended Complaint at ¶¶ 39-42, 57-58.  Under Pennsylvania law, when presenting an FTCA

claim for negligence, "a plaintiff must show that (1) a duty was owed to him by a defendant; (2)

the duty was negligently breached; and (3) the negligent breach of the duty was the proximate

cause of the plaintiff's injury."  Hoyte v. Wagner, 2007 WL 2768862, at * 4 (E.D.Pa. September

14, 2007)(citing <u>Mahler v. United States</u>, 196 F.Supp. 362 364 (W.D. Pa. 1961), <u>aff'd</u>, 306 F.2d

713 (3d Cir. 1962). Pennsylvania law has determined that proximate cause is causation which

was a substantial factor in bringing about the injury. <u>Simon v. Hudson Coal,</u> Co., 350 A.2d 259

(Pa.Super. 1944). Because Plaintiff cannot establish that a duty to him was negligently breached,

neither Count I nor II of the Third Amended Complaint can survive.

The investigation of the incident at FCI-Allenwood revealed that during the morning of

October 15, 2002, Woodland and Sparks engaged in a mutual, physical altercation. <u>See id</u>. at ¶ 5.

Woodland did not notify the staff of this altercation nor discuss with them any concerns he had

about his physical safety. <u>Id</u>. at ¶ 6. In addition, Woodland hid from staff the fact that the

altercation occurred. <u>See</u> Exhibit F. Between 12:41 p.m. and 12:56 p.m., Woodland and Sparks

engaged in another physical altercation inside of cell 109. <u>See</u> Exhibit A at ¶ 7. During this

altercation, Inmate Ishmael Ford-Bey held the cell door closed. <u>Id</u>. Another inmate positioned

two cell doors at ninety degree angles to interfere with the view of the surveillance cameras on

that range. <u>See</u> Exhibit A at ¶ 8. This inmate also interfered with the unit officer attempting to

perform his duties by requested a broom and dust pan from another location. This delayed the

officer from discovering the fight or Woodland. <u>Id</u>. Under circumstances in which FCI-

Allenwood employees were prevented from performing their duties, Plaintiff Steven Sledge

cannot establish that a duty to Woodland was negligently breached, and Counts I and II must fail.

Counts I and II must also fail because they are barred by the discretionary function

exception to the FTCA <u>See</u> Fed. R. Civ. P. 12(b)(1). While it is true that the FTCA waives the

United States' immunity with respect to claims "for injury or loss of property, or personal injury

or death caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment . . . [,]" 28 U.S.C. § 1346(b)(1), this

waiver of sovereign immunity is not unlimited.  Indeed, the FTCA's waiver of sovereign

immunity is limited in part by 28 U.S.C. § 2680(a), which insulates the United States from:

> [a]ny claim based upon an act or omission of an employee of the
> Government, exercising due care, in the execution of a statute or
> regulation, whether or not such statute or regulation be valid, or based
> upon the exercise or performance or the failure to exercise or perform
> a discretionary function or duty on the part of a federal agency or an
> employee of the Government, whether or not the discretion involved
> be abused.

28 U.S.C. § 2680(a).

"The second clause of § 2680(a) 'marks the boundary between Congress' willingness to

impose tort liability upon the United States and its desire to protect certain governmental

activities from exposure to suit by private individuals." Loughlin v. United States, 393 F.3d 155,

162 (D.C. Cir. 2004) (citing United States v. S.A. Empresa de Viacao Aerea Rio Grandense

(Varig Airlines), 467 U.S. 797, 808 (1984)).  By fashioning an exception for discretionary

governmental functions, "Congress took 'steps to protect the Government from liability that

would seriously handicap efficient government operations.'" Varig Airlines, at 814 (quoting

United States v. Muniz, 374 U.S. 150, 163 (1963)).  Claims falling under this "discretionary

function exception" are barred by lack of subject-matter jurisdiction.  Id.  See Williams v. United

States, 50 F.3d 299, 304-05 (4th Cir. 1995); Black Hills Aviation, Inc. v. United States, 34 F.3d

968, 972 (10th Cir. 1994); Kirchmann v. United States, 8 F.3d 1273, 1274 (8th Cir. 1993); In re

Glacier Bay, 71 F.3d 1447, 1450 (9th Cir. 1995).  Accordingly, "[a] district court . . . has no

authority to address the merits of claims allegedly arising under the FTCA in cases where the

plaintiff is unable to overcome this jurisdictional barrier."  Id.

To determine whether a government agency or employee's conduct is protected under the discretionary function exception, the Supreme Court has developed a two prong test. See <u>United States v. Gaubert</u>, 499 U.S. 315 (1991); <u>Berkovitz v. United States</u>, 486 U.S. 531 (1988). Under this test, a court must determine 1) whether the federal agency or employees had a choice in making the decision or taking the challenged action; and 2) whether the choice involved social, economic and/or political policy considerations. <u>Id</u>. at 536.

Under the first prong of this test, the court must determine if the action is "specifically prescribed" by a federal statute, regulation or policy. <u>Id</u>. at 536. The statute, regulation, or policy must be both specific and mandatory, and must embody a "fixed or readily ascertainable standard." <u>Starrett v. United States</u>, 847 F.2d 539, 541 (9th Cir. 1988); <u>Alabama Elec. Co-op v. United States</u>, 769 F.2d 1523, 1529 (11th Cir. 1985) (quoting <u>Miller v. United States</u>, 710 F.2d 656, 663 (10th Cir. 1983)). In order to strip the agency action of the discretionary function exception's protection, a directive must clearly dictate a particular course of conduct on the subject at issue. See <u>Baum v. United States</u>, 986 F.2d 716, 720 (4th Cir. 1993). If the action was not "specifically prescribed" by a federal statute, regulation or policy, then the challenged conduct is the "product of judgment or choice," and the first prong of the test is satisfied.

