# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| _____ | ) |  |
| STEVEN D. SLEDGE, In His Capacity | ) |  |
| As Personal Representative Of The | ) |  |
| Estate Of RICO WOODLAND, | ) |  |
| Deceased; And DIANNE D. SLEDGE, | ) |  |
|  | ) |  |
| Plaintiffs, | ) | Case No. 1:06-CV-00742-PLF |
| v. | ) |  |
|  | ) |  |
| UNITED STATES OF AMERICA, | ) | ORAL ARGUMENT REQUESTED |
|  | ) |  |
| Defendant. | ) |  |
| _____ | ) |  |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S RULE 12(b)(1) MOTION TO DISMISS OR IN THE ALTERNATIVE, TO TRANSFER

Thomas F. Connell, DC Bar 289579
Demian S. Ahn, DC Bar 491109
Wilmer Cutler Pickering Hale and
Dorr LLP
Attorneys for Plaintiffs
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone (202) 663-6000
Fax (202) 663 6363

January 22, 2008

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 4

    A.   The October 15, 2002, Assault In Woodland's Cell At FCI-Allenwood ...................... 4
    B.   Woodland's Initial Recovery At FMC-Fort Worth ......................................................... 4
    C.   Woodland's Sudden Decline And Untimely Death at USMCFP-Springfield ............... 5
    D.   Administrative Exhaustion Of Plaintiffs' Claims .......................................................... 6
    E.   The Defendant's Proffered "Evidence" ........................................................................ 7
        1.   The Lyons Declaration ........................................................................................ 7
        2.   The Rinker Declaration ....................................................................................... 9

ARGUMENT ........................................................................................................................ 10

I.    Defendant's Motion To Dismiss Should Be Denied As A Premature Attempt
       To Resolve The Merits Of The Dispute Before Any Discovery Has Occurred ............... 11

    A.   The Standard Of Review Under Rule 12(b)(1) ............................................................. 11
    B.   Defendant's Facial Challenges Are Not Proper Under Rule 12(b)(1) .......................... 12
    C.   Plaintiffs Cannot Be Required To Prove The Merits Before Trial ............................... 13

II.   The Discretionary Function Exception To The FTCA Does Not Bar Any Of
       Plaintiffs' Claims .............................................................................................................. 16

    A.   The Legal Framework Governing The Discretionary Function Exception ................... 17
        1.   The FTCA And The Discretionary Function Analysis ..................................... 17
        2.   The First Step: Whether The "Acting Employee" Had Discretion .................. 18
        3.   The Second Step: Decisions "Fraught With Public Policy
            Considerations" ................................................................................................... 19
    B.   The Discretionary Function Exception Does Not Bar Counts I and II ......................... 20
        1.   Plaintiffs' Allegations Are Based On Garden-Variety Negligence By
            Individuals Breaching Their Mandatory Duties As Prison Employees ............ 20
        2.   Policies And Directives Limiting Employee Discretion At FCI-
            Allenwood ........................................................................................................... 22
        3.   The Alleged Negligence Underlying Counts I And II Did Not Involve
            Decisions "Fraught With Public Policy Considerations" ................................. 24
    C.   The Discretionary Function Exception Does Not Bar Counts V And VI .................... 25
        1.   Counts V and VI Are Directed To USMCFP-Springfield Employees
            Arbitrarily Denying Visitation, Despite Prior Approval ................................... 26
        2.   USMCFP-Springfield Employees Had No Discretion To Arbitrarily
            Deny A Visit That Had Previously Been Approved ......................................... 26

III.  Steven And Dianne Sledge Are Proper Plaintiffs To Maintain Their Claims
       Under The Governing State Law ..................................................................................... 28

    A.   Missouri Law Governs Plaintiffs' Claims Based On Negligence In Missouri ............ 28
        1.   Missouri Choice Of Law Rules Govern Counts III and IV ............................. 28

2.   The Missouri Choice Of Law Rules: Missouri Substantive Law Governs............... 30

3.   The Pennsylvania Choice Of Law Rules: Missouri Substantive Law
     Governs ............................................................................................................. 30

B.   Rule 2202 Specifically Permits The Decedent's Mother To File A Claim ................. 33

IV.  Counts III And IV Are Not Barred By State Procedural Statutes That
     Defendant Itself Has Defeated ...........................................................................................34

A.   The State Certification Statutes Cited By Defendant Conflict With The
     Federal Rules Of Civil Procedure And Cannot Apply To FTCA Litigation ............... 35

1.   The Certification Statutes Conflict With Federal Law ............................................. 35

2.   Concerns About Forum Shopping Do Not Apply To FTCA Actions ...................... 37

3.   The Certification Statutes Would Result In "Inequitable Administration" ............. 37

B.   State Certification Statutes Cannot Apply When The Defendant Fails To
     Promptly Produce Requested Medical Records........................................................... 39

C.   Counts III And IV Are Not Limited To Medical Malpractice Claims ........................ 40

V.   Defendant's Request For Transfer Should Be Denied.......................................................41

**CONCLUSION** ...................................................................................................................... **45**

# TABLE OF AUTHORITIES

## CASES

*Aster v. Shoreline Behavioral Health*, 788 A.2d 821 (N.J. Super. A.D. 2002) ...........................40

*Austin v. International Bhd. Of Teamsters-Airline Div. 2747*, 739 F. Supp. 206 (S.D.N.Y. 1990) ...................................................................................................................................44

*Baird v. Celis*, 41 F. Supp. 2d 1358 (N.D. Ga. 1999) ...................................................................36

*Barrett v. United States*, 845 F. Supp. 774 (D. Kan. 1994) ...........................................21, 23, 25

*Baumgart v. Keene Bldg. Prods. Corp.,* 633 A.2d 1189 (Pa. Super. Ct. 1993)............................32

*Beals v. Sicpa Securink Corp.*, 1994 WL 236081 (D.D.C. 1994) ................................................45

*Berkovitz v. United States*, 486 U.S. 531 (1988) .............................................................17, 18, 19

*Boehm v. Pernoud*, 24 S.W.3d 759 (Mo. App. Ct. 2000) ..............................................................13

*Braddock v. Orlando Regional Health Care Sys., Inc.*, 881 F. Supp. 580 (M.D. Fla. 1995) ........36

*Brooks v. United States*, 337 U.S. 49 (1949) ...............................................................................29

*Buford v. United States*, 1999 WL 319078 (D. Kan. 1999)...........................................................23

*Burlington Northern Railroad Co. v. Woods*, 480 U.S. 1 (1987) ...........................................35, 36

*Campbell v. United States*, 167 F. Supp. 2d 440 (D. Mass. 2001) ...............................................19

*Collier v. Murphy*, 2002 WL 31761406 (N.D.Ill. 2002)................................................................44

*Collins v. Missouri Elec. Coop. Employee Credit Union*, 2005 WL 1702687 (E.D. Mo. 2005) ...................................................................................................................................44

*Cope v. United States*, 45 F.3d 445 (D.C. Cir. 1995) .................................................17, 19, 20, 25

*Coulthurst v. United States*, 214 F.3d 106 (2d Cir. 2001) .......................................................24, 25

*Edelson v. Soricelli*, 610 F.2d 131 (3d Cir. 1979) .......................................................................37

*Garcia v. United States*, 896 F. Supp. 467 (E.D. Pa. 1995)....................................................18, 27

*Garza v. United States*, 161 Fed. Appx. 341 (5th Cir. 2005)........................................17, 19, 21, 23

*Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415 (1996) ............................................35

*Gemological Institute of America, Inc. v. Thi-Dai Phan*, 145 F. Supp. 2d 68 (D.D.C. 2001) ......................................................................................................................................42

*Hager v. Etting*, 408 A.2d 856 (Pa. Super. Ct. 1979) ...........................................................32

*Hammersmith v. TIG Ins. Co.*, 480 F.3d 220 (3d Cir. 2007) .............................................31

*Hanna v. Plummer*, 380 U.S. 460 (1965) ...........................................................................37

*Herbert v. National Academy of Sciences*, 974 F.2d 192 (D.C. Cir. 1992) ...............11, 12, 14, 28

*Hervey v. United States*, 450 F. Supp. 1148 (E.D. Wis. 1978) ...........................................44

*Hill v. Morrison*, 870 F. Supp. 978 (W.D. Mo. 1994) ....................................................36, 37

*Hitchcock v. United States*, 665 F.2d 354 (D.C. Cir. 1981) ...........................................28, 29

*Hurlock v. Park Lane Medical Center, Inc.*, 709 S.W.2d 872 (Mo. App. Ct. 1985) ...................13

*Ignatiev v. United States*, 238 F.3d 464 (D.C. Cir. 2001) ...............2, 11, 13, 14, 16, 19, 22, 23, 25, 28

*In re Glacier Bay*, 71 F.3d 1447 (9th Cir. 1996) .....................................................18, 19

*In re Vitamins Antitrust Litigation*, 263 F. Supp. 2d 67 (D.D.C. 2003) ...................................42, 43

*International Painters and Allied Trades Industry Pension Fund v. Tri-State Interiors, Inc.*, 357 F. Supp. 2d 54 (D.D.C. 2004) ......................................................................................42

*Jacocks v. United States*, 2006 WL 2850639 (W.D. Va. 2006) .......................................23

*Jerome Stevens Pharmaceuticals, Inc. v. FDA.*, 402 F.3d 1249 (D.C. Cir. 2005) ...............12, 27

*Knochel v. United States*, 49 F. Supp. 2d 1155 (D. Ariz. 1998) .......................................19

*Leighton v. Central Intelligence Agency*, 2007 WL 1109273 (D.D.C. 2007) ...................12, 14

*Levin by Levin v. Desert Palace, Inc.*, 465 A.2d 1019 (Pa. Super. Ct. 1983) ......................32

*Loughlin v. United States.*, 230 F. Supp. 2d 26 (D.D.C. 2002) ......................................13, 14, 15

*Loughlin v. United States*, 393 F.3d 155 (D.C. Cir. 2004) .......................................2, 11, 15, 16, 28

*Machado v. Kunkel*, 804 A.2d 1238 (Pa. Super. 2002) ...............................................34

*Mahoney v. Doerhoff Surgical Services, Inc.*, 807 S.W.2d 503 (Mo. 1991) ...............................38

*Mike v. Lian*, 185 A. 775 (Pa. 1936), *overruled on other grounds in Griffith v. United Airlines*, 203 A.2d 796 (Pa. 1964) ...........................................................................33

*Moore v. United States*, 213 F.3d 705 (D.C. Cir. 2000) .............................................18

*Moore v. Valder*, 65 F.3d 189 (D.C. Cir. 1996).........................................................27

*Morrison v. St. Luke's Health Corp.*, 929 S.W.2d 898 (Mo. Ct. App. 1996) ...............................41

*National Wildlife Federation v. Harvey*, 437 F. Supp. 2d 42 (D.D.C. 2006) ...............................42

*Newell v. Ruiz*, 286 F.3d 166 (3d Cir. 2002)...........................................................40

*Nichols v. U.S. Bureau of Prisons*, 895 F. Supp. 6 (D.D.C. 1995)................................44

*Pain v. United Technologies Corp.*, 637 F.2d 775 (D.C. Cir. 1980) .........................................42

*Palay v. United States*, 349 F.3d 418 (7th Cir. 2003) ...................................16, 21, 24, 25

*Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36 (D.C. Cir. 2000)............................12

*Poindexter v. Bonsukan*, 145 F. Supp. 2d 800 (E.D. Tex. 2001)............................................35, 36

*Prakash v. American University*, 727 F.2d 1174, 1179-1180 (D.C. Cir. 1984) ...........................12

*Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002)....................11

*Race Safe Systems, Inc. v. Indy Racing League*, 251 F. Supp. 2d 1106 (N.D.N.Y. 2003) ............44

*Raflo v. United States*, 157 F. Supp. 2d 1 (D.D.C. 2001) ............................................30

*Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187 (D.C. Cir. 1986)........18, 27

*Richards v. United States*, 369 U.S. 1 (1962) ............................................................29

*Ross v. United States*, 1987 WL 33514 (D.D.C. 1987) ................................................42

*Sauceda v. Pfizer, Inc.*, 2007 WL 87660 (S.D. Tex. 2007) ........................................35

*Scheerer v. Hardee's Food Systems, Inc.*, 92 F.3d 702 (8th Cir. 1996)....................................30

*Serocki v. Meritcare Health Sys.*, 312 F. Supp. 2d 1201 (D.S.D. 2004) ...............................35, 36

*Shipp v. McMahon*, 234 F.3d 907 (5th Cir. 2000) ........................................................................27

*Simon v. United States*, 341 F.3d 193 (3d Cir. 2003) ................................................................30

*Smith v. Planned Parenthood of the St. Louis Region*, 225 F.R.D. 233 (E.D. Mo. 2004).............36

*Smith v. United States*, 518 F. Supp. 2d 139 (D.D.C. 2007)........................................11, 12, 14, 21

*State ex rel. Dean v. Cunningham*, 182 S.W.3d 561 (Mo. 2006) ..................................................13

*State ex. rel. McNary v. Hais*, 670 S.W.2d 494 (Mo. 1984) ........................................................39

*Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22 (1988)...................................................37

*Stewart v. Capitol Area Permanent Medical Group, P.C.*, 720 F. Supp. 3 (D.D.C. 1989) .........45

*Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875 (8th Cir. 2006) ..........................................30

*Triestman v. Federal Bureau of Prisons*, 470 F.3d 471 (2d Cir. 2006).................17, 20, 21, 24, 25

*Troxel v. A.I. DuPont Institute*, 636 A.2d 1179 (Pa. Super. Ct. 1994) ..........................................32