The second prong of the test is rooted in the discretionary function exception's purpose to "prevent judicial second guessing of legislative administrative decisions grounded in social, economic and political policy." <u>Gaubert</u>, 499 U.S. at 323. Hence, the court must determine whether the agency or employee's judgment was "based on considerations of public policy." <u>Id</u>. (quoting <u>Berkovitz</u>, 486 U.S. at 537). The focus of the analysis is not whether or how policy considerations were weighed in the decision-making process but, rather, whether or not those

19

decisions were susceptible to policy considerations.  <u>Gaubert</u>, 499 U.S. at 325.  Day-to-day

operational and management decisions of a federal agency, not just those made by high-level

government officials, often implicate policy considerations.  <u>Id</u>. at 328, 332; <u>In re Consolidated

Testing U. S. Atmospheric Testing Litigation</u>, 820 F.2d 982, 993 (9th Cir. 1987) ("acts of

subordinates in carrying out the operations of government in accordance with official directions

cannot be actionable")(quoting <u>Dalehite v. United States</u>, 346 U.S. 15, 36 (1953)); 28 U.S.C. §

2680(a).  <u>See</u> <u>Fazi v. United States</u>, 935 F.2d 535, 538 (2nd Cir. 1991).  If an "established

government policy, as expressed or implied by statute, regulation, or agency guidelines, allows a

Government agent to exercise discretion, it must be presumed that the agent's acts are grounded

in policy when exercising that discretion."  <u>Gaubert</u>, 499 U.S. at 324-325; <u>Dalehite</u>, 346 U.S. at

36 ("Where there is room for policy judgment and decision, there is discretion.").  Plaintiff has

the burden of rebutting that presumption.  <u>See</u> <u>Dykstra v. BOP</u>, 140 F.3d 791, 795-96 (8th Cir.

1988).

      1.  <u>FCI-Allenwood Employees' Actions Were the Product of Judgment or Choice</u>

      In Counts I and II, Plaintiff alleges that FCI-Allenwood employees 1) "knew or should

have known that individuals at FCI-Allenwood . . . posed a specific, concrete and immediate

threat to Woodland's life[;]" and 2) "knew or should have known that Woodland was being

attacked . . . ."  Third Amended Complaint at ¶¶ 12-13.  Plaintiff argues that these BOP

employees had a specific duty to stop the attack or take other actions to protect inmate

Woodland, and that the employees breached that duty.  In making these claims, plaintiff

challenges the security and staffing at FCI-Allenwood at the time of the incident.

      Under the first prong of the discretionary function analysis, the Court must determine if

there were federal statutes, regulations, or procedures in place that required BOP employees to follow a particular course of action in protecting Woodland from other inmates. See Cope v. Scott, 45 F.3d 445, 448 (D.C. Cir. 1995); Drake v. FAA, 291 F.3d 59, 72-73 (D.C. Cir. 2002). Here, there were not.

Title 18, United States Code, Section 4042 (a)(2)-(3) states that:

The Bureau of Prisons, under the direction of the Attorney General, shall -

(2) provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .

18 U.S.C. § 4042(a)(2) and (a)(3). Section 4042 has been interpreted as requiring the BOP to exercise "ordinary diligence." Cowart v. United States, 617 F.2d 112, 116 (5th Cir. 1980), cert. denied, 449 U.S. 903 (1980); Herrington v. United States, 1984 WL 1279 at * 1 (S.D.N.Y. Nov. 28, 1984)(under 18 U.S.C. § 4042, government owes prisoners a duty of "ordinary care.")

However, while 18 U.S.C. § 4042 generally delegates responsibility for inmates to the BOP, "[t]he statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their duty to protect inmates." Calderon v. United States, 123 F.3d 947, 950 (7th Cir. 1997). Instead, prison officials are given considerable discretion on how best to use their limited resources to fulfill this responsibility. The absence of specific guidelines of appropriate conduct by BOP employees in administering these duties, therefore, leaves judgment or choice to the employees. Buford v. United States, 1999 WL 319078 at * 4, n.2 (Apr. 28, 1999) (where method, extent, and thoroughness of procedures used to protect prisoners were left

21

unspecified, there was an element of discretion in how guards could satisfy 18 U.S.C. § 4042).

Title 28, Code of Federal Register, Section 541, provides general guidance to employees of correctional institutions in fulfilling their duties.  However, as is true of the governing statutes, there is no mandate as to specifically how the staff duties are to be fulfilled.  See Calderon, 123 F.3d at 949 (none of the federal regulations cited within 28 C.F.R. § 541 sets forth a mandatory, non-discretionary action that was required to be taken prior to the attack on plaintiff by another inmate); see also Caudle v. United States, 72 F.3d 132 (7th Cir. 1995)(unpublished opinion) (dismissing claim by plaintiff who was severely stabbed by other inmate without provocation because the manner in which the BOP fulfills its statutory duty to protect prisoners is discretionary).  Because no statutes, regulations or procedures exist which require FCI-Allenwood employees to follow a specific course of action when protecting and supervising inmates, the first prong of the discretionary function analysis is satisfied.

2.  The Practices at FCI-Allenwood are Grounded in Policy

Under the second prong of the discretionary function analysis, the court must determine whether the BOP's management decisions regarding the supervision and protection of inmates were grounded in social, economic or political policy.  Gaubert, 499 U.S. at 323; see Sloan v. U.S. Dep't of Housing and Urban Dev't, 236 F.3d 756, 761 (D.C. Cir. 2001).  The focus of the inquiry is not on the "agent's objective intent in exercising discretion conferred by statute or regulation, but on the nature of the actions taken or whether they are susceptible to policy analysis.  Id. at 325.