*Tsarparikos v. Ford Motor Corp.*, 2002 WL 31844949 (N.D. Ill. 2002).....................................44

*United States v. Gaubert*, 499 U.S. 315 (1991) ................................................................17, 18, 19, 24

*United States v. Muniz*, 374 U.S. 150 (1963)................................................................................41

*United States Fidelity & Guaranty Co. v. United States*, 837 F.2d 116 (3d Cir. 1988) ...............19

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) ................................................................27

*Vine v. Republic of Iraq*, 459 F. Supp. 2d 10 (D.D.C. 2006).......................................................15

*Wojiski v. Gordon*, 1990 WL 39153 (E.D. Pa. 1990) ...................................................................32

*Womer v. Hilliker*, 908 A.2d 269 (Pa. 2006) ...............................................................................38

*Zakiya v. United States*, 267 F. Supp.2d 47 (D.D.C. 2003)..........................................................45

## STATUTES

28 C.F.R. § 14 .............................................................................................................................6, 7

28 C.F.R. § 543 ...........................................................................................................................6, 7

1 Pa. C.S.A. § 1922 .......................................................................................................39

42 Pa. C.S.A. § 8301(b) ...............................................................................................34

42 Pa. C.S.A. § 6155(b)(1) ..........................................................................................38

18 U.S.C. § 4042 ............................................................................................22, 40, 41

28 U.S.C. § 1346(b) ........................................................................10, 17, 28, 37

28 U.S.C. § 1404(a) .....................................................................................................41

28 U.S.C. § 2072 ..........................................................................................................35

28 U.S.C. § 2675 ......................................................................................................6, 7

28 U.S.C. § 2680(a) .....................................................................................................16

Fed. R. Civ. P. 8 ..............................................................................2, 13, 22, 29

Fed. R. Civ. P. 12(b) ..................................1, 2, 11, 12, 14, 15, 16, 20, 21, 22

Fed. R. Civ. P. 16(b) ...................................................................................................36

Fed. R. Civ. P. 37 .........................................................................................................36

Fed. R. Civ. P. 26(a)(2)(C) .........................................................................................36

Mo. Rev. Stat. § 191.227 ............................................................................................38

Mo. Rev. Stat. § 537.090 ............................................................................................32

Mo. Rev. Stat. § 538.225 ..........................................................34, 35, 36, 40, 41

Pa. R. Civ. P. 1042.3 ..................................................................34, 35, 36, 40, 41

Pa. R. Civ. P. 2202 .................................................................................................33, 34

## MISCELLANEOUS

Restatement (Second) of Conflict of Laws (1971) ......................................................30

Wright, Miller & Cooper, 15 Federal Practice & Procedure § 3849 (2007) ...............................44

## PRELIMINARY STATEMENT

This is a personal injury and wrongful death action brought under the Federal Tort Claims Act ("FTCA") by the mother and brother of the late Rico Woodland ("Woodland"), a federal inmate who died in federal custody.  As described in the Third Amended Complaint ("TAC"), Woodland was viciously assaulted by other inmates while in federal custody in Pennsylvania in 2002; was denied adequate sustenance and medical care by Federal Bureau of Prisons ("BOP") employees in Missouri beginning in 2005; and was even denied a final visit with his mother shortly before he died on January 29, 2006, at age 34.

Three months after Woodland's death, his brother Steven Sledge, the personal representative of Woodland's estate, filed a handwritten *pro se* complaint in this Court, moved to proceed *in forma pauperis*, and moved for appointed counsel.  This Court granted those motions and appointed the undersigned as Mr. Sledge's counsel on July 10, 2006.  Both before and after the filing of the *pro se* complaint, plaintiffs have diligently pursued their claims, requesting documents from the Government, exhausting all their administrative remedies, and then filing their claims in this action.  Defendant has now moved to dismiss the TAC in its entirety, citing Fed. R. Civ. P. 12(b)(1) and arguing that this Court lacks subject matter jurisdiction.

Defendant's motion is fundamentally flawed in nearly every respect.  After withholding from plaintiffs every single documentary record relating to Woodland's nearly sixteen-year detention in the federal system – including his medical records and autopsy report, which counsel requested under FOIA in March 2007 and were first produced to plaintiffs one week ago – defendant now offers as the centerpiece of its motion two hearsay declarations from prison officials, and a small selection of never-before-produced documents, that defendant contends establish that this Court lacks jurisdiction over this action.  The hearsay declarations and selectively produced documents do no such thing.  At most, they illustrate that defendant's

"jurisdictional" argument is intertwined with its defenses on the merits, and that plaintiffs must

have a full and meaningful opportunity for discovery on all issues (both jurisdiction and merits)

before any determination can be made on which claims should proceed to trial.  Defendant's

motion is a premature and unwarranted effort to truncate that process.  Moreover, it is directly

contrary to binding precedent in this Circuit – which defendant failed to discuss – requiring

adequate discovery in connection with such Rule 12(b)(1) motions.[1]  In this case in particular,

the need for such discovery is overwhelming, based on the total disparity of information between

the parties.  Here, the principal witness, Rico Woodland, is dead; and all of the relevant records

concerning his claims, and most of the witnesses with knowledge about the causes and

circumstances of his injuries and death, are exclusively within defendant's control.  Under those

circumstances, it would be unconscionable to dismiss plaintiffs' claims at this juncture.

    Moreover, with or without the defendant's hearsay "evidence," its motion to dismiss

should be rejected, because it is based on legal propositions that are fundamentally flawed.

    *First*, defendant confuses the crucial distinction between the standard for notice pleading

under Fed. R. Civ. P. 8 with the requirements of "proof" at trial.  Again and again, defendant

asserts that the TAC should be dismissed because plaintiffs have failed to "prove," to "establish,"

or to "show" that they can prevail on the merits.  That puts the cart before the horse.  At this

stage, plaintiffs are required only to ***plead*** their case, not to ***prove*** it.

    *Second*, defendant's effort to dismiss four of the six counts based on the "discretionary

function exception" to the FTCA misreads the TAC and grossly overstates the breadth of the

exception.  Properly construed, the TAC asserts claims that have nothing to do with policy

judgments; the conduct at issue is outside the limited exception created by Congress to insulate

---

[1] *See, e.g., Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001); *Loughlin v. United States*, 393 F.3d 155, 166-168 (D.C. Cir. 2004).

the deliberative decisions of policymakers from judicial review.  Plaintiffs do not challenge BOP

"management decisions" or "policies"; instead, their claims are based on the negligent failure of

BOP employees to follow policy.  Binding legal precedent permits such claims.

      ***Third***, defendant misstates and misapplies the applicable choice of law rules, in a

mistaken effort to pigeonhole all of the negligence claims into Pennsylvania law.  This error

infects much of defendant's analysis, even as to claims that it concedes are viable; and it leads to

the wholly erroneous conclusion that one claim (Count IV) arising out of conduct and injuries

occurring only in Missouri should be dismissed because it fails under Pennsylvania law.

      ***Fourth***, defendant's reliance on state certification laws, requiring civil litigants to submit

a "certificate of merit" from a doctor before filing suit, is misplaced here.  This is a federal

action, governed by federal procedural rules.  Moreover, the state certification laws were not

intended for situations such as this, in which the patient died in federal custody before the action

began and no one but the Government had access to his medical records until last week.[2]

      ***Finally***, defendant's request to transfer this action to Pennsylvania or Missouri is wholly

without merit; it is a transparent effort to deny these indigent plaintiffs their day in court.

Plaintiffs live in the District; their appointed counsel work in the District; and the BOP and its

records are in the District.  Although there are relevant witnesses and documents in other places

(including Pennsylvania, Missouri and Texas), no other venue is more proper than this one; and

there is no just reason to deny plaintiffs their choice of this venue.

---

[2] The death certificate prepared by the BOP and sent by the BOP to Woodland's family stated, incorrectly, that there had been no autopsy.  Pltff. Ex. 1 (Certificate of Death).  (Exhibits in support of this Opposition and referenced herein are attached to the Declaration of Phillip R. Seybold, dated January 22, 2008 (cited hereafter as Pltff. Ex. -)).  On January 15, 2008, the Government provided for the first time the autopsy report.  No reputable medical professional could have certified to anything without first reviewing the autopsy report and medical records.

## FACTUAL BACKGROUND

The relevant facts are set forth in detail in the TAC, and are briefly summarized here.

We also briefly describe the defendant's proffered "evidence" submitted with the motion.

**A.     The October 15, 2002, Assault In Woodland's Cell At FCI-Allenwood**

On the morning of October 15, 2002, while he was incarcerated at FCI-Allenwood, Rico

Woodland was involved in an altercation with another inmate, Jesse Sparks ("Sparks").  TAC ¶

9.  Later that day, at approximately 12:35 PM, Woodland was attacked by several individuals

including Sparks and Ishmael Ford-Bey.  TAC ¶¶ 10-11; Pltff. Ex. 2 ¶¶ 4-9 (Statement of Facts

Supporting Guilty Plea of Jesse L. Sparks).  Woodland was savagely beaten and kicked in the

head with steel-toed boots.  Pltff. Ex. 3 at 1 (Indictment).  The attack lasted nearly thirty minutes

(TAC ¶ 11; Pltff. Ex. 2 ¶ 7) and was captured by surveillance cameras.  Pltff. Ex. 2 ¶ 7; Pltff. Ex.

4 ¶ 3(2) (Motion To Detain).  The Bureau of Prisons employees at FCI-Allenwood ("FCI-

Allenwood employees") failed to intervene at any point during the assault.  TAC ¶¶ 41, 50.

In light of the earlier altercation and possibly other circumstances, FCI-Allenwood

employees knew or should have known that Sparks posed an immediate and concrete threat to

Woodland's life.  TAC ¶ 40, 49.  If FCI-Allenwood employees did not know about this threat to

Woodland's life, it was only because they breached their duties to monitor inmate activity and to

provide a safe and secure environment.  *Id.*  Likewise, during the thirty-minute assault, FCI-

Allenwood employees knew or should have known that Woodland was being attacked.  TAC ¶¶

41, 50.  If they did not know about the ongoing attack, it was only because they breached their

duties to monitor inmate activity and to provide a safe and secure environment.  *Id.*

**B.     Woodland's Initial Recovery At FMC-Fort Worth**

The attack – beating and kicking Woodland with steel-toed boots for nearly thirty

minutes – inflicted grave injuries, including massive brain damage that left Woodland comatose

- 4 -

for several months.  TAC ¶ 14.  When Woodland later regained consciousness, he endured

terrible and constant pain.  *Id*.  He never regained the full use of his arms or legs; he was

"functionally quadraparetic," and was never able to walk again; and he suffered severe

psychological distress, including intense episodes of agitation and crying out, such that he was

prescribed anti-psychotic medications.  *Id*.

Nevertheless, Woodland's condition improved while he was hospitalized at the Fort

Worth Federal Medical Center in Fort Worth, Texas ("FMC-Fort Worth").  TAC ¶ 15.  During

that time, from December 13, 2002, though March 21, 2005 (Def. Ex. C), Woodland resumed

contact with his family, including his mother, plaintiff Dianne Sledge, his daughter Angelique

Higgins, his sister Teresa Sledge, and his brother, plaintiff Steven Sledge.  TAC ¶ 16.

C.    <u>**Woodland's Sudden Decline And Untimely Death at USMCFP-Springfield**</u>

Woodland might have recovered from many of his injuries if the BOP had provided him

adequate sustenance and appropriate care.  *Id.* ¶ 15.  However, in March 2005 he was transferred

to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP-

Springfield").  *Id*. at ¶ 17.  Shortly thereafter, his health rapidly deteriorated.  *Id.* ¶ 17.  The

responsible employees at USMCFP-Springfield ("USMCFP-Springfield employees") failed to

provide Woodland adequate sustenance and/or care.  *Id*. ¶¶ 17-18, 58, 66.  That failure caused

Woodland severe pain, hunger, and illness for the rest of his natural life.  *Id*. ¶¶ 18-19, 59, 67.

Woodland complained to his family that he was receiving inadequate care at USMCFP-

Springfield.  *Id*. ¶ 20.  At least one other inmate expressed similar concerns about the care

Woodland received.  *Id*.  Shortly thereafter, plaintiff Dianne Sledge, along with her daughter

Teresa Sledge, sought to visit Woodland.  *Id*. ¶¶ 20-21.  They requested and received approval

from the responsible USMCFP-Springfield employees.  *Id*. ¶ 21.  Thereafter, on the approved

dates in November 2005, and at great personal expense on borrowed funds, they traveled over

1,000 miles by bus from Washington, D.C., to Springfield, Missouri.  TAC ¶ 21.

When Dianne and Teresa Sledge arrived at USMCFP-Springfield, they identified themselves as Woodland's mother and sister, stated that they had received permission to visit, and asked to see Woodland.  *Id.* ¶ 22.  The USMCFP-Springfield employees were aware of the distance traveled and the expenses incurred.  *Id.* ¶ 23.  They were aware of Woodland's failing health, and knew or should have known that Woodland and his mother might never have another opportunity to visit again.  *Id.*  Nonetheless – without any legitimate justification and despite previously approving the visit – USMCFP-Springfield employees arbitrarily, irrationally and/or invidiously turned Dianne and Teresa Sledge away at the door to USMCFP-Springfield.  *Id.*

If Dianne and Teresa Sledge had been allowed access to Woodland, they would have discovered first-hand the inadequacies in the care, treatment and sustenance provided to Woodland.  *Id.* ¶ 24.  They would have been able to advocate for Woodland, and might have compelled USMCFP-Springfield employees to provide adequate sustenance and care – and thereby saved Woodland's life.  *Id.*  Instead, Dianne Sledge never saw her son again.  *Id.* ¶ 23.  On January 29, 2006, two months after he was denied the opportunity to see his mother, Rico Woodland died in federal custody.  *Id.* ¶ 27.  He was thirty-four years old.  *Id.*

D.    **Administrative Exhaustion Of Plaintiffs' Claims**

Rico Woodland first began these proceedings with an administrative tort claim (the predecessor to Count I) submitted on October 15, 2004.  That claim, filed under 28 U.S.C. § 2675, 28 C.F.R. § 14 and 28 C.F.R. § 543, alleged that FCI-Allenwood employees failed to protect Woodland from the attack on October 15, 2002, and further alleged the attack caused Woodland severe personal injuries.  TAC ¶ 28 & TAC Ex. B.  The claim was denied on October 24, 2005.  TAC ¶ 29 & TAC Ex. C.  Woodland died three months later, on January 29, 2006.