In making decisions regarding the appropriate security measures within FCI-Allenwood, BOP officials must "balance the need to provide inmate security with the rights of the inmates to

circulate and socialize within the prison . . . ."  Calderon, 123 F.3d at 951.  These decisions

regarding the manner in which FCI-Allenwood is staffed, and how inmates are monitored and

protected, necessarily involve judgment and discretion.[14/]  When established governmental

policy, as expressed or implied by statute, regulation or agency guidelines, "allows a Government

agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy

when exercising that discretion."  Gaubert, 499 U.S. at 324; Dalehite, 346 U.S. at 36("Where

there is room for policy judgment and decision, there is discretion."); Dykstra, 140 F.3d at 796

("Prison officials supervise inmates based upon security levels, available resources, classification

of inmates, and other factors which are inherently grounded in social, political, and economic

policy.").  Therefore, although prison employees have a duty to protect inmates, "decisions made

as to how best to fulfill that duty are protected by the discretionary function exception."  Barrett

v. United States, 845 F. Supp. 774, 782 (D.Kan. 1994)("prison regulations and the statutes with

which they conform are grounded in social, political, and economic policy and, thus, decisions

made in accordance with these regulations are protected by the discretionary function

exception.").

    When examining whether a duty of care to Woodland was breached, it must be noted that

---

[14/]The Supreme Court has repeatedly recognized that broad deference is to be afforded to
the discretion exercised by prison administrators in adopting and executing policies and practices
which address the day-to-day problems in operating a corrections facility.  E.g., Thornburgh v.
Abbott, 490 US 401, 408 (1989); Turner v. Safley, 482 U.S. 78, 85 (1987); Bell v. Wolfish, 441
U.S. 520, 547 (1979); Pell v. Procunier, 417 U.S. 817, 827 (1974).  In fact, the Court has stated
that, "a prison's internal security is peculiarly a matter normally left to the discretion of prison
administrators."  Rhodes v. Chapman, 452 U.S. 337, 349 n.14 (1981).  This "deference extends
to a prison security measure taken in response to an actual confrontation with riotous inmates,
just as it does to prophylactic or preventive measures intended to reduce the incidence of these or
any other breaches of prison discipline."  Whitley v. Albers, 475 U.S. 312, 322 (1986).

efforts were made by third-parties and by Woodland himself to prevent the FCI-Allenwood employees from learning of the existence of any danger to Woodland. <u>See</u> Exhibit A, ¶ 7. Woodland did not report the occurrence of the initial altercation to prison officials, and affirmatively took steps to hide the fact that this altercation took place. During the second altercation, other inmates interfered with the staff's ability to learn of the danger to Woodland by blocking the view of the surveillance cameras and distracting the officer who was beginning the census count. <u>Id</u>. at ¶¶ 8-9. FCI-Allenwood employees could not protect Woodland from some harm about which they were unaware. Moreover, even if FCI-Allenwood employees knew of the altercation, their actions would be protected by the discretionary function exception. <u>See</u> <u>Calderon</u>, 123 F.3d at 949-50 (where inmate informed at least four members of prison staff that he had been threatened and staff took no steps to protect inmate or discipline inmate who threatened him, discretionary function exception applied when inmate was assaulted because 28 C.F.R. § 541 did not "set forth a mandatory, non-discretionary disciplinary action which the BOP was required to take."); <u>Miller v. United States</u>, 992 F.2d 1223(10th Cir. 1993)(where prison officials received anonymous note of impending fight between two groups of inmates, prison staff was increased, but plaintiff was seriously injured, court found that actions of prison officials in response to the potential fight were discretionary as a "prison's internal security is normally left to the discretion of prison officials.")(internal citations omitted)(unpublished opinion). Because the decisions made regarding the staffing and security at FCI-Allenwood clearly involved judgments grounded in policy, the second prong of the discretionary function analysis is satisfied.

      As both prongs of the discretionary function exception have been satisfied, Counts I and

24

II of the Third Amended Complaint must be dismissed for lack of subject matter jurisdiction.

See Fed. R. Civ. P. 12(b)(1); Baird v. United States, 653 F.2d 437, 439 (10th Cir. 1981)

(discretionary function exception is a matter of subject matter jurisdiction), cert denied, 454 U.S.

1444 (1982); Barrett, 845 F. Supp. at 780 n.4 (same); see also Cope, 45 F.3d at 448 (where

exception to FTCA waiver applies, the Court lacks subject matter jurisdiction.)

### E.  Claims Based Upon Actions of Employees at USMCFP-Springfield (Count III-Personal Injury Claim and Count IV-Wrongful Death Claim)

Rule 1042.3(a) of the Pennsylvania Rules of Civil Procedure provides that:

In an action based upon an allegation that a licensed professional deviated from an acceptable professional standard, the attorney for the plaintiff, or the plaintiff if not represented, shall file with the complaint or within sixty days after the filing of the complaint, a certificate of merit signed by the attorney or party that either

(1) an appropriate licensed professional has supplied a written statement that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm, or . . .

(2) the claim that the defendant deviated from an acceptable professional standard is based solely on allegations that other licensed professionals for whom this defendant is responsible deviated from an acceptable professional standard . . . .

Pa.R.C.P. No. 1042.3.

In this case, Plaintiffs have failed to file the required a certificate of merit with the First,

Second or Third Amended Complaints.[15/]  Moreover, they have failed to file the certificate of

---

[15/]The Third Circuit has stated that federal courts have recognized the applicability of "preconditions that states may impose of a plaintiff's right to sue in state court" to diversity actions.  Edeldson v. Soricelli, 610 F.2d 131, 135 (3rd Cir.1979).  Federal Courts must "treat diversity claims so as to discourage forum shopping and to reach results identical to the state courts . . . .") Id.

merit within sixty days of the filing of these complaints.  Specifically, well over sixty days have

passed since November 30, 2006, when Plaintiff filed its First Amended Complaint and noted

that it had filed administrative claims on November 29, 2006 regarding the alleged failure, by

Missouri Medical Center employees, to "provide adequate sustenance and care" to Woodland.

First Amended Complaint at ¶ 25   In that complaint, Plaintiff indicated that if the administrative

claims regarding medical care at USMCFP-Springfield were denied, they would be asserted in

this Court.  See First Amended Complaint at ¶ 25, 26; Exhibits F and G.