Steven Sledge filed this action on behalf of Woodland's estate on April 24, 2006.  The

- 6 -

Court granted Mr. Sledge's motion to proceed *in forma pauperis*, as well as his motion to appoint counsel, and undersigned counsel were appointed on July 10, 2006. Since being appointed, counsel have worked to promptly identify all relevant claims and ensure that they were pursued and exhausted administratively. Thus, between November 29, 2006, and June 14, 2007, plaintiffs Steven Sledge and Dianne Sledge submitted five claims – administrative predecessors to Counts II, III, IV, V and VI – under 28 U.S.C. § 2675, 28 C.F.R. § 14 and 28 C.F.R. § 543. *See* TAC ¶¶ 31-35 & TAC Exs. E, G, I, K, M (administrative tort claims). The BOP denied the last of those claims on July 20, 2007 (*see* TAC ¶¶ 31-35 & TAC Exs. F, H, J, L, N); all have been asserted under the FTCA in plaintiffs' TAC.

### E.    The Defendant's Proffered "Evidence"

In support of its motion, defendant submitted declarations from two BOP employees, as well as some documents. One declarant, Lieutenant James Lyons, purports to describe documents (that are not appended to his declaration and have not been produced) relating to the assault at FCI-Allenwood. Def. Ex. A. The other declarant, Crystal Rinker, purports to describe Dianne Sledge's November 2005 effort to visit her son in USMCFP-Springfield. Def. Ex. Y. Both declarations are hearsay, and the Lyons declaration is at least double hearsay.

#### 1.    The Lyons Declaration

Lieutenant James Lyons states that he has been employed at FCI-Allenwood since 2000. Def. Ex. A. Lieutenant Lyons does not state that he ever met Woodland or that he has any first-hand, personal knowledge of any of the events described in the TAC. *Id.* Instead, Lieutenant Lyons simply purports to summarize some self-selected portions of a "file concerning inmate Woodland." *Id.* ¶ 4. Lieutenant Lyons does not describe all, or even any, of the contents of this "file." He does not specify what documents or other evidence he reviewed. He does not cite any documentary or other support for any of the assertions in his declaration. He does not identify

- 7 -

what witnesses he has relied upon, or whether he even spoke directly with them. Nothing in the Lyons declaration allows the Court to assess those witnesses' motives, credibility or veracity.

Moreover, nothing in the Lyons declaration contradicts in any material respect the allegations in the TAC. Thus, Lieutenant Lyons concedes that "a fight occurred between inmate Woodland and inmate Sparks during the morning of October 15, 2002." *Id*. at ¶ 6. While Lieutenant Lyons claims that "staff did not become aware of this fight" until after the second assault on Woodland, he offers no evidence to support that conclusion. *Id*. Moreover, even if "Woodland did not notify staff of … the fight," as the declarant asserts, that does not explain how or why the altercation went undetected. *Id*. It does not contradict, and may even be read to support, the notion that FCI-Allenwood employees breached their obligations to monitor inmate activity; otherwise, they would have known of the fight and stopped it.

Lieutenant Lyons concedes that, after that initial altercation, "inmate Sparks physically assaulted inmate Woodland by repeatedly kicking at inmate Woodland's defenseless upper torso and head area while wearing boots. Inmate Ishmael Ford-Bey … remained in the area of cell 109, during the fighting, and physically held the cell door closed during the assault." *Id*. at 7. While the declarant claims the attack lasted 15 minutes (*id*.), he does not address plaintiffs' allegations or the evidence that the fight lasted nearly 30 minutes (TAC ¶ 11; Pltff. Ex. 2 ¶ 7).

Lieutenant Lyons concedes the involvement of at least a third inmate, who assertedly "positioned two cell doors to a ninety degree angle, in an effort to interfere with the view of the surveillance camera." Def. Ex. A at 8. The declaration does not state whether this "effort" was successful; and in fact it apparently was not, as the United States' motion for pretrial detention of Ford-Bey stated the video "shows [him] on tape committing the offense." Pltff. Ex. 4 ¶ 3(2).

Lieutenant Lyons further asserts that this third inmate "stopped the unit officer who was

about to begin an afternoon census count, and requested a broom and dust pan which were located in a secure room"; and that this inmate's "request delayed the officer from beginning his afternoon census count." Def. Ex. A ¶ 8. But the Lyons declaration does not state *when* this inmate requested a broom. It does not state *where* the request took place. It does not state whether the officer was close enough that he should have heard sounds of the attack – or even whether the officer actually heard any such sounds. Nor does it state whether that officer was the only FCI-Allenwood employee responsible for monitoring Woodland's cell. Indeed, while the declaration boldly claims that "staff did not become aware of" the *morning altercation* until after the fact, it takes no position on whether staff were aware, could have been aware, or should have been aware of the assault at 12:35 p.m. Other than to assert that one officer was "distract[ed]" by the alleged request for "a broom" (a claim that plaintiffs dispute at this stage), the declaration offers no account *at all* of the conduct, performance, or duties of any FCI-Allenwood employees.

    2.    The Rinker Declaration

    The Government has also proffered the Declaration of Crystal Rinker, a former employee at USMCFP-Springfield. Def. Ex. Y. Inexplicably, Ms. Rinker states that she retired from her position on February 2, 2005; and yet two paragraphs later, she purports to give an eyewitness account of Dianne Sledge's visit to USMCFP-Springfield in November 2005, i.e., eight months after Ms. Rinker had retired. Ms. Rinker states that she reviewed unspecified "records" that allowed her to recall Dianne Sledge's visit more than two years ago – a remarkable feat of recall, given the number of visitors who undoubtedly arrived at the facility on a daily basis. *Id.* ¶ 4.

    Ms. Rinker states that Dianne and Teresa Sledge "did not have prior authorization for this visit"; and when she "offered to arrange a visit within the next few days," they "refused to return." *Id.* But plaintiffs specifically allege that Dianne and Teresa Sledge obtained prior approval for their visit in November (TAC ¶ 21) and neither Dianne nor Teresa Sledge "refused"

- 9 -

any "visit within the next few days." *See id.* ¶ 23; *see also* Pltff. Ex. 5 (Sledge Declaration).[3]  If

Ms. Rinker was in fact present and working in November 2005 (and was not retired), her

declaration at most raises a disputed issue of fact as to whether Dianne and Teresa Sledge had

permission to visit.  That dispute cannot be resolved on a motion to dismiss.  And even if Ms.

Rinker's recollection were correct, it does not contradict plaintiffs' assertion, expressly made in

the TAC, that USMCFP-Springfield employees denied visitation for no good reason; and that

they acted "arbitrarily, irrationally, and/or invidiously," causing both Woodland and Dianne

Sledge to suffer severe emotional distress.  *Id.* ¶¶ 25-26.

## ARGUMENT

Plaintiffs assert their claims under the FTCA, which makes the United States liable in tort

for "injury or death caused by the negligent or wrongful act or omission of any employee of the

Government … if a private person would be liable" under like circumstances.  28 U.S.C. §

1346(b)(1).  The statute specifies that substantive liability must be determined "according to the

law of the place where the act or omission occurred," *id.*, meaning that the relevant standards of

care are generally established by state tort law.  Plaintiffs have asserted six claims:

- Count I alleges that FCI-Allenwood employees negligently breached duties to monitor inmates, proximately causing Woodland's injuries at FCI-Allenwood.
- Count II is a wrongful death claim based on the negligence in Count I.
- Count III alleges that USMCFP-Springfield employees negligently breached duties to provide adequate sustenance and care, proximately causing Woodland's injuries at USMCFP-Springfield.
- Count IV is a wrongful death claim based on the negligence in Count III.
- Count V alleges that USMCFP-Springfield employees intentionally and/or negligently inflicted emotional distress on Woodland when they denied him visitation with his mother.

---

[3] Although plaintiffs have no legal obligation to present any of their evidence in response to a motion to dismiss, they have submitted with this Opposition the Declaration of Teresa Sledge. Pltff. Ex. 5.  Ms. Sledge states that she and Dianne Sledge received prior approval to visit Woodland on November 12, 2005, but were rudely turned away without any justification.  *Id.*

- Count VI alleges that USMCFP-Springfield employees intentionally inflicted emotional distress on Dianne Sledge, based on the same conduct in Count V.

Defendant has moved to dismiss all of these claims under Rule 12(b)(1), arguing that plaintiffs have failed to prove the merits of their claims and that the Court lacks subject matter jurisdiction. As described below, defendant's motion is without merit and should be rejected.

## I.   DEFENDANT'S MOTION TO DISMISS SHOULD BE DENIED AS A PREMATURE ATTEMPT TO RESOLVE THE MERITS OF THE DISPUTE BEFORE ANY DISCOVERY HAS OCCURRED

The motion to dismiss directly attacks the merits of plaintiffs' claims, arguing that the Court lacks subject matter jurisdiction because plaintiffs "failed to prove" the alleged negligence. *See, e.g.*, Def. Br. at 32. The entire premise of the motion is fatally flawed. The motion assumes that (i) plaintiffs must "prove" the merits of their claims *before* trial or even discovery, and (ii) the merits can be resolved now, based on out-of-court declarations by two witnesses who have never been cross-examined, and who rely on documents never produced to plaintiffs. Defendant's approach turns the Federal Rules on their head. It is also squarely foreclosed by Circuit precedent, which holds that motions such as this one must be denied unless plaintiffs have had "an opportunity for discovery of facts necessary to establish jurisdiction." *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001); *see also Loughlin v. United States*, 393 F.3d 155, 167 (D.C. Cir. 2004); *Herbert v. National Academy of Sciences*, 974 F.2d 192, 198 (D.C. Cir. 1992).

## A.   The Standard Of Review Under Rule 12(b)(1)

Rule 12(b)(1) of the Federal Rules permits two types of jurisdictional challenges: "facial challenges" and "factual challenges." *Smith v. United States*, 518 F. Supp. 2d 139, 145 (D.D.C. 2007). A facial attack disputes the "legal sufficiency of plaintiffs' jurisdictional claims," *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002), by addressing the allegations on "'the face of the complaint,'" *Smith*, 518 F. Supp. 2d at 145. When resolving such

- 11 -

a challenge, the court "must accept as true the allegations in the complaint and consider the factual allegations … in the light most favorable to the non-moving party, just as it would on a motion to dismiss under Rule 12(b)(6)." *Id*. at 145 (quotations and citations omitted).

The process is different for factual challenges, which attack "the factual basis" for jurisdiction with evidence outside the pleadings. *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). While in appropriate cases the court may consider such evidence, plaintiffs must be given "ample opportunity to secure and present evidence relevant to the existence of jurisdiction." *Id*. (quoting *Prakash v. American University*, 727 F.2d 1174, 1179-1180 (D.C. Cir. 1984)). The court must "bear in mind what procedural protections could be required to assure that a full airing of the facts … may be given to all parties" and thus "ruling on a Rule 12(b)(1) motion may be improper before" discovery. *Herbert*, 974 F.2d at 198. That is particularly true where the evidence is within defendant's exclusive control, and thus "neither the Plaintiff nor the Court has been properly apprised of what [evidence] may exist … to support" the claims. *Leighton v. Central Intelligence Agency*, 2007 WL 1109273 at *2 (D.D.C. 2007).

## B.    Defendant's Facial Challenges Are Not Proper Under Rule 12(b)(1)

Defendant argues that every count should be dismissed because plaintiffs have "failed to prove" their claims. Def. Br. at 32. Specifically, defendant argues that plaintiffs "cannot establish" Counts I and II (*id*. at 17); that plaintiffs "do not satisfy [their] burden" for Counts III and IV (*id*. at 30); and that plaintiffs have "failed to prove" Counts V-VI (*id*. at 32). These are not proper facial challenges to the Court's jurisdiction under Rule 12(b)(1).

A facial attack must address whether plaintiffs have "pled claims," not whether they have "established" all the elements of their claims. *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005). Plaintiffs are not required to *prove* anything by their complaint; a "'short and plain'" statement of the claims is enough to satisfy the Federal Rules.

- 12 -

*Ignatiev*, 238 F.3d at 466 (quoting Fed. R. Civ. P. 8(a)(2)).  Defendant does not and cannot argue

that the TAC fails to meet that standard.

Defendant half-heartedly attempts to avoid these basic principles with respect to Counts

III and IV by characterizing plaintiffs' allegations as "conclusory" and arguing that the TAC

must "show" the alleged negligence.  Def. Br. at 30.  That is not what federal notice pleading

requires, and defendant cites no authority suggesting otherwise.[4]  In fact, defendant's cited cases

involve state appeals *after trial*, not situations like this in which discovery has not even begun.

*See Boehm v. Pernoud*, 24 S.W.3d 759 (Mo. App. Ct. 2000) (appeal after verdict); *Hurlock v.