　　　　In addition, over sixty days have passed since June 27, 2007, when Plaintiff filed its

Second Amended Complaint and actually asserted the claims regarding claims of USMCFP-

Springfield's alleged "failure to provide adequate sustenance and care."  See Second Amended

Complaint, ¶¶ 55, 63.  Finally, more than sixty days have passed since the filing of the Third

Amended Complaint in which Plaintiffs again asserted the claims regarding the "failure to

provide adequate sustenance and care."  See Third Amended Complaint at ¶¶ 58, 66.  Therefore,

because Plaintiffs have failed to file the required certificate of merit with the complaint or within

sixty days after the filing of the complaint," Counts III and IV must be dismissed.

　　　　Moreover, under Pennsylvania law, when presenting an FTCA claim for negligence, "a

plaintiff must show that (1) a duty was owed to him by a defendant; (2) the duty was negligently

breached; and (3) the negligent breach of the duty was the proximate cause of the plaintiff's

injury."  See supra at 17 (citing Hoyte, 2007 WL 2768862 at * 4; Mahler, 196 F.Supp. at 364,

aff'd 306 F.2d at 713.  See Osorio v. U.S., 2007 WL 2008498, *1 (W.D. Pa. July 05, 2007)("The

FTCA . . . makes the United States liable for the torts of negligence or medical malpractice under

circumstances where Pennsylvania law would impose liability for those torts on a private

26

party.")(citing 28 U.S.C. § 1346(b)).  Pennsylvania law has determined that proximate cause is

causation which was a substantial factor in bringing about the injury.  <u>Simon v. Hudson Coal,</u>

Co., 350 A.2d 259 (Pa.Super. 1944); <u>see</u> <u>Frangis v. Duquesne Light Co.</u>, 335 A.2d 796 (Pa.

Super. 1975) ("The mere existence of negligence or the occurrence through injury . . . are

insufficient to impose liability upon [a] tort-feasor.").  Because Plaintiff has not established that a

duty to him was negligently breached, Counts III and IV of the Third Amended Complaint must

be dismissed.

With respect to Counts III and IV, Plaintiff Steven Sledge merely claims that from

approximately March 2005 through January 29, 2006, the employees at USMCFP-Springfield

"knew of should have known that Woodland was not receiving adequate sustenance and care."

Third Amended Complaint at ¶¶ 58, 66.  He asserts that they, therefore, breached their duty of

care to Woodland.  <u>Id</u>. at ¶¶ 57-58, 66.  This unsupported allegation is insufficient to establish

either that a duty to Woodland was negligently breached or that any alleged negligent breach of

the duty was the proximate cause of Woodland's injury as required by Pennsylvania law.

Therefore, Counts III and IV must be dismissed.

Assuming *arguendo* that Missouri rather than Pennsylvania law applies to the "Missouri"

personal injury and wrongful death claims in Counts III and IV, these counts still should be

dismissed.

Section 538.225.1 of the Missouri Revised Statutes provides that:

> In any action against a health care providers for damages for
> personal injury or death on account of the rendering of or failure to
> render your health care services, the plaintiff or his attorney shall
> file an affidavit with the court stating that he has obtained the
> written opinion of a legally qualified health care provider which

> states that the defendant health care provider failed to use such
> care as a reasonably prudent and careful health care provider
> would have under similar circumstances and that such failure to use
> such reasonable care directly caused or directly attributed to cause
> the damages claimed in the petition.

Mo. Rev. Stat. § 538.225.1.

The statute states that "[s]uch affidavit shall be filed no later than 90 days after the filing

of the petition unless the court, for good cause shown, orders that such time be extended."  Mo.

Rev. Stat. §538.225.4.  Further, "[i]f the plaintiff or his attorney fails to file such affidavit the

court may, upon motion of any party, dismiss the action against such moving party without

prejudice."  Mo. Rev. Stat. §538.225.5.[16]

In this case, Plaintiffs have failed to file such an affidavit.[17]  Well over ninety days have

passed since November 30, 2006, when Plaintiff filed its First Amended Complaint and noted

that it had filed administrative claims on November 29, 2006 regarding the alleged failure, by

Missouri Medical Center employees, to "provide adequate sustenance and care" to Woodland.

First Amended Complaint at ¶ 25   In that complaint, Plaintiff indicated that if the administrative

claims regarding medical care at USMCFP-Springfield were denied, they would be asserted in

---

[16]Missouri Revised Statutes 538.205(4) defines a "health care provider" as any
"physician, hospital, health maintenance organization, ambulatory surgical center, long-term care
facility . . . including those licensed under chapter 198 . . ., dentist, registered or licensed
practical nurse, optometrist, podiatrist, pharmacist, chiropractor, professional physical therapist,
psychologist, physician-in-training, and any other person or entity that provides health care
services under the authority of a license or certificate."

[17]The Missouri statute requiring that individual bringing medical malpractice action
submit an affidavit of heath care provider, pursuant to Mo. Rev. Stat. § 538.225.1, applies to
diversity actions.  Hill v. Morrison, 870 F.Supp. 978, 982-983 (W.D. Mo. 1994).  Failure to
apply statute would promote forum shopping and result in inequitable administration of the law.
Id. at 982.

this Court.  <u>See</u> First Amended Complaint at ¶ 25, 26; Exhibits F and G.

In addition, over ninety days have passed since June 27, 2007, when Plaintiff filed its Second Amended Complaint and actually asserted the claims regarding claims of USMCFP-Springfield's alleged "failure to provide adequate sustenance and care."  <u>See</u> Second Amended Complaint, ¶¶ 55, 63.  Finally, ninety days have passed since the filing of the Third Amended Complaint in which Plaintiffs again asserted the claims regarding the "failure to provide adequate sustenance and care."  <u>See</u> Third Amended Complaint at ¶¶ 58, 66.  Therefore, since Plaintiffs have failed to file the required affidavit "no later than 90 days after the filing of the petition," Counts III and IV must be dismissed.