Park Lane Medical Center, Inc.*, 709 S.W.2d 872, 875 (Mo. App. Ct. 1985) ("jury trial").[5]

**C.    Plaintiffs Cannot Be Required To Prove The Merits Before Trial**

Most of defendant's arguments are factual challenges that rely on the two declarations

submitted with the motion.  They are woefully deficient on the law and the facts.[6]

As explained above, defendant's facial challenges fail because plaintiffs are entitled to

discovery before they can be required to "prove" their claims.  The same is true with respect to

defendant's factual challenges, for which defendant has gone outside the record and submitted its

own "testimony" and "evidence."  As this Circuit has noted, courts "must bear in mind what

---

[4] While plaintiffs' allegations satisfy the Federal Rules, it should be noted that defendant itself made additional detail impossible.  Despite FOIA requests submitted months before Counts III and IV were filed in this Court, plaintiffs were not provided *any* records until January 15, 2008, when the BOP provided a file containing, in no particular order, a subset of the records relevant to Woodland's sustenance and treatment.  *See* Pltff. Ex. 6 (December 21, 2007, Letter to Marian L. Borum, Esq.); Pltff. Ex. 7 (January 14, 2008, Letter from Wanda H. Hunt).

[5] Similarly flawed is the argument that plaintiffs have failed to show sufficient harm with respect to Count VI.  *See* Def. Br. at 33 n.19.  Defendant does not argue that plaintiffs failed to satisfy Rule 8(a)(2); overlooks express allegations of bodily harm (*e.g.*, TAC ¶ 25); and at any rate, physical injury is not an element of the claim.  *State ex rel. Dean v. Cunningham*, 182 S.W.3d 561, 568 (Mo. 2006) (requisite injury includes distress "unaccompanied by physical injury").

[6] The mere assertion that plaintiffs "failed to prove" their case is not itself evidence for a factual challenge.  *See Loughlin*, 230 F. Supp. 2d at 36 (noting that in a factual challenge the court must weigh the "allegations of the complaint and *evidence* outside the pleadings") (emphasis added).

procedural protections could be required to assure that a full airing of the facts … may be given to all parties," *Herbert*, 974 F.2d at 198. The plaintiffs in this case could not possibly prove their allegations without "an opportunity for discovery," *Smith*, 518 F. Supp. 2d at 145.

Here, the relevant events occurred within the black box of the federal prison system, and plaintiffs' primary witness (Woodland) is now deceased – a result proximately caused by defendant's negligence. Much of the critical evidence is within defendant's exclusive control. For that reason alone discovery is an indispensable "procedural protection," *Herbert*, 974 F.2d at 198. *Ignatiev* is instructive on this point. There, plaintiffs asserted U.S. Secret Service officers negligently violated their own internal policies. 238 F.3d at 465. The district court dismissed the complaint before discovery, but the D.C. Circuit reversed. Observing that the relevant evidence was wholly within defendant's control, the court stated: "[W]ithout discovery, [plaintiff would] have no way to know what mandatory policies may bind the Secret Service." *Id*. at 467. The result should be no different here. *Cf. Leighton*, 2007 WL 1109273 at *2 ("neither the Plaintiff nor the Court has been properly apprised of what [evidence] may exist").

Defendant's arguments go far beyond a simple procedural challenge. Defendant's essential claim is that because plaintiffs cannot prove negligence, now or later, there is no jurisdiction under the FTCA. That "jurisdictional" defense is fully intertwined with the merits of the case; as such, it can only be addressed at the same time as the merits. As a result, there must not only be discovery, but it must be broad discovery consistent with the defense of a claim on the merits. *Loughlin* addressed that precise point, noting that Rule 12(b)(1) motions that conflate jurisdiction with the merits of the case would "require a litigant to prove the merits of his claims at the earliest possible stage of the proceedings without the benefit of discovery and trial." 230 F. Supp. 2d at 36. When confronted with this dilemma, the "courts have not dismissed federal

- 14 -

claims on Rule 12(b)(1) motions unless they are clearly insubstantial or immaterial," and have instead resolved any "material factual disputes … at trial." *Id*. at 36 (quotations and citations omitted).[7]  *See also Vine v. Republic of Iraq*, 459 F. Supp. 2d 10, 18 n.7 (D.D.C. 2006) (postponing jurisdictional determination "until the merits are heard.") (quotations omitted).  *Cf. Loughlin*, 393 F.3d at 144 (when jurisdiction is challenged under Rule 12(b)(1), the district court must allow plaintiff "a full and fair opportunity to pursue relevant information" in discovery).

Finally, even if defendant's declarations and other evidence are accepted without affording plaintiffs any opportunity to challenge them, they provide no grounds for granting the motion.  The Lyons declaration has no evidentiary value whatsoever.  Lieutenant Lyons does not assert that he witnessed anything relevant to the claims.  He states only that at some unspecified time, he reviewed some documents that are not identified or described; and that based on the documents, he drew some conclusions about what the documents indicate happened.  That is not competent or admissible testimony.  Moreover, the conclusions he reached shed no light on the factual issues that need to be addressed and resolved, including what the FCI-Allenwood employees were doing at the time of the fight, what they were supposed to be doing, and whether they acted with the requisite care to perform their duties and protect Woodland's safety.  The facts relevant to those issues can only be addressed in discovery.

The Rinker declaration is similarly unhelpful.  On its face, the declaration raises serious doubt as to whether Ms. Rinker was even employed at USMCFP-Springfield during the relevant time period.  But even if it is accepted on its own terms, it directly conflicts with plaintiffs' allegations and the Declaration of Teresa Sledge (Pltff. Ex. 5).  Thus, it does no more than create

---

[7] In *Loughlin*, the court ultimately treated the government's Rule 12(b)(1) motion as a motion for summary judgment under Rule 56.  230 F. Supp. 2d at 38.  That would not be appropriate in this case, as discovery has not yet begun; but if the Court were inclined to convert defendant's motion into a motion for summary judgment, plaintiffs would request relief under Rule 56(f).

a disputed issue of fact as to whether Dianne and Teresa Sledge had been given permission to visit Woodland in November 2005. Factual disputes among competent witnesses must be resolved at trial, not on motion papers.[8]  *See Ignatiev*, 238 F.3d at 467 n.4 (declaration by head of Secret Service Uniformed Division was insufficient to justify dismissal).

## II.    THE DISCRETIONARY FUNCTION EXCEPTION TO THE FTCA DOES NOT BAR ANY OF PLAINTIFFS' CLAIMS

Defendant has moved to dismiss Counts I, II, V and VI, arguing that they are barred by the "discretionary function exception" of the FTCA (28 U.S.C. § 2680(a)).[9]  Defendant's arguments are flawed in two major respects.

*First*, as already discussed, defendant's motion to dismiss should be rejected as premature.  This Circuit's binding precedent involving the application of the discretionary function exception requires that plaintiffs be given a full and fair opportunity at discovery before any ruling can be made on a motion to dismiss under Rule 12(b)(1).  *See, e.g., Ignatiev*, 238 F.3d 464; *Loughlin*, 393 F.3d 155.

*Second*, defendant has misread the TAC and mischaracterized the relevant law, which plainly distinguishes between discretionary actions that are policy-related, and those that simply involve "garden-variety" negligence by prison employees.  As relevant case law – including cases involving federal prisoners – plainly holds, the discretionary function exception shields the United States only in the former situations, not the latter.  *See, e.g.*, *Palay v. United States*, 349

---

[8] Significantly, the only evidence proffered by defendant about what occurred at USMCFP-Springfield concerns the visitation issue.  Although the Government has full knowledge of the care given Woodland at Springfield, it has offered nothing to counter the assertions in the TAC that that care was inadequate and was a proximate cause of Woodland's death.

[9] That exception insulates the United States from liability for:

> [a]ny claim … based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2860(a).

F.3d 418, 432 (7th Cir. 2003) (reversing dismissal based on discretionary function exception, because routine "carelessness" by prison guards "would not be covered by the discretionary function exception, as it involves no element of choice or judgment grounded in public policy considerations"); *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 475-477 (2d Cir. 2006) (discretionary function exception does not preclude "negligent guard theory"); *Garza v. United States*, 161 Fed. Appx. 341, 344 (5th Cir. 2005) (discretionary function exception did not protect guard's failure to monitor inmates as required by "post order"). The allegations in the TAC are directed at such routine, "garden-variety" negligence, not at management decisions or policies. As such, they are not subject to the discretionary function exception.

Before turning to these arguments, we begin with a review of the relevant legal principles defining the specific and limited nature of the discretionary function exception.

A.    **The Legal Framework Governing The Discretionary Function Exception**

   1.    The FTCA And The Discretionary Function Analysis

The FTCA establishes the general principle that the United States is liable for "injury or death caused by the negligent or wrongful act or omission of any employee of the Government … if a private person[] would be liable" in like circumstances. 28 U.S.C. § 1346(b)(1). The discretionary function exception is a limited carve-out to the more general rule, under which the United States takes legal responsibility for the actions of its employees. The exception "was designed to prevent the courts from 'second guessing' … the way that government officials choose to balance economic, social, and political factors." *Cope v. United States*, 45 F.3d 445, 448 (D.C. Cir. 1995). It was not meant "to swallow the FTCA's sweeping waiver." *Id*. at 449.

Thus, to ensure the exception serves its purpose but does not undermine the rule, courts apply the two-step "*Gaubert/Berkovitz*" test. *See United States v. Gaubert*, 499 U.S. 315 (1991); *Berkovitz v. United States*, 486 U.S. 531 (1988). Under that test, the court must first determine

whether the claim depends on "discretionary" decisions requiring "judgment or choice" by authorized employees. *Gaubert*, 499 U.S. at 322; *Berkovitz*, 486 U.S. at 536. If not, the exception cannot apply. But if the claim does depend on discretionary decisions, the court proceeds to the second step. It must then determine whether the decision involved a "policy judgment that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 332. When "properly construed, the exception 'protects only governmental actions and decisions based on considerations of public policy.'" *Id*. at 323 (quoting *Berkovitz*, 486 U.S. at 537).

        2.        The First Step: Whether The "Acting Employee" Had Discretion

As stated, the first step of the *Gaubert*/*Berkovitz* test requires the Court to determine whether the claim involves a discretionary decision by a federal employee. *Berkovitz*, 486 U.S. at 536. The question "is not whether the Government as a whole had discretion at any point, but whether its allegedly negligent agents did in each instance." *In re Glacier Bay*, 71 F.3d 1447, 1451 (9th Cir. 1996). The court must examine "[e]ach separate action … to determine whether the specific actor had discretion of the type Congress intended to shield." *Id*.; *cf. Moore v. United States*, 213 F.3d 705, 711 (D.C. Cir. 2000). The exception does not apply unless the "acting employee" possessed discretion. *Berkovitz*, 486 U.S. at 536.

The exception does not apply to decisions beyond the employee's actual authority. "A government official has no discretion to violate the binding laws, regulations, or policies that define the extent of his official powers." *Red Lake Band of Chippewa Indians v. United States*, 800 F.2d 1187, 1196 (D.C. Cir. 1986). Thus, the exception does not cover unconstitutional or otherwise unlawful conduct. *See id*.; *Garcia v. United States*, 896 F. Supp. 467, 473 (E.D. Pa. 1995) ("Federal officials do not possess discretion to violate constitutional rights or federal statutes.") (quotations omitted). Moreover, the exception does not cover conduct breaching other policy directives, including internal directives, because federal employees have no discretion to

- 18 -

breach duties established by the manuals, memoranda, orders, and other directives issued by their

superiors.[10]

    3.       <u>The Second Step: Decisions "Fraught With Public Policy Considerations"</u>

If the employee did exercise *bona fide* discretion, the *Gaubert/Berkovitz* test requires the

Court to determine whether that discretion required "public policy" judgment.  *Gaubert*, 499

U.S. at 323; *Berkovitz*, 486 U.S. at 537.  This step is designed to ensure that the exception

"protects only governmental actions and decisions based on considerations of public policy,"

*Berkovitz*, 486 U.S. at 537.  As the D.C. Circuit has stated, the "touchstone" is this:

> We have consistently held that the discretionary function exception applies "only where
> 'the question is not negligence but social wisdom, not due care but political practicability,
> not reasonableness but economic expediency.'"

*Cope*, 45 F.3d at 450 (citations omitted).  Thus, the court has repeatedly distinguished decisions

"fraught with public policy concerns" from those involving routine or "garden-variety"

discretion.  *Id*. at 448-450.  The one is exempted from liability, while the other is not.

While many activities involve some degree of discretion, that is not enough for the

exception to apply.  *Cope* is a good case in point.  There, the plaintiff alleged that the National

Park Service had negligently failed to "post adequate warning signs" on a roadway, thereby

causing an accident.  *Id*. at 451.  There were no policy directives on point; in fact, the relevant

agency manual specifically required the exercise of discretion.  *Id*.  Nevertheless, the court

---

[10] *See, e.g., Ignatiev*, 238 F.3d at 467 (guidelines may have imposed mandatory duties); *see also
Garza*, 161 Fed. Appx. at 344 ("post order" established mandatory duties to monitor inmates); *In
re Glacier Bay*, 71 F.3d at 1451 (manual included mandatory instructions); *Campbell v. United
States*, 167 F. Supp. 2d 440, 448 (D. Mass. 2001) (standing orders may have imposed mandatory
obligations); *Knochel v. United States*, 49 F. Supp. 2d 1155, 1158-1159 (D. Ariz. 1998)
(handwritten instructions and other memoranda may have each imposed mandatory obligations).
*Cf. United States Fidelity & Guaranty Co. v. United States*, 837 F.2d 116, 123 (3d Cir. 1988)
(noting plaintiff did not argue that negligence "involved any violation of a superior's
instructions").

rejected the Government's attempt to rely on the discretionary function exception.  It noted that

the Government had taken control of the road, and had assumed responsibility to ensure the

safety of motorists using the road, by placing some warning signs on it.  Having done so, the

court concluded, "the Park Service cannot argue that its failure to ensure that those steps [it had

already taken] are effective involves protected 'discretionary' decisions."  *Id*. at 452.[11]

**B.      The Discretionary Function Exception Does Not Bar Counts I and II**

Defendant's discretionary-function challenge to Counts I and II rests on three wholly

inaccurate propositions: (i) that plaintiffs' claims are based on "management decisions" or

"security and staffing" policies, Def. Br. at 20, 22; (ii) that *all* conduct at FCI-Allenwood is

"discretionary," because there are "no statutes, regulations or procedures" limiting employee

discretion in that prison, *id*. at 22; and, (iii) that *all* decisions at FCI-Allenwood are "grounded in

public policy," regardless of the individual circumstances.  *Id*. at 24.