Moreover, under Missouri law, the plaintiff has the burden of establishing his claim of medical negligence by showing that 1) the defendant failed to utilize that degree of skill and learning ordinarily used by like healthcare providers; and 2) the failure caused the alleged injuries to the plaintiff.  <u>See</u> <u>Boehm v. Pernoud</u>, 24 S.W.3d 759, 761 (Mo.App. 2000).  There is no presumption of negligence on the part of a physician arising from an adverse result.  Rather, the plaintiff has the burden to prove negligence.  <u>Hurlock v. Park Lane Med. Ctr., Inc.</u>, 709 S.W.2d 872, 883 (Mo.App.1985).

In the instant case, the plaintiff has failed to satisfy either prong of the test set forth in <u>Boehm</u>.  Counts III and IV allege that the USMCFP-Springfield employees "knew or should have known that Woodland was not receiving adequate sustenance and care" and that such failure led to his personal injury and death.  Third Amended Complaint at ¶¶ 57, 58, 66.  However, the complaint does not explain what steps USMCFP-Springfield employees failed to take or should have taken.  Moreover, the fact that Woodland died does not give rise to a presumption of

medical negligence.  Hurlock, 709 S.W.2d at 883.  As Boehm makes clear, the plaintiffs have an affirmative duty to "show" that employees at USMCFP-Springfield "failed to utilize that degree of skill and learning ordinarily used by like healthcare providers."  Boehm, 24 S.W.3d at 761. The allegations in the complaint do not satisfy this burden because Plaintiffs have not made the required showing, but have limited their allegations to conclusory accusations.

###     F.  Plaintiffs' Claims for Intentional Reckless or Negligent Infliction of Emotional Distress under Missouri Law - Counts V and VI

In Count V of the Third Amended Complaint, Plaintiff Steven Sledge claims that by not allowing Woodland's  mother to visit him, in November of 2005, the employees at USMCFP-Springfield "intentionally, recklessly, and/or negligently caused Woodland severe emotional distress . . . which . . . caused further deterioration to his physical health."  Third Amended Complaint at ¶ 75.  In Count VI, Plaintiff Diane Sledge claims that, in November 2005, the employees at USMCFP-Springfield "intentionally and/or recklessly caused [her] severe emotional distress[,]" in November 2005, by not allowing her to visit Woodland.  Id. at ¶ 83.

While Woodland was at USMCFP-Springfield, Plaintiff Steven Sledge, Plaintiff Diane Sledge and Woodland's sister, Teresa Sledge, sought and received approval for a bedside visit with Woodland on July 16 and 17, 2005.  See Exhibit J.  In the Third Amended Complaint, Plaintiffs "artfully" allege that Dianne Sledge was denied the opportunity to visit her son even though USMCFP-Springfield employees "knew that Dianne Sledge had previously received permission for the visit."  See Amended Complaint at ¶ 73.  However, this "previously received permission" was for the visit four months earlier, on July 16 and 17, 2005, for which Steven, Diane and Teresa Sledge never appeared.  See Exhibit J.

On November 12, 2005, at 8:46 a.m., Diane and Teresa Sledge arrived at USMCFP-Springfield unannounced, and requested a bedside visit with Woodland.  See Exhibit K.  Because Diane and Teresa Sledge did not pre-arrange for a bedside visit for November 12, 2005, the duty officer denied their request.[18/]  See Exhibit Y at ¶ 4.  No staff members were available to "provide constant and immediate visual supervision[,]" as required by policy.  Id.; see Exhibit L, Federal Bureau of Prisons, U.S. Medical Center for Federal Prisoners, Springfield, Missouri, Institutional Supplement, SPG-5267.07e, Section 14(c)(1)("Staff supervising bedside visits in hospital wards must provide constant and immediate visual supervision of inmates and their visitors to prevent security violations.").  Moreover, they did not receive the warden's approval for the visit.  Id., Section 14(c)(1)("Bedside visits must be prearranged by the inmate's unit team and approved by the Warden.").  However, the duty officer offered to arrange a visit during the next few days.  See Exhibit Y at ¶ 4.  While Plaintiff Steven Sledge claims that Woodland suffered intentional/negligent infliction of emotional distress, and Plaintiff Diane Sledge alleges that she suffered intentional and/or reckless infliction of emotional distress because the visit was refused, Plaintiffs did not accept the offer, and did not return to USMCFP-Springfield for a visit they seem to indicate they desperately wanted.  Given the actions of Plaintiffs, these infliction of emotional distress claims in Counts V and VI should be dismissed.

These claims of negligent, intentional and/or reckless infliction of emotional distress involve separate actions that are based on alleged conduct that took place solely in Missouri.

---

[18/]Clearly, Plaintiffs were aware that prior approval for visitation was necessary because they sought and received such approval in July 2005.  See Exhibit J.  Even if Plaintiffs did have prior approval for the November 12, 2005 visit, denial of that visit would be within the discretion of USMCFP-Springfield employees. See infra at 35-39.

Under the choice of law analysis, the law to be applied is the law in which the alleged injury occurred. Therefore, this Court must apply the law of Missouri.

Under Missouri law, in order to prove intentional or reckless infliction of emotional distress, plaintiff must establish that: 1) the defendants' conduct was extreme and outrageous; 2) the conduct was intentional or done recklessly; and 3) the conduct caused severe emotional distress that results in bodily harm. Thornburg v. Fed. Express Corp., 62 S.W.3d 421, 427 (Mo.App. W.D. 2001). In order to prove negligent infliction of emotional distress, plaintiff must prove that: 1) the defendant should have realized that his conduct involved an unreasonable risk of causing distress; and 2) the emotional distress or mental injury must be medically diagnosable and must be of sufficient severity so as to be medically significant. Id. The defendant's conduct must be more than simply malicious or intentional; the conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. (citing Gibson v. Brewer, 952 S.W.2d 239, 249 (Mo. Banc. 1997)). With respect to both counts, Plaintiffs have failed to prove intentional or reckless infliction of emotional distress.