1.      Plaintiffs' Allegations Are Based On Garden-Variety Negligence By
Individuals Breaching Their Mandatory Duties As Prison Employees

Contrary to defendant's contention, all of plaintiffs' claims are directed at negligence

violating management decisions establishing the duties of employees at FCI-Allenwood.  *See,*

*e.g*., *Triestman*, 470 F.3d at 475 (discussing "negligent guard theory").  The TAC does not

challenge "the security and staffing" policies at FCI-Allenwood, as defendant claims (Def. Br. at

20).  Nor does it challenge "management decisions regarding the supervision and protection of

inmates," *id*. at 22.  Defendant's efforts to mischaracterize the TAC should be rejected,

particularly because under Rule 12(b)(1), the court must "consider the factual allegations … in

the light most favorable to the non-moving party, just as it would on a motion to dismiss under

---

[11] The court expressly rejected the Government's efforts to characterize its decisions as involving
policy decisions about where and how to spend money, or "aesthetic considerations."  *Cope*, 45
F.3d at 452.  "The mere presence of choice – even if that choice involves whether money should
be spent – does not trigger the exception."  *Id.* at 449.

Rule 12(b)(6)." *Smith*, 518 F. Supp. 2d at 145 (citations omitted).

Plaintiffs' allegations are specifically directed at the activities (including actions and failures to act) of prison employees entrusted with the responsibility of guarding the inmates, including Woodland. The complaint includes numerous allegations of fact demonstrating that FCI-Allenwood guards carried out their duties in a negligent and improper manner that subjected Woodland to an unnecessary and unreasonable degree of risk. The October 2002 attack (i) was preceded by at least one other altercation, (ii) involved several individuals, (iii) lasted nearly thirty minutes, (iv) involved potentially contraband steel-toed boots, and (v) and was captured on video maintained for the purpose of supervising inmate activity.[12] Under those circumstances, it is inconceivable that prison guards acting in a diligent and responsible manner would not have learned of the fight and timely intervened. In any event, whether the guards were negligent has nothing to do with BOP policy or management decisions. It is simply a question of whether they acted in a prudent and responsible manner consistent with their duties at FCI-Allenwood.[13] If the guards did not, and instead acted negligently, the discretionary function exception does not apply. *See, e.g.*, *Palay*, 349 F.3d at 432; *Triestman v. Federal Bureau of Prisons*, 470 F.3d at 477; *Garza v. United States*, 161 Fed. Appx. 341 at 344-345.

---

[12] With respect to this conduct, plaintiffs have expressly alleged, and are entitled to prove, that FCI-Allenwood employees "knew or should have known" that Sparks and Ford-Bey "posed a specific, concrete, and immediate threat to Woodland's life"; and that those employees "knew or should have known that Woodland was being attacked." TAC ¶¶ 40-41, 49, 50.

[13] If prison employees knew about the threat beforehand, or knew about the attack as it was ongoing, they "had a specific mandatory duty to take some action, but instead abdicated their duties and failed to take any action." TAC ¶ 40-41. *See infra* at part II.B.2., discussing *Barrett v. United States*, 845 F. Supp. 774, 781 (D. Kan. 1994). Conversely, if prison employees did not know about the threat beforehand, or were unaware of the attack as it was occurring, it was because they breached "specific duties to monitor inmate activities." TAC ¶¶ 40-41. *See infra* at part III.B.2., discussing *Garza*, 161 Fed. Appx. at 344. Either the guards abdicated their duties entirely, or breached other binding directives, or were otherwise oblivious based on laziness, inattentiveness, or other simple negligence.

- 21 -

2.    Policies And Directives Limiting Employee Discretion At FCI-Allenwood

Defendant also asserts that "no statutes, regulations or procedures exist which require FCI-Allenwood employees to follow a specific course of action when protecting and supervising inmates," and that therefore "the first prong of the discretionary function analysis is satisfied." Def. Br. at 22.  Defendant offers no evidence to support this contention; the argument is based solely on defendant's interpretation of 18 U.S.C. § 4042 and the Code of Federal Regulations. But the inquiry cannot end there.  The question is whether the relevant FCI-Allenwood employees possessed *bona fide* discretion to commit the allegedly negligent conduct – and as discussed above, a federal employee's discretion may be limited by policy directives other than an agency's enabling act and published regulations.

Whether this argument is construed as a facial or factual challenge, the case cannot be dismissed based on defendant's conclusory assertion that "no statutes, regulations, or procedures exist." *Ignatiev* is controlling on this point.  238 F.3d 464.  In that case, plaintiffs alleged a "failure … to provide adequate protection to the Bulgarian Embassy." *Id*. at 467.  The Government successfully moved for dismissal in the district court, arguing that the claim was barred by the discretionary function exception. *Id*.  The D.C. Circuit reversed.  It first rejected any facial attack on the complaint, holding that even if the complaint was "at the shorter and plainer end" of the spectrum, plaintiffs had complied with Rule 8(a)(2). *Id*.  Likewise, the court rejected the government's apparent attempt to mount a factual challenge with a declaration "asserting that the [Secret Service's] mission-protection functions are generally discretionary." *Id*. at 467 n.4.  As the court explained, "such a declaration or affidavit is [not] sufficient to justify dismissal under Rule 12(b)(1)." *Id*.

The result should be the same here.  FCI-Allenwood employees were bound by any number of binding policy directives established by BOP management decisions.  Relevant

directives are likely embodied in program statements, institutional supplements, policy handbooks, guidelines, training manuals, work schedules, work assignments, policy memoranda, post orders, and other orders or instructions from the warden (or other superior officers and officials).  While in the absence of discovery plaintiffs lack access to any specific policies, it is well known that such directives are mandatory for prison employees.[14]  For example, in *Garza v. United States*, a prison guard violated "post orders" which required her to monitor the yard where plaintiff was assaulted.  161 Fed. Appx. at 344.  That negligence was outside the discretionary function exception.  *Id.  See also Jacocks v. United States*, 2006 WL 2850639 at *10 (W.D. Va. 2006) (exception would not have applied, had guard breached mandatory post orders).  Plaintiffs believe similar post orders governed FCI-Allenwood employees.

Other mandates were cited in *Buford v. United States*, 1999 WL 319078, *4 (D. Kan. 1999).  There, the court reviewed relevant "duty post orders, Program Statements, Institutional Supplements, and the Correctional Service Manual," as well as trial evidence.  *Id*.  The court held that "the evidence … including [Bureau of Prisons / U.S. Penitentiary in Leavenworth] regulations and guidelines, as well as testimony from BOP officials, establishes that … prison officials were required to perform simple 'pat' searches."  *Id*.  The court therefore denied the motion for summary judgment on the government's discretionary function defense.  *Id*. Plaintiffs believe similar obligations governed FCI-Allenwood employees.

Similarly, in *Barrett v. United States*, the Government "conceded … that once a threat of violence was brought to the attention of [prison] officials, they were required to investigate the threat and determine whether [the plaintiff] was in danger."  845 F. Supp. 774, 781 (D. Kan. 1994).  Plaintiffs believe similar obligations governed FCI-Allenwood Employees.  This would

---

[14] *See Ignatiev*, 238 F.3d at 467 (explaining that "without discovery, [a plaintiff would] have no way to know what mandatory policies may bind the Secret Service").

be particularly important if prison employees "knew or should have known" that Sparks and Ford-Bey "posed a specific, concrete, and immediate threat to Woodland's life," or (during the attack) that Woodland was being attacked.  TAC ¶¶ 40-41, 49-50.

Furthermore, federal employees have no discretion to abdicate their duties out of laziness, haste, or inattentiveness.  Thus, as the Seventh Circuit explained in *Palay v. United States*:

> [I]t is easy to imagine a scenario in which MCC officials behaved in a negligent fashion, but without making the types of discretionary judgment that the statutory exception was intended to exempt from liability. Perhaps the corrections officer monitoring the holdover unit at the time that the gang altercation broke out was simply asleep, for example.  Or perhaps he left the unit unattended in order to enjoy a cigarette or snack. That type of carelessness would not be covered by the discretionary function exception, as it involves no element of choice or judgment grounded in public policy considerations.

349 F.3d at 432 (citing *Coulthurst v. United States*, 214 F.3d 106, 109-110 (2d Cir. 2001) (such negligence does not "involve an element of judgment or choice within the meaning of *Gaubert*")).  Similarly, the exception did not preclude the "negligent guard theory" in *Triestman*, whereby an "officer on duty … [may have] failed to patrol or respond diligently to an emergency situation out of laziness or inattentiveness."  470 F.3d at 475 (citing *Coulthurst,* 214 F.3d 106). The same principles apply here.  FCI-Allenwood employees would have had no discretion to abandon their posts, take an unauthorized smoke break, claim patrols they did not undertake, or otherwise fail to perform basic duties of their employment.  Plaintiffs have properly alleged claims based on that kind of negligence; and they are entitled to discovery on those claims, and an opportunity to prove them.

        3.       The Alleged Negligence Underlying Counts I And II Did Not Involve
                     Decisions "Fraught With Public Policy Considerations"

Because defendant's arguments fail on the first step of the *Gaubert/Berkovitz* test, it is unnecessary even to consider the second step.  But even if the second step is considered,

defendant's position must still be rejected. As already noted, plaintiffs' allegations do not involve any decision based on "public policy" judgments, and the TAC properly states a claim under the FTCA. *See, e.g., Ignatiev*, 238 F.3d at 465-466; *Treistman*, 470 F.3d at 475-477; *Palay*, 349 F.3d at 432; *Coulthurst*, 214 F.3d at 109-111. Thus, defendant's facial challenge fails.

Moreover, defendant has not mounted a proper factual challenge in this case. Defendant does not describe *any* specific decision by anyone at FCI-Allenwood, let alone a decision involving policy judgment, that exclusively caused the October 15, 2002, attack on Woodland.[15]

Lacking any basis for a proper challenge to the allegations in this case, defendant resorts instead to the suggestion that all "decisions made regarding the staffing and security at FCI-Allenwood" involved "judgments grounded in policy," Def. Br. at 24, and hence are protected by the discretionary function exception. If accepted, this argument would allow the exception to swallow the rule – a result that the D.C. Circuit has expressly rejected. *See Cope*, 45 F.3d at 449. It would also eliminate federal jurisdiction for nearly all claims challenging negligence occurring in prison – a result that nearly every court has also rejected. *See, e.g., Treistman*, 470 F.3d at 475 (distinguishing claims based on "staffing policy" from a "negligent guard theory"); *see also Palay*, 349 F.3d at 432; *Coulthurst*, 214 F.3d at 109-111.

C.    **The Discretionary Function Exception Does Not Bar Counts V And VI**

Defendant also seeks dismissal of Counts V and VI, wrongly asserting that "[p]laintiffs challenge the visitation policy of the medical center," Def. Br. at 34, and that all "decisions made

---

[15] Defendant does at one point claim that "even if FCI-Allenwood employees knew of the altercation, their actions would be protected." Def. Br. at 24. That generic hypothetical is not tied to any facts; does not identify any particular decision *in this case,* or explain how such a decision was grounded in policy; and at any rate not *all* "actions would be protected," Def. Br. at 24. *See Barrett*, 845 F. Supp. at 781 ("once a threat of violence was brought to the attention of [prison] officials, they were required to investigate the threat and determine whether [the plaintiff] was in danger"); *see also Triestman*, 470 F.3d at 475; *Palay*, 349 F.3d at 432.

regarding visitation … [are] grounded in policy," *id.* at 38.  This argument fails for the same

reasons already discussed with respect to Counts I and II, above.  Once again, defendant has

mischaracterized the claims that plaintiffs have made, and has ignored internal policies and

constitutional principles limiting USMCFP-Springfield employees' discretion.

>    1.    Counts V and VI Are Directed To USMCFP-Springfield Employees
>          Arbitrarily Denying Visitation, Despite Prior Approval

Defendant mischaracterizes the TAC by asserting, "[p]laintiffs challenge the visitation

policy of the medical center."  Def. Br. 34.  In fact, plaintiffs' allegations are directed at the

USMCFP-Springfield employees who arbitrarily denied visitation to Woodland and Dianne

Sledge and thereby intentionally and/or negligently caused them severe emotional distress:

- Dianne and Teresa Sledge sought and received permission to visit Woodland in November 2005.  TAC ¶ 21.  Thereafter, "on the approved dates," they traveled by bus to USMCFP-Springfield in Springfield, Missouri.  *Id.*
- When they arrived, USMCFP-Springfield employees rejected the visit (and thereby denied Woodland visitation with his mother and sister).  *Id.* ¶ 22.
- Those employees knew the visit had been approved; knew how difficult the trip had been; knew of Woodland's failing health; and knew or should have known that Woodland and Dianne Sledge might never have another visit.  *Id.*
- Nevertheless, without any legitimate justification, the employees "arbitrarily, irrationally, and/or invidiously" denied the visit.  *Id.* ¶ 23.