Plaintiffs have failed to establish intentional or reckless infliction of emotional distress. In light of the fact that Plaintiffs had not followed known procedures and arranged in advance for the visit with Woodland, on November 12, 2005, it cannot be said that the conduct of the USMCFP-Springfield employees was extreme and outrageous or reckless. Moreover, the duty officer attempted to accommodate Plaintiffs, but they refused the subsequent visit. See Exhibit Y at ¶ 4. In addition, besides the unsupported allegations made in the complaint, Plaintiffs have failed to establish that the actions of the USMCFP-Springfield employees caused severe

32

emotional distress that resulted in bodily harm to either Woodland or Diane Sledge.[19/]  See

Thornburg, 62 S.W.3d at 427.  While Woodland and Plaintiff Diane Sledge might have wanted

to visit with each other, and may have been disappointed when they were not allowed to do so,

not every wrong constitutes a legally cognizable cause of action.  See Prosser on Torts, 4th ed. §

1 (1971)(Not every loss constitutes a legal injury for which compensation is available.).

 Plaintiffs also have failed to establish negligent infliction of emotional distress.

There is no reason to believe that the denial of the visit on November 12, 2005 involved an

unreasonable risk of causing distress, particularly in light of the fact that Plaintiffs were approved

to visit Woodland in July, but never appeared.  See Exhibit J.  However, even if USMCFP-

Springfield employees should have known that their conduct involved an unreasonable risk of

causing distress, the employees offered the Plaintiff Diane Sledge the opportunity to visit

Woodland, an opportunity which she refused.  See Exhibit Y at ¶ 4.  Moreover, besides

Plaintiff's unsupported allegations, there is no indication that the alleged emotional distress was

"medically diagnosable and of sufficient severity so as to be medically significant."  Thornburg,

62 S.W.3d at 427.  In light of Plaintiffs' failure to meet the statutory requirements, failure to meet

the requirements of the prison, and refusal of a visit to be arranged as promptly as reasonably

practicable, it cannot be said that the conduct of the USMCFP-Springfield employees was "so

outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Id.

Therefore, Plaintiffs' claims of infliction of intentional, reckless or negligent infliction of

---

 [19/] Indeed, the Third Amended Complaint does not even allege that Plaintiff Diane Sledge suffered any physical injury.  See Third Amended Complaint at ¶ 83 ("Missouri Medical Center Employees . . . caused Diane Sledge severe *emotional* distress")(emphasis added).

emotional distress in Counts V and VI should be dismissed.

### G. Even if the Claims in Counts V and VI, for Intentional/Negligent Infliction of Emotion Distress Do Not Fail, They Are Barred By the Discretionary Function Exception to the Federal Tort Claims Act.

As indicated above, the FTCA does not apply to acts or omissions by government employees that are "discretionary functions." 28 U.S.C.2680(a). Accordingly, if approving or denying visitation privileges is within the discretion of employees at USMCFP-Springfield, such denial cannot be the basis of a claim under the FTCA. Specifically, if officials at USMCFP-Springfield had discretion to approve or deny Plaintiffs' request to visit Woodland on November 12, 2005, a date for which they did not have prior approval for a visit, the denial of that request cannot form the basis for a claim for infliction of severe emotional distress under the FTCA, and these claims must be dismissed.

As previously indicated, the Supreme Court has developed a two prong test to determine whether a government employee's conduct is protected under the discretionary function exception. See supra at 19; Gaubert, 499 U.S. at 315; Berkovitz, 486 U.S. 531. A court must determine 1) whether the federal agency or employees had a choice in making the decision or taking the challenged action; and 2) whether the choice involved social, economic and/or political policy considerations. Berkovitz, 486 U.S. at 536.

### 1. USMC-Springfield Employees' Actions Were the Product of Judgment or Choice.

Plaintiffs allege that Missouri Medical Center Employees breached their duty of care by denying Woodland and his mother, Diane Sledge, a visit. Third Amended Complaint at ¶¶ 73, 81. In making this claim, Plaintiffs challenge the visitation policy of the medical center.

34

Under the first prong of the discretionary function analysis, the Court must determine if there were federal statutes, regulations or procedures in place that required BOP employees to follow a particular course of action in determining whether a non-scheduled visitation could take place at its facility. If no mandate exists, the governmental action is considered the product of judgment or choice, and is thus discretionary.

Pursuant to Title 18, United States Code, Section 4042 (a)(2)-(3), the Bureau of Prisons, shall -

> (2) provide suitable quarters and provide for the safekeeping, care and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

> (3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States . . . .

18 U.S.C. § 4042(a)(2) and (a)(3). This section has been interpreted as requiring the BOP to exercise "ordinary diligence." Cowart, 617 F.2d at 116, cert. denied, 449 U.S. at 903; Herrington, 1984 WL 1279, at * 1 (under 18 U.S.C. § 4042, government owes prisoners a duty of "ordinary care.").

However, while 18 U.S.C. § 4042 generally delegates responsibility for inmates to the BOP, "[t]he statute sets forth no particular conduct the BOP personnel should engage in or avoid while attempting to fulfill their dut[ies] . . .." Calderon, 123 F.3d at 947. Instead, prison officials are given considerable discretion on how best to use their limited resources to fulfill this responsibility. The absence of specific guidelines of appropriate conduct by BOP employees in administering these duties, therefore, leaves judgment or choice to the employees. Buford, 1999 WL 319078 at * 4, n.2 (where method, extent, and thoroughness of procedures used to protect

35

prisoners were left unspecified, there was an element of discretion in how guards could satisfy 18

U.S.C. § 4042).