None of these allegations implicate any "policy" judgments.  They concern the arbitrary

violation of a policy, not its adoption.  Thus, any facial attack to Counts V and VI must fail, even

if the adoption of the visitation policy is itself protected by the discretionary function exception.

>    2.    USMCFP-Springfield Employees Had No Discretion To Arbitrarily Deny A
>          Visit That Had Previously Been Approved

In support of its motion, defendant has presented a copy of USMCFP-Springfield's

visitation policy adopted on July 13, 2006 – nine months **after** the November 2005 visit (and

seven months after Woodland's death).  Def. Ex. L.  It is unclear whether that policy was in

place in November 2005.  If it was, USMCFP-Springfield employees violated the policy by

- 26 -

refusing a previously-approved visit. *See* Def. Ex. L (Attachment 4) (approved-visits form specifies the visit "will" be held at specified time). The policy states that the warden must approve visits; it does not suggest that other employees can deny visits already approved by the warden. *See* Def. Ex. L ¶ 14(c). Yet that is what happened here. No USMCFP-Springfield employee had proper discretion to deny the November 2005 visit by Dianne and Teresa Sledge.

More generally, no federal employee has "discretion to violate the binding laws, regulations, or policies that define the extent of his official powers," *Red Lake Band of Chippewa Indians*, 800 F.2d at 1196, or to "violate constitutional rights." *Garcia*, 896 F. Supp. at 473.[16] Plaintiffs allege that USMCFP-Springfield employees "arbitrarily, irrationally, and/or invidiously" prevented Dianne Sledge from visiting Woodland, and that those employees had no "legitimate justification" for doing so. TAC ¶ 23, 73, 81. Those allegations plead a constitutional violation under *Village of Willowbrook v. Olech*, which held that allegations of "irrational and wholly arbitrary" treatment are "sufficient to state a claim for relief under" the equal protection clause. 528 U.S. 562, 565 (2000).[17] While "constitutional tort claims are not actionable under the FTCA," the point here is that "the discretionary function exception does not shield unconstitutional conduct." *Garcia*, 896 F. Supp. at 473.

Finally, defendant's motion to dismiss Counts V and VI turns in part on an unresolved dispute of material fact. Plaintiffs have alleged they were given permission to visit on November 12, 2005, *see* TAC ¶ 21; that allegation is supported by the Declaration of Teresa Sledge. Defendant relies on a questionable hearsay declaration (i) submitted by a witness plaintiffs have

---

[16] *Cf. Jerome Stevens Pharma.*, 402 F.3d at 1252 (exception did not protect violations of statute prohibiting disclosure of trade secrets); *Moore v. Valder*, 65 F.3d 189, 197 (D.C. Cir. 1996) (rule prohibiting disclosure of grand jury testimony).

[17] *See also Shipp v. McMahon*, 234 F.3d 907, 916-917 (5th Cir. 2000) (allowing plaintiff to amend claims and assert equal protection violation regarding police protection).

never examined, (ii) citing documents plaintiffs have never seen, and (iii) raising questions as to

why the declarant (Ms. Rinker) would have been involved at USMCFP-Springfield after her

retirement date.  That is exactly the type of factual dispute that can only be resolved at trial.

*Herbert*, 974 F.2d at 197-198.  *See also Ignatiev*, 238 F.3d at 467; *Loughlin*, 393 F.3d at 166.

**III.**   **STEVEN AND DIANNE SLEDGE ARE PROPER PLAINTIFFS TO MAINTAIN THEIR CLAIMS UNDER THE GOVERNING STATE LAW**

Defendant concedes that Steven Sledge properly asserts Counts I and II ("FCI-Allenwood

claims") under Pennsylvania law.  Defendant further concedes that Steven Sledge and Dianne

Sledge properly assert Counts V and VI ("emotional distress claims") under Missouri law.

However, in support of its argument that Count IV should be dismissed under Pennsylvania Rule

of Civil Procedure 2202 (which supposedly precludes Dianne Sledge from asserting a wrongful

death claim), defendant argues that Pennsylvania law governs Counts III-IV.  That is incorrect.

Properly understood, Counts III and IV are governed by Missouri law, not Pennsylvania law.

Moreover, even if Rule 2202 applied, it would not foreclose plaintiffs' claims in Count IV.

**A.**   **Missouri Law Governs Plaintiffs' Claims Based On Negligence In Missouri**

**1.**   Missouri Choice Of Law Rules Govern Counts III and IV

The FTCA's choice of law rule is straightforward: plaintiffs' claims are governed by the

law of the state where the negligent "act or omission occurred."  28 U.S.C. § 1346(b).  As

defendant concedes, courts in this Circuit must apply the law (including the choice-of-law rules)

of the state "where the negligence took place."  *Hitchcock v. United States*, 665 F.2d 354, 359

(D.C. Cir. 1981); *see* Def. Br. at 11.  Thus, claims alleging negligence by FCI-Allenwood

employees in Pennsylvania (Counts I-II) are governed by Pennsylvania law, and claims alleging

negligence by USMCFP-Springfield employees in Missouri (Counts III-VI) are governed by

Missouri law.[18]  That should be the end of the analysis.  But here, defendant has attempted to conflate Counts I-IV, arguing that they are all part of a "multi-state tort" that began when Woodland was first injured in Pennsylvania, and must all be governed by Pennsylvania law. Defendant's argument is wrong on the facts and wrong on the law.

First, plaintiffs' FCI-Allenwood claims are entirely separate from their USMCFP-Springfield claims.  The negligence underlying Counts III and IV is separated from Counts I and II by three years and several hundred miles; involves different types of conduct (sustenance and medical care, as opposed to prison security); involves separate and distinct injuries; and arises from separate administrative claims resolved by separate regional offices of the BOP.[19]

Second, contrary to defendant's contention, nothing prevents the Court from applying different state law to different claims.  Indeed, defendant itself argues that Pennsylvania law applies to some counts (I-IV), while conceding that Missouri law applies to others (V-VI). Moreover, the "multi-state tort" cases relied on by defendant are readily distinguishable; they all involved a *single claim* that touched upon two jurisdictions.  Thus, *Richards* and *Hitchcock* both involved a single act of negligence in one state followed by a single injury in another state.  *See Richards v. United States*, 369 U.S. 1, 2 (1962) ("an act of negligence occurs in one State and results in an injury and death in another State"); *Hitchcock v. United States*, 665 F.2d at 359 ("[a]ny negligence arising from these facts certainly cannot be attributed to the [acts occurring in

_____

[18] Defendant concedes that Counts V and VI are governed by Missouri law.  Def. Br. 31-32.

[19] Count I involves "brain damage" and injuries that rendered Woodland "functionally quadraparetic." TAC ¶ 14.  In contrast, Count III involves "injury at USMC-Springfield, including severe pain, hunger, and illness," that eliminated Woodland's "chance of recovery." TAC ¶ 19.  While Counts II and IV are both wrongful death claims, they are based on separate conduct and plaintiffs do not seek a "double remedy," Def. Br. at 15 n.13.  In the event plaintiffs prove liability for both Counts II and IV, damages will be adjusted to prevent a double recovery. *See Brooks v. United States*, 337 U.S. 49, 53-54 (1949).  And even if recovery between Counts II and IV were mutually exclusive, Fed. R. Civ. P. 8(a) permits plaintiffs to plead alternative theories.

the other state]").  Similarly, *Raflo* and *Simon* involved related acts that resulted in a single

injury.  *Raflo v. United States*, 157 F. Supp. 2d 1, 4 (D.D.C. 2001) ("*a series of negligent actions*

in failing to properly diagnose") (emphasis added); *Simon v. United States*, 341 F.3d 193, 202

(3d Cir. 2003) (single theory of liability for plane crash caused by negligence in Washington, DC

and Indiana).  These "multi-state tort" cases have no application here.  Plaintiffs' USMCFP-

Springfield claims are based on negligence committed in Missouri; the claims are therefore

governed by Missouri choice of law rules.

> 2.    The Missouri Choice Of Law Rules: Missouri Substantive Law Governs

The next step is to consider, under Missouri's choice of law rules, what substantive law

should apply.  The "Missouri courts apply the 'most significant relationship' test." *Stricker v.*

*Union Planters Bank, N.A.*, 436 F.3d 875, 878 (8th Cir. 2006).  This test "requires a court to

consider: '(a) the place where the injury occurred, (b) the place where the conduct causing the

injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of

business of the parties, and (d) the place where the relationship, if any, between the parties is

centered.'" *Id.* (quoting Restatement (Second) of Conflict of Laws § 145 (1971)).

This analysis confirms that Missouri substantive law governs Counts III and IV.  While

Woodland's domicile was arguably the District of Columbia, the negligent conduct occurred in

Missouri; the injury occurred in Missouri; and at the time the parties' relationship was centered

in Missouri.  Because three of the four factors definitively weigh in favor of Missouri (and none

points towards Pennsylvania), Missouri's choice of law rules confirm that Counts III-IV are

governed by the substantive law of Missouri.  *See Scheerer v. Hardee's Food Systems, Inc.*, 92

F.3d 702, 708 (8th Cir. 1996) (citing Restatement (Second) of Conflict of Laws § 146 & cmt. d).

> 3.    The Pennsylvania Choice Of Law Rules: Missouri Substantive Law Governs

The result is the same even if, as defendant erroneously argues, the FTCA analysis

- 30 -

compelled the application of Pennsylvania's choice of law rules to Counts III and IV.

Pennsylvania's choice of law rules combine a "relationships" analysis with an "interests analysis" in three stages. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007). First, the courts identify relevant "conflicts" in the laws of the two states. *Id*. at 229-30. Second, if there are such differences, the court determines whether they present a "true conflict," a "false conflict," or an "unprovided-for" case. *Id*. at 230. Finally, depending on the second step, courts apply one of three dispositive tests. Thus:

- If the "governmental interests of both jurisdictions would be impaired if their law were not applied," there is a "true conflict," and the court applies the law of the state with the "most significant contacts or relationships."
- If "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws," there is a "false conflict," and the court applies the law of the state whose "interests would be impaired."
- If the court finds that "neither state's interests would be impaired if its laws were not applied," there is an "unprovided-for" situation, and the outcome is determined by the *lex loci delicti*.

*Id*. at 229-30 (citations omitted). Defendant overlooks Missouri's interests in Counts III and IV, argues that the conflict is "unprovided for," and then concludes that *lex loci delicti* applies. In fact, the case presents a "false conflict." But in the end it does not matter – under either analysis Counts III and IV would be governed by Missouri law.[20] In sum, even if Pennsylvania's *choice of law rules* applied, and even if *lex loci delicti* were the right framework, there can be no question that Missouri *substantive law* governs Counts III and IV.[21]

a) Pennsylvania Has No Governmental Interests In Counts III and IV

First, while there are relevant differences in Missouri and Pennsylvania law (including

---

[20] Missouri law would apply even if there were a true conflict. Missouri has substantial relationships to Counts III-IV (*see supra* part III.A.2); Pennsylvania has no relationship to either claim.

[21] Defendant correctly concedes that these choice of law rules require the application of Missouri substantive law to Counts V and VI. Def. Br. at 31-32.

with respect to wrongful death damages),[22] any "conflicts" are false, because Pennsylvania has no interest in Counts III and IV. Those claims (a) are directed to negligence committed only in Missouri; (b) involve injuries caused and suffered only in Missouri; (c) do not involve Pennsylvania citizens; and (d) do not involve a decedent whose estate or beneficiaries reside in Pennsylvania. *Cf. Hager v. Etting*, 408 A.2d 856, 858 (Pa. Super. Ct. 1979) ("We see no significant interest that [Pennsylvania] would further by having its law applied as to duties of possessors of land where the alleged tort occurred in New Jersey.").

On the other hand, Missouri, like any state, has a compelling interest in governing primary conduct within its borders, especially when it comes to health care.[23] Thus, for example, *Troxel v. A.I. duPont Institute* applied Delaware law to claims based on care provided in Delaware – even where the patient was a Pennsylvania citizen. 636 A.2d 1179, 1181 (Pa. Super. Ct. 1994).[24] The court explained that, while Pennsylvania had an interest in protecting plaintiff, "that interest [was] superseded by Delaware's interest in regulating the delivery of health care." *Id.* The result is the same here: while Missouri has compelling interests in Counts III and IV, Pennsylvania has none. The conflict is "false," and the substantive law of Missouri governs.

b)  The Relevant Injuries Occurred In Missouri

Defendant overlooks Missouri's interests in Counts III and IV, and therefore argues that this case involves an "unprovided-for situation" governed by *lex loci delicti*. That is wrong, but it is of no consequence. That is because, under Pennsylvania choice of law rules for wrongful

---

[22] *Compare Baumgart v. Keene Bldg. Prods. Corp.,* 633 A.2d 1189, 1191 (Pa. Super. Ct. 1993) (pecuniary loss includes deprivation of the earnings survivors would have received) *with* Mo. Rev. Stat. § 537.090 (value of lost services, consortium, companionship, comfort, and guidance).

[23] While Counts III-IV are not limited to medical malpractice, they do allege such negligence.

[24] *See also, e.g., Wojiski v. Gordon*, 1990 WL 39153 at *5 (E.D. Pa. 1990) (recognizing Delaware's interest in regulating conduct of dentists within Delaware); *Levin by Levin v. Desert Palace, Inc.*, 465 A.2d 1019, 1021 (Pa. Super. Ct. 1983) (recognizing "Nevada's interest in regulating the conduct and prescribing the liability of hotel owners within its jurisdiction").