Title 28, Code of Federal Register, Section 540.40 provides general guidance to

employees of correctional institutions in fulfilling their duties regarding visitation. Specifically,

Section 540.40 states:

> The Bureau of Prisons encourages visiting by family, friends, and community
> groups to maintain the morale of the inmate and to develop closer relationships
> between the inmate and family members or others in the community. The Warden
> shall develop procedures consistent with this rule to permit inmate visiting. The
> Warden may restrict inmate visiting when necessary to ensure the security and
> good order of the institution.

Hence, it is clear that there is no mandate as to specifically how staff duties are to be fulfilled

regarding visitation. However, the warden at each institution may develop procedures for staff to

follow. See Kelly v. Brewer, 525 F.2d 394, 399 (8th Cir. 1975)("We leave the formulation of

specific regulations and methods of visitation to the informed discretion of correctional officials,

recognizing that "it is not the function of the federal courts to embroil themselves unduly in

matters of prison administration ... or of prison security."); Lester v. Owens, 1985 WL 25970, at

*2 (E.D. Pa. Nov. 26, 1985)(visitation privileges are a matter of discretion of prison officials.)

The procedures established for USMCFP-Springfield reinforce the discretionary nature of

visitation privileges. Accordingly, USMCFP-Springfield's visiting regulations indicate that

visits will generally be denied where the visitors do not have prior approval for their visit. See

Exhibit, L, Section 7(a) ("It should be the exception rather than the rule that a prospective visitor

is permitted entrance to the visiting room without being on an inmate's approved visiting list

prior to their arrival at the institution."). "[V]isiting times have been established to ensure

institutional programs are not hampered or interfered with." Id., Section 6.  Moreover, Institution

Bedside Visits "must be prearranged by the inmates unit team and approved by [the] Warden."

Id., Section 14 and Attachments 4, 5.  All visiting arrangements must be consistent with "the

security and good order of the institution . . . ." Id., Section 7.  Because it is clear that no federal

statutes, regulations or procedures exist which required USMCFP-Springfield employees to

follow a specific course of action regarding visitation, the first prong of the discretionary

function analysis is satisfied.

## 2.  The Practices at USMC-Springfield are Grounded in Policy.

Under the second prong of the discretionary function analysis, the court must determine

whether the BOP's management decisions regarding visitation were grounded in social,

economic or political policy.  See Gaubert, 499 U.S. at 323.  A governmental agency's exercise

of discretion is often required in balancing considerations of public policy and the best allocation

of limited agency resources.  It is well settled that institutional security is a primary penological

interest, Bell v. Wolfish, 441 U.S. 520, 547-548 (1979), and prison administrators are granted

wide discretion in establishing rules and regulations to maximize the security interests of their

institution.  Procunier v. Martinez, 416 U.S. 396, 404-405 (1974); Pell v. Procunier, 417 U.S.

817, 827 (1974). Included in this area of institutional security expertise best left to the discretion

of prison officials is the establishment of prison policies and procedures governing prison

visitations.  Newman v. State of Alabama, 559 F.2d 283, 291 (5th Cir.1977), cert. denied, 438

U.S. 915 (1978).

> [O]ne of the primary aims of penal security is to insure that persons coming from
> without the prison-whether they are visitors, employees, or volunteers-do not
> bring contraband in the form of drugs, weapons, currency or other unauthorized

items into the prison.

Id.  Accordingly, "[i]nmates do not have an absolute right to visitation, such privileges being

subject to the prison authorities' discretion provided that the visitation policies meet legitimate

penological objectives."  Caraballo-Sandoval v. Honsted, 35 F.3d 521, 525 (11th Cir. 1994).[20]

Clearly, then, the decisions made regarding visitation at USMC-Springfield, and the timing of

that visitation, involved judgments grounded in policy.  Dalehite, 346 U.S. at 36 ("Where there is

room for policy judgment and decision, there is discretion.").  See Barrett, 845 F. Supp. at 782

("prison regulations and the statutes with which they conform are grounded in social, political,

and economic policy and, thus, decisions made in accordance with these regulations are protected

by the discretionary function exception.").  Hence, the second prong of the discretionary function

analysis is satisfied.

       As both prongs of the discretionary function exception have been satisfied, Counts V and

VI must be dismissed for lack of subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1); Baird,

653 F.2d at 439 (discretionary function exception is a matter of subject matter jurisdiction), cert

denied, 454 U.S. at 1444; Barrett, 845 F. Supp. at 780 n.4 (same); see also Cope, 45 F.3d at 448

(where exception to FTCA waiver applies, the Court lacks subject matter jurisdiction.)

**H.  Plaintiff's Amended Complaint Should be Transferred From the District of
Columbia**

       In the event this Court does not dismiss Plaintiffs' FTCA claims, this matter should be

--------

[20] The Third Circuit has held that "[t]he manner in which visitation privileges are granted
is a matter generally subject to the discretion of prison officials.  Inmates v. Robinson, 612 F.2d
754 (3d Cir. 1979).  The Eight Circuit also has held that a decision to curtail visitation privileges
is discretionary.  See Ware v. Morrison, 276 F.3d 385, 387-388 (8th Cir. 2002) (citing Caraballo-
Sandoval v. Honsted, 35 F.3d at 525).  See Neumeyer v. Beard, 301 F.Supp.2d 349 (M.D. Pa.
2004)(prison officials have the discretion to curtail or deny visitation if they deem appropriate.)

transferred to United States District Court for the Middle District of Pennsylvania or the Western

District of Missouri.  Pursuant to 28 U.S.C. § 1402(b), venue for any FTCA claim lies in the

judicial district where the plaintiff resides or where the cause of action arose.  See Bryant v.

Carlson, 652 F. Supp. 1286, 1287 (D.D.C. 1987); Bartel v. Fed. Aviation Admin., 617 F. Supp.

190, 198 (D.D.C. 1985).  According to the Third Amended Complaint, Plaintiff Steven Sledge is

the duly-appointed personal representative of the estate of inmate Rico Woodland and resides in

the District of Columbia.  See Third Amended Complaint at ¶ 3.  Based upon the residency of

Steven Sledge, venue in the United States District Court for the District of Columbia is proper.