- 32 -

death claims, the *lex loci delicti* is the law of the state "where the injuries are received." *Mike v. Lian*, 185 A. 775, 777-78 (Pa. 1936), *overruled on other grounds in Griffith v. United Airlines*, 203 A.2d 796 (Pa. 1964). The injuries here were "received" at USMCFP-Springfield – and therefore Missouri law governs.

That is so regardless of defendant's unexplained assertion that the "operative injury is that which took place in FCI-Allenwood." Def. Br. at 14. The negligence asserted in Counts III and IV was committed three years after Woodland left FCI-Allenwood, and it is impossible to see how USMCFP-Springfield employees could have possibly caused an injury in Pennsylvania. Thus, even applying Pennsylvania choice of law rules, and even applying *lex loci delicti*, Counts III and IV are still governed by the substantive law of Missouri.

**B.**     **Rule 2202 Specifically Permits The Decedent's Mother To File A Claim**

For the reasons stated above, Pennsylvania Rule 2202 does not apply to Count IV. But even if it did, Dianne Sledge would still be entitled to maintain her claim. While Pennsylvania Rule 2202 does provide that only the personal representative can assert a wrongful death action *during the first six months after the death*, after that point any statutory beneficiary can assert the claim. While citing and relying on Rule 2202, Defendant has omitted its controlling language:

> (a) *Except as otherwise provided in clause (b) of this rule,* an action for wrongful death shall be brought only by the personal representative of the decedent for the benefit of those persons entitled by law to recover damages for such wrongful death.
>
> (b) *If no action for wrongful death has been brought within six months after the death of the decedent, the action may be brought by the personal representative or by any person entitled by law to recover damages in such action as trustee ad litem on behalf of all persons entitled to share in the damages.*

Pa. R. Civ. P. 2202 (emphasis added for text omitted from Def. Br. at 14).

Dianne Sledge is entitled to proceed even under Rule 2202. First, as Woodland's mother, she is a "person entitled by law to recover damages in such action as trustee *ad litem* on behalf of

all persons entitled to share in the damages." *See* 42 Pa. C.S.A. § 8301(b) (establishing that a decedent's parent is a statutory beneficiary for wrongful death claim).[25]  Second, no action was brought within six months of Woodland's death.  Woodland died on January 29, 2006, and Count IV was not asserted until the Second Amended Complaint was filed in this Court on June 25, 2007 – nearly a year and a half later.[26]  Thus, even under defendant's flawed choice of law analysis, by which Pennsylvania law supposedly governs this Missouri wrongful death claim, Pennsylvania Rule 2202 would not bar Dianne Sledge from asserting Count IV.

## IV.    COUNTS III AND IV ARE NOT BARRED BY STATE PROCEDURAL STATUTES THAT DEFENDANT ITSELF HAS DEFEATED

Defendant argues that Counts III and IV should be dismissed based on state laws that require plaintiffs to file expert "certificates of merit" or "affidavits of merit" (collectively, "certification statutes") before asserting medical malpractice claims.  *See* Def. Br. at 25-29 (citing Pa. R. Civ. P. 1042.3; Mo. Rev. Stat. § 538.225.1).  Defendant's argument should be rejected for three reasons.  First, the state certification statutes are procedural devices that are inapplicable to this federal action.  Second, even if the state statutes could otherwise supplant the Federal Rules of Civil Procedure, they cannot apply when the defendant itself rendered compliance impossible by failing to timely produce a deceased patient's medical records.  Third, Counts III and IV include claims for simple negligence (negligent failure to provide adequate sustenance) that would survive even if the claims of professional negligence were dismissed.

---

[25]  Dianne Sledge asserts Count IV for the benefit of all of Woodland's statutory beneficiaries. *See* TAC ¶¶ 67, 69, 84(e) (seeking damages for Woodland's statutory beneficiaries).  Thus, under Pennsylvania law, Dianne Sledge acts as trustee *ad litem*.  *See Machado v. Kunkel*, 804 A.2d 1238, 1246-1247 (Pa. Super. Ct. 2002) (plaintiff acted as trustee *ad litem* by naming statutory beneficiaries and seeking damages for those statutory beneficiaries).

[26] Moreover, the relevant administrative claim was filed on November 29, 2006, *i.e.*, ten months after Woodland's death.

**A.** **The State Certification Statutes Cited By Defendant Conflict With The Federal Rules Of Civil Procedure And Cannot Apply To FTCA Litigation**

Both the Pennsylvania and Missouri certification statutes require plaintiffs to submit an expert statement attesting to the merits of their medical malpractice claims.[27]  The Pennsylvania statute requires a "certificate of merit" by a "licensed professional" within sixty days after the complaint is filed.  Pa. R. Civ. P. 1042.3.  The Missouri statute requires an "affidavit of merit" attesting that plaintiff has obtained a written opinion from a "legally qualified health care provider" within ninety days of filing the complaint.  Mo. Rev. Stat. § 538.225.1.  Both statutes require an expert certification establishing the merits of the claims, and they mandate dismissal where the certification has not been filed.

　　　1.　　The Certification Statutes Conflict With Federal Law

The state certification statutes do not apply to this federal action.  First, where state laws directly conflict with the Federal Rules of Civil Procedure, the state laws must give way.  *Burlington Northern Railroad Co. v. Woods*, 480 U.S. 1, 4-5 (1987) (where federal rules are "sufficiently broad to cause a direct collision with the state law or, implicitly, to control the issue before the court…the [Federal] Rule must then be applied if it represents a valid exercise of Congress' rulemaking authority") (quotations omitted); *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 428 n.7 (1996) ("It is settled that if the Rule in point is consonant with the Rules Enabling Act, 28 U.S.C. § 2072, and the Constitution, the Federal Rule applies regardless of contrary state law.").  That is precisely the case here, as observed by several courts confronting analogous statutes.[28]

_____

[27] While the relevant claims are exclusively governed by Missouri law (*see* part III.A., *supra*), defendant argues in the alternative, asserting both the Pennsylvania and Missouri certification statute.  Accordingly, we address both statutes here.

[28] *See Poindexter v. Bonsukan*, 145 F. Supp. 2d 800, 808 (E.D. Tex. 2001) (Texas certification statute conflicted with Rules 26(a)(2) and 37(c)(1) as they related to expert discovery); *Sauceda*

The Pennsylvania and Missouri certification statutes both directly conflict with the "discretionary mode of operation" (*Woods*, 480 U.S. at 7) established by the Federal Rules of Civil Procedure. Whereas the Federal Rules "adopt a case-by-case approach to discovery of experts and identifying and deterring frivolous actions," the state certification statutes impose specific deadlines and "automatically characterize[] every medical malpractice suit as frivolous where an expert affidavit is not obtained" by the deadline. *Serocki,* 312 F. Supp. 2d at 1210. Thus, the certification statutes set automatic, mandatory deadlines by which plaintiffs must file their expert statements of merit. *See* Mo. Rev. Stat. §§ 538.225.1, 538.225.5; Pa. R. Civ. P. 1042.3. Those deadlines conflict with Rules 16 and 26, which grant district courts broad discretion to control the timing of discovery, including expert discovery. *See Poindexter*, 145 F. Supp. 2d at 804.[29] Similarly, while Federal Rule of Civil Procedure 37 grants courts broad discretion to determine sanctions for noncompliance, the certification statutes only allow the harshest possible sanction: mandatory dismissal. That, too, is a direct conflict with federal law.[30]

_____

*v. Pfizer, Inc.*, 2007 WL 87660 at *2 (S.D. Tex. 2007) (same); *Serocki v. Meritcare Health Sys.*, 312 F. Supp. 2d 1201, 1210-1211 (D.S.D. 2004) (North Dakota certification statute conflicted with Rules 26(a)(2) and 37(c)(1)); *Baird v. Celis*, 41 F. Supp. 2d 1358, 1362 (N.D. Ga. 1999) (Georgia certification statute conflicted with federal notice pleading); *Braddock v. Orlando Regional Health Care Sys., Inc.*, 881 F. Supp. 580, 583-584 (M.D. Fla. 1995) (Florida certification statute conflicted with federal notice pleading).

[29] Fed. R. Civ. P. 26(a)(2)(C) states that a party must disclose expert testimony "at the times and in the sequence that the court orders" and allows the court broad discretion to establish those times and orders. Fed. R. Civ. P. 16(b)(3) and (4) specifically grant federal district courts discretion to establish, and for good cause to modify, a scheduling order, including a discovery schedule and deadline. Fed. R. Civ. P. 16(b)(3)(B)(ii) further gives the courts discretion to "modify the extent of discovery." By contrast, under the Pennsylvania and Missouri provisions, the courts have no choice but to apply the statutory deadlines.

[30] While the Missouri certification statute once allowed courts some discretion with respect to dismissal (*see* Def. Br. at 28), that changed in 2005 when the statute was amended to require dismissal. *See* Mo. Rev. Stat. § 538.225.6 (court "shall" dismiss). That now-obsolete discretion was critical in *Smith v. Planned Parenthood of the St. Louis Region*, 225 F.R.D. 233 (E.D. Mo. 2004) (applying previous certification statute in a diversity action). The *Smith* court, citing authority that other certification statutes could not apply in federal court, distinguished those

2.    Concerns About Forum Shopping Do Not Apply To FTCA Actions

Even if there were no technical conflict between state and federal law, under *Erie* these

procedural statutes cannot apply to an FTCA action against the United States.  As explained in

*Hill*, when "there is no federal rule on point, the court must evaluate whether application of the

state law would further the 'twin aims of the *Erie* rule: discouragement of forum shopping and

avoidance of inequitable administration of the laws.'"  870 F. Supp. at 982 (quoting *Stewart

Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 n. 6 (1988) and citing *Hanna v. Plummer*, 380

U.S. 460, 468 (1965)).

In *Hill*, the court found that failing to apply the certification statute in a diversity action

might "encourage forum-shopping" plaintiffs to file in the federal courts (rather than state

courts).  *Id*.  The court further found that failing to apply the statute would "result in inequitable

administration of the law by compelling a health care provider sued in federal court to forego the

protections afforded by" the statute, which "would be available except for the circumstance of

diversity of citizenship."  *Id*.  *Cf. Edelson v. Soricelli*, 610 F.2d 131, 135 (3d Cir. 1979)

(applying state-law screening procedures "to discourage forum shopping"). That reasoning does

not apply to an FTCA action against the United States, because regardless of any state procedural

statutes, the FTCA *requires* plaintiffs to file in federal court.  28 U.S.C. § 1346(b)(1).

3.    The Certification Statutes Would Result In "Inequitable Administration"

Applying the certification statutes in an FTCA action would itself "result in [an]

inequitable administration of the law" that *Erie* was intended to prevent.  *Hill*, 870 F. Supp. at

982.  The certification statutes assume that the plaintiff will have prompt and continuing access

---

cases based on the then-discretionary nature of Missouri law.  *Id*. at 240-41.  Similarly, the fact
that the previous Missouri statute allowed courts discretion may be one reason why *Hill v.
Morrison* (*see* Def. Br. 28 n.17) did not address the current conflicts between Missouri law and
Federal Rules 16, 26, and 37.  870 F. Supp. 978, 982 (W.D. Mo. 1994).

to the evidence, including relevant medical records.  They were not designed to cover claims relating to a deceased federal prisoner, where the claim is that the defendant United States caused his death, and where the Bureau of Prisons itself has failed to timely produce his medical records.

This case demonstrates the problem, and indeed the absurdity, of defendant's position that Counts III-IV should be dismissed.  Plaintiffs requested Woodland's medical records long before filing the Second Amended Complaint (which first asserted Counts III and IV).  *See* Pltff. Ex. 6; *see also* Pltff. Ex. 8 (April 23, 2006, Request for Medical Records); Pltff. Ex. 9 (March 23, 2007, FOIA Request); Pltff. Ex. 10 at 1 (April 5, 2007, Letter to Joseph T. McGuire, Esq.). But plaintiffs did not receive *any* records about Woodland until January 15, 2008 – seven days before this Opposition was due, ten months after counsel's request, and more than six months after the Second Amended Complaint was filed.  *See* Pltff. Ex. 7.  That is not how these certification statutes are supposed to work.

The statutes were established "to cull at an early stage of litigation suits for negligence damages against health care providers that lack even color of merit."  *Mahoney v. Doerhoff Surgical Services, Inc.*, 807 S.W.2d 503, 507 (Mo. 1991); *cf. Womer v. Hilliker*, 908 A.2d 269, 275 (Pa. 2006) (rule established to "weed non-meritorious malpractice claims from the judicial system efficiently and promptly").  The certification statutes are part of a regulatory regime that includes, and must be interpreted in conjunction with, other state-law rules requiring the prompt production of patient records.  *See* 42 Pa. C.S.A. § 6155(b)(1); Mo. Rev. Stat. § 191.227. Without those medical records, it is obviously impossible for any plaintiff to submit a proper certification – especially where (as here) the alleged negligence resulted in the patient's death.

Here, the foundational premise of the state regulatory regime – the requirement that

health care providers promptly provide all relevant medical records – does not apply to federal agencies; and even if it did, the BOP has not complied.  Under those circumstances, there is no legitimate or equitable reason to apply only one part of the regulatory regime – the one requiring plaintiffs to submit an expert certification within a fixed time period  – when there is no legal requirement that defendant first produce the medical records needed to make the certification.

Here, plaintiffs do not know the reason for the lengthy delay in producing Woodland's medical records.  But whatever the reason, the fact remains that plaintiffs could not possibly have filed certifications of merit from expert witnesses before they had received the records, *and it was defendant that rendered compliance impossible*.  The certification statutes cannot apply under these circumstances; otherwise, federal agencies could defeat meritorious claims merely by delaying production of rightfully requested records.