However, Title 28, United States Code, Section 1404(a) provides that:

> For the convenience of parties and witnesses, in the interest of justice, a district
> court may transfer any civil action to any other district or division where it might
> have been brought.

"The purpose of the transfer provision is 'to prevent the waste of time, energy and money' and

'to protect litigants, witnesses and the public against unnecessary inconvenience and expense....'"

Ross v. United States, No. 86-0857, 1987 WL 33514, at *5 (D.D.C. December 30, 1987) (citing

Van Dusen v. Barrack, 376 U.S. 612, 617 (1964) (additional citations omitted)).  "There are no

fixed rules for determining when a case should be transferred.  Instead the proper approach is a

case-by-case evaluation of the statute's requirements in light of the relevant facts."  Id. (citing

Van Dusen, 376 U.S. at 622; SEC v. Savoy Indus., Inc., 587 F.2d 1149, 1154 (D.C. Cir. 1978),

aff'd, 587 F.2d 1149 (1981); Starnes v. McGuire, 512 F.2d 918, 929 (D.C. Cir. 1974)(en banc).

The threshold determination in considering a transfer motion is whether the case might

have been brought in the place where the movant seeks it to be transferred.  Ross, 1987 WL

33514, at *2.  Here, Plaintiffs have brought "Pennsylvania wrongful death" and "Pennsylvania

personal injury" claims.  See Third Amended Complaint at pp. 8-9.  The assault that took place

and caused Woodland's injuries occurred in Allenwood, Pennsylvania.  In addition, according to

the choice of law provisions, Pennsylvania law should be applied to the actions in this complaint.

Therefore, this case could have been brought in the Middle District of Pennsylvania.  Because

four of Plaintiffs's claims arise out of the U.S. Medical Center in Springfield, Missouri, the case

also could have been brought in the Western  District of Missouri.  See Third Amended

Complaint at pp. 11-15; Beattie v. United States, 592 F.Supp. 780, 784 (D.D.C. 1984), aff'd, 756

F.2d 91 (D.C. Cir. 1984).

Clearly, none of the injuries Woodland or the plaintiffs allegedly sustained occurred in

[the D]istrict of Columbia.  Indeed, not a single factual allegation in this complaint concerns

events which occurred in the District of Columbia.  See Zakiya v. United States, 267 F. Supp.2d

47, 59 (D.D.C. 2003) (venue improper in the District of Columbia where "none of the operative

events that constitute the gravamen of plaintiff's claims took place in the District of Columbia.")

"Although the plaintiffs' choice of forum must be given deference, this deference is 'greatly

diminished when the activities have little, if any connection with the chosen forum.'"  Zayika,

267 F. Supp.2d at 59 (citing Armco Steel co. v. CSX Corp., 790 F.Supp. 311, 323 (D.D.C. 1991).

 Moreover, FTCA actions are governed by the law of "the place where the act or omission

[complained of] occurred."  28 U.S.C. § 2672.  Therefore, decisions in this case will not be

governed by the law of the District of Columbia.  Certainly a court in the Middle District of

Pennsylvania or Western District of Missouri would be most familiar with the application of its

laws.  See Ross, 1987 WL 33514, at * 4 (on a motion to transfer, a court considers the familiarity

of a federal district court with the law of the state in which it sits.)

Therefore, if any of Plaintiffs' claims survive this motion, this case should be transferred to the Middle District of Pennsylvania or the Western District of Missouri. A transfer of this case will "prevent the waste of time, energy and money and will protect the great majority of witnesses, the public, and the government . . . against unnecessary inconvenience." See id., 1987 WL 33514, at *5.

## IV.  **CONCLUSION**

Accordingly, for the reasons set forth above, Defendant respectfully requests that the

Court dismiss this action, or in the alternative, grant Defendant's motion to transfer.

Respectfully submitted,


_/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_/s/_____
MARIAN L. BORUM, D.C. BAR # 435409
Assistant United States Attorney
555 Fourth Street, N.W.
Civil Division
Washington, D.C.  20530
(202) 514-6531
Attorneys for Defendant

## CERTIFICATE OF SERVICE

I certify that, on this 6th day of December, 2007, the foregoing, and the attached Orders,

were served upon counsel for Plaintiffs via the Court's Electronic Filing System and mailed

postage prepaid to:

   Thomas F. Connell
   Demian S. Ahn
   Wilmer Cutler Pickering
    Hale and Dorr, LLP
   1875 Pennsylvania Avenue, N.W.
   Washington, D.C.  20006

    /s/
    MARIAN L. BORUM
    Assistant United States Attorney

43

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **STEVEN D. SLEDGE, et al.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-0742 (PLF)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**ORDER**

This matter is before the Court on defendant's Motion to Dismiss Third Amended

Complaint or, in the Alternative, to Transfer.  Upon consideration of this Motion and the entire

record of this case, it is this _____ day of _____, 2008,

**ORDERED** that Defendant's Motion to Transfer should be and hereby is GRANTED.


_____
UNITED STATES DISTRICT JUDGE

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **STEVEN D. SLEDGE, et al.** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 06-0742 (PLF)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>ORDER</u>

This matter is before the Court on defendant's Motion to Dismiss Amended Complaint

or, in the Alternative, to Transfer.  Upon consideration of this Motion and the entire record of

this case, it is this _____ day of _____, 2008,

**ORDERED** that Defendant Motion to Dismiss should be and hereby is GRANTED;

and it is further

**ORDERED** that this case should be and hereby is DISMISSED with prejudice from the

Court's docket.

_____
UNITED STATES DISTRICT JUDGE

Copies to:

      Marian L. Borum
      Assistant United States Attorney
      555 Fourth Street, N.W.
      Civil Division
      Washington, DC  20530

      Thomas F. Connell
      Demian S. Ahn
      Wilmer Cutler Pickering
       Hale and Dorr, LLP
      1875 Pennsylvania Avenue, N.W.
      Washington, D.C.  20006