**B.**     **State Certification Statutes Cannot Apply When The Defendant Fails To Promptly Produce Requested Medical Records**

For the same reasons discussed above, even as a matter of state law, neither the Pennsylvania nor Missouri certification statutes would require dismissal of Counts III and IV. Pennsylvania and Missouri both hold that statutes should be interpreted in ways that avoid "absurd" results.  *See* 1 Pa. C.S.A. § 1922(1) (establishing presumption that legislature did not intend "a result that is absurd [or] impossible of execution"); *State ex. rel. McNary v. Hais*, 670 S.W.2d 494, 495 (Mo. 1984) (courts "presume that the legislature did not intend to enact an absurd law" and "favor a construction that avoids unjust or unreasonable results.").  If applied here, the state certification statutes would create a result that is both "unjust" and "absurd," and particularly so because the defendant itself rendered compliance "impossible of execution."

A private defendant in Pennsylvania or Missouri could not delay providing requested records for nearly *ten months* without violating state patient-records laws.  Thus, even assuming

that there was no bad faith here, the proper state-law analogue would be a defendant who unlawfully withheld records to avoid substantive liability. The certification statutes cannot apply under those circumstances; otherwise they would perversely reward violations of state patient-records laws. That is not how state legislatures intended these statutes to work.[31]

## C.    Counts III And IV Are Not Limited To Medical Malpractice Claims

Plaintiffs' Counts III and IV allege a "negligent failure to provide adequate sustenance and care." TAC, ¶¶ 58, 66. This allegation encompasses not only professional negligence for medical malpractice, but also simple negligence for the failure to provide adequate sustenance. By contrast, the state certification statutes relied on by defendant apply only to claims of medical malpractice. Mo. Rev. Stat. § 538.225.1 (applying to actions for "the rendering of or failure to render health care services"); Pa. R. Civ. P. 1042.3 (applying to claims that a "licensed professional deviated from an acceptable professional standard"). Thus, even if those statutes could be construed to apply here – a result that, for the reasons stated, is contrary to common sense and elementary fairness – they would not result in dismissal of Counts III and IV. The portions of those two counts that assert claims of simple negligence would necessarily survive.

The adequate-sustenance allegations underlying Counts III and IV are not directed to USMCFP-Springfield employees acting as "health care provider[s]" under Mo. Rev. Stat. § 538.225.1. They are directed to USMCFP-Springfield employees who were, under 18 U.S.C. § 4042, responsible for providing Woodland adequate sustenance. Moreover, the duty at issue is

---

[31] "The purpose of the statute[ ] is not to afford malpractice defendants with a sword to fight off a malpractice action by procrastinating in providing records and other relevant materials that a competent, conscientious expert would have to analyze before submitting an Affidavit of Merit." *Newell v. Ruiz*, 286 F.3d 166, 172 (3d Cir. 2002) (citations omitted) (alteration in original); s*ee also Aster v. Shoreline Behavioral Health*, 788 A.2d 821 (N.J. Super. A.D. 2002) (overturning dismissal where plaintiff made repeated requests for records that were never produced and that "had a substantial bearing on the ability to prepare an affidavit of merit.").

imposed by federal law, not by the state-law standards governing professional health care

providers.  *See United States v. Muniz*, 374 U.S. 150, 164-165 (1963).[32]  In addition, because

plaintiffs' adequate-sustenance allegations do not assert that USMCFP-Springfield employees

were "health care provider[s] …  acting in that capacity," even at trial it will not be "essential

that the plaintiff establish by expert testimony that the health care provider deviated from the

accepted standard of care."  *Morrison v. St. Luke's Health Corp.*, 929 S.W.2d 898, 906 (Mo. Ct.

App. 1996).  The duty of care established by 18 U.S.C. § 4042 does not require "expert

testimony to establish the standard of care of a professional health care provider" because

USMCFP-Springfield employees were "not functioning in that capacity." *Id.* at 905-906.[33]

Consequently, for those portions of Counts III and IV that are not "medical malpractice action[s],

the type of case clearly addressed by § 538.225.1," it is "not necessary for plaintiff to file an

affidavit pursuant to that statute."  *Id.* at 906.  Therefore, Counts III and IV cannot be dismissed

for failure to submit such an affidavit.  *Id.*

## V.    DEFENDANT'S REQUEST FOR TRANSFER SHOULD BE DENIED

As an alternative and last-ditch effort, defendant has moved under 28 U.S.C. § 1404(a) to

transfer this action to the Middle District of Pennsylvania or the Western District of Missouri.

Def. Br. at 39-41.  The request should be denied.  Defendant concedes that venue is proper in this

district; that plaintiffs' choice of forum is entitled to deference; that regardless of where the case

is heard, witnesses will be required to travel interstate; and that any court deciding the case will

need to construe the law of at least one foreign state.  *Id.* at 39-41.  Plaintiffs are entitled to their

---

[32] FTCA claims are generally determined with reference to state law.  However, with respect to certain prisoner claims, "the duty of care owed by the Bureau of Prisons to federal prisoners is fixed by 18 U.S.C. § 4042," which obligates the BOP to "provide … subsistence" for prisoners.

[33] The same reasoning applies to Pennsylvania's certification statute.  That statute only applies to claims that a "licensed professional deviated from an acceptable professional standard."  Pa. R. Civ. P. 1042.3.  The relevant standard in this case is not such a "professional standard," but rather the standard imposed by federal law, 18 U.S.C. § 4042.  *Muniz*, 374 U.S. at 164-165.

chosen forum.  They and other witnesses are here in the District of Columbia.  Any transfer

would impose an impossible financial burden on plaintiffs, effectively ending the case.

While transfer under section 1404(a) is "a discretionary matter to be decided on a case-

by-case basis," the moving party "bear[s] the burden of showing that the balance of case-specific

factors favors transfer."  *In re Vitamins Antitrust Litigation*, 263 F. Supp. 2d 67, 68-69 (D.D.C.

2003) (citations omitted).  Moreover, it is well established that a plaintiff's "choice of forum…is

afforded substantial deference, and a case should not be transferred 'from a plaintiff's chosen

forum simply because another forum, in the court's view, may be superior to that chosen by the

plaintiff.'"  *National Wildlife Federation v. Harvey*, 437 F. Supp. 2d 42, 46 (D.D.C. 2006) (citing

*Pain v. United Technologies Corp.*, 637 F.2d 775, 783 (D.C. Cir. 1980)).  Deference to plaintiff's

choice of forum "is particularly strong" where, as here, "plaintiff has chosen his home forum."

*Gemological Institute of America, Inc. v. Thi-Dai Phan*, 145 F. Supp. 2d 68, 71 (D.D.C. 2001).[34]

The transfer statute on its face lists three main factors for the Court to consider: "the

convenience of the parties," "the convenience … of the witnesses," and "the interest of justice."

Those same three factors are recited in the principal case relied on by defendant.  Def. Br. 39

(citing *Ross v. United States*, 1987 WL 33514 at *2 (D.D.C. 1987) (transfer provision is intended

"to protect litigants, witnesses and the public against unnecessary inconvenience and expense…

.") (citations omitted)).  Each of those three principal factors strongly supports plaintiffs' choice

of venue; and none points strongly, much less decisively, toward either Pennsylvania or

Missouri.

The Parties: As noted, both plaintiffs reside in the District of Columbia.  In addition, all

---

[34] *See also International Painters and Allied Trades Industry Pension Fund v. Tri-State Interiors, Inc.*, 357 F. Supp. 2d 54, 56 (D.D.C. 2004) ("plaintiff's choice of forum is given additional deference when the plaintiff is a resident of the forum district") (citations omitted).

of Woodland's statutory beneficiaries (for wrongful death actions under Pennsylvania and Missouri law), including his three children, reside in the Washington, D.C. area. Moreover, the defendant United States is centered in Washington, D.C., which is also the headquarters of the most relevant federal agency, the Bureau of Prisons. No party resides outside the District.

The Witnesses: Many of the important witnesses reside in Washington, D.C. They include both plaintiffs (Steven Sledge and Dianne Sledge); Teresa Sledge (who regularly spoke with Woodland until his death and accompanied plaintiff Dianne Sledge to USMCFP-Springfield for the November 2005 visit); Rico Woodland's children (whose testimony will be relevant to damages); Ishmael Ford-Bey (who pled guilty to the assault on Woodland and since his release is believed to be in Washington, D.C.); Francis Jones (a former inmate patient care assistant at FMC-Fort Worth presently believed to be in Washington, D.C.); and any BOP employees with first-hand knowledge either of relevant events or of the policy directives governing employees at FCI-Allenwood and USMC-Springfield. To be sure, there are undoubtedly witnesses with relevant information outside Washington, including in Pennsylvania, Missouri, and Fort Worth, Texas. But the defendant has not shown, and there is no reason to believe, that there are more of them in any one location than there are in Washington, D.C., or that it would be more convenient for all witnesses if the case were transferred to Pennsylvania or Missouri. *See In re Vitamins Antitrust Litigation*, 263 F. Supp. 2d at 69 ("Section 1404(a) provides for transfer to a more convenient forum, not a forum likely to prove equally convenient or inconvenient.") (quotations omitted). This Court is relatively centrally located in the Nation's capital, and considering the disparate locations of relevant witnesses, it is the most convenient forum.

The Interest of Justice: The interest of justice strongly supports keeping this case in the District. Plaintiffs are indigents, allowed to proceed *in forma pauperis*. Their counsel, appointed

by the Court and acting *pro bono*, are headquartered in the District, and have no offices in either

Pennsylvania or Missouri.  A transfer of this action would impose a crushing financial burden on

plaintiffs that would make it difficult, if not impossible, for them to proceed.  Under those

circumstances, the Court can and should exercise its discretion to reject a proposed transfer that

would effectively end the litigation.  *See, e.g., Race Safe Systems, Inc. v. Indy Racing League*,

251 F. Supp. 2d 1106, 1112 (N.D.N.Y. 2003) ("[a] court should not find that transfer to a forum

which is financially out of reach of a plaintiff in strained pecuniary circumstances to be in the

interest of justice.").[35]  By contrast, there is no financial disadvantage to the defendant in

litigating here, or in any other forum.  *See, e.g., Tsarparikos v. Ford Motor Corp.*, 2002 WL

31844949 at *2 (N.D. Ill. 2002) (finding "Plaintiffs' financial hardship and Ford's ability to

litigate in either forum heavily favor the retention of this venue.").

Against all of these factors, the defendant's arguments carry little weight.  To be sure, no

issue in this case turns on the law of the District of Columbia.  But as defendant itself concedes,

this case involves both Pennsylvania and Missouri law.  Thus, wherever it is litigated, the court

---

[35] *See also Collier v. Murphy*, 2002 WL 31761406 at *4 (N.D.Ill. 2002) (denying motion to
transfer, after concluding that the "overwhelming factor is the economic impact on the parties"
and "a transfer would have a much greater impact on plaintiff's ability to litigate this claim");
*Austin v. International Bhd. Of Teamsters-Airline Div. 2747*, 739 F. Supp. 206, 208 (S.D.N.Y.
1990) (denying a motion to transfer a case from New York to Michigan, despite the fact that the
incidents took place in Michigan and many witnesses were in Michigan, because the plaintiff
brought the action in her home forum of New York and would be unable to pursue the action, if
transferred, due to "severe financial strain"); *Hervey v. United States*, 450 F. Supp. 1148, 1149
(E.D. Wis. 1978) (denying a transfer of FTCA action by a former federal prisoner for injuries
suffered while in prison, where, *inter alia*, plaintiff "resides in Wisconsin; most of her witnesses
on the issue of damages reside in Wisconsin; [and] she is presently on welfare and would suffer a
severe financial disadvantage were she required to prosecute her action in Kentucky[.]"); *Collins
v. Missouri Elec. Coop. Employee Credit Union*, 2005 WL 1702687 at *5 (E.D. Mo. 2005)
(noting potential injustice of transfer where plaintiff proceeds *in forma pauperis*).  *Cf.  Nichols v.
U.S. Bureau of Prisons*, 895 F. Supp. 6, 8 (D.D.C. 1995) (noting the location of counsel as an
important factor in deciding a transfer motion).  *See generally* Wright, Miller & Cooper, 15
Federal Practice & Procedure § 3849 & n.22 (2007).

will need to construe the law from at least one other state.[36]  Finally, defendant's reliance on *Zakiya v. United* States, 267 F. Supp. 2d 47 (D.D.C. 2003) is entirely misplaced.  Def. Br. at 40. The result in *Zayika* was not based on the "convenience of parties and witnesses," or "the interests of justice"; instead, it was based on the court's conclusion that the District of Columbia was an *improper* venue for the suit.  *Zakiya*, 267 F. Supp. 2d at 59.  Here, by contrast, defendant concedes that venue in Washington, D.C. is proper.  Def. Br. at 39.  For the reasons stated, there are no just or equitable grounds on which to overturn plaintiffs' choice of forum.

## **CONCLUSION**

For the reasons stated, defendant's motion should be denied in its entirety.

Respectfully submitted,

/s/ Thomas F. Connell_____
Thomas F. Connell, DC Bar 289579
Demian S. Ahn, DC Bar 491109
Wilmer Cutler Pickering Hale and
Dorr LLP
Attorneys for Plaintiffs
1875 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone (202) 663-6000
January 22, 2008                                   Fax (202) 663 6363

---

[36] Public factors (such as which substantive law governs) are in any event given less weight than private factors such as convenience and choice of forum, both of which weigh in plaintiffs' favor here.  *Beals v. Sicpa Securink Corp.*, 1994 WL 236081 at *3-4 (D.D.C. 1994) (citing *Stewart v. Capitol Area Permanente Medical Group, P.C.*, 720 F. Supp. 3, 6 (D.D.C. 1989)).