**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|                                    |   |                        |
|------------------------------------|---|------------------------|
|                                    | * |                        |
| **STEVEN SLEDGE,** *et al.,*       | * |                        |
|                                    | * |                        |
|     Plaintiffs | * |                        |
|                                    | * |                        |
| v.                                 | * | Case No.: RWT 06cv742  |
|                                    | * |                        |
| **UNITED STATES OF AMERICA,**      | * |                        |
|                                    | * |                        |
|     Defendant. | * |                        |
|                                    | * |                        |

## MEMORANDUM OPINION

Plaintiffs instituted this action against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671-2680 (2006). Defendant moves to dismiss the complaint for lack of subject matter jurisdiction under the discretionary function exception of the FTCA and for failure to state a claim. Alternatively, Defendant moves to transfer the case to the United States District Court for the Middle District of Pennsylvania or the Western District of Missouri.

## BACKGROUND

On October 15, 2002, inmate Rico Woodland (a/k/a Rico Sledge), son of Plaintiff Dianne D. Sledge and brother of Plaintiff Steven Sledge, was allegedly involved in an altercation with inmate Jesse L. Sparks at the Federal Correctional Institution-Allenwood ("FCI-Allenwood") in White Deer, Pennsylvania.[1] *See* Third Am. Compl. ¶ 9. Later that same day, Woodland was

---

[1] According to Defendant, a subsequent investigation by the Federal Bureau of Investigation revealed that Woodland neither notified Federal Bureau of Prisons staff that he had been in the first altercation with Sparks nor raised any concerns with staff regarding his safety. Lyons Decl. ¶ 6 (Def.'s Mot. to Dismiss Ex. A). Rather, Woodland purportedly "changed his clothes and cleaned up the injuries he may have sustained" to hide the fact that the first altercation had occurred. Letter from Henry J. Sadowski, Regional Counsel, Northeast Regional Office, Federal Bureau of Prisons, to James Thomas Maloney, Maloney & Mohsen, PLLC (Oct. 24, 2005) (Def.'s Mot. to Dismiss Ex. F).

attacked in his cell by Sparks and inmate Ishmael Ford-Bey. *Id.* ¶ 10.[2] The beating purportedly lasted thirty minutes.[3] *Id.* ¶ 11.

Woodland sustained serious injuries from the beating. *Id.* ¶ 14. He suffered brain damage, was comatose for several months, and never regained full use of his arms and legs. *Id.* (alleging that Woodland was "functionally quadraparetic"). He also suffered "severe psychological and emotional distress, including intense episodes of agitation and crying out," and as a result, was prescribed anti-psychotic medications. *Id.* However, Woodland's condition purportedly improved while he was hospitalized at the Fort Worth Federal Medical Center in Fort Worth, Texas. *Id.* ¶ 15.

In March 2005, Woodland was transferred to the United States Medical Center for Federal Prisoners, in Springfield, Missouri ("USMC-Springfield"). *Id.* ¶ 17. His condition is alleged to have deteriorated rapidly, *id.*, and he purportedly experienced severe pain, hunger, and illness while at the medical center, *id.* ¶ 19.

After Woodland and another inmate expressed concerns over the care Woodland was receiving, his mother, Plaintiff Dianne Sledge, and his sister, Teresa Sledge, arranged to visit USMC-Springfield. *Id.* ¶ 21. They allegedly requested and received advance approval from USMC-Springfield employees to visit Woodland in November 2005. *Id.*

---

[2] In December 2003, a grand jury sitting in Williamsport, Pennsylvania, indicted Sparks and Ford-Bey for offenses related to the assault. *See* Docket, *United States v. Sparks*, No. 4:03-cr-00364-MM-1 (M.D. Pa. Dec. 11, 2003) (Def.'s Mot. to Dismiss Ex. G); Docket, *United States v. Sparks*, No. 4:03-cr-00364-MM-2 (M.D. Pa. Dec. 11, 2003) (Def.'s Mot. to Dismiss Ex. H). Sparks was sentenced to ten years, *see* Docket, *United States v. Sparks*, No. 4:03-cr-00364-MM-1 (M.D. Pa. Dec. 11, 2003) (Def.'s Mot. to Dismiss Ex. G), and Ford-Bey was sentenced to time served, Docket, *United States v. Sparks*, No. 4:03-cr-00364-MM-2 (M.D. Pa. Dec. 11, 2003) (Def.'s Mot. to Dismiss Ex. H).

[3] Defendant contests that the attack lasted thirty minutes and states that during the second altercation, Ford-Bey held the cell door closed during the fight, another inmate positioned two cell doors at ninety degree angles to interfere with the surveillance cameras, and the same inmate delayed the unit officer from conducting a census count by requesting a broom and dust pan which were located in a secure room. Lyons Decl. ¶¶ 7, 8 (Def.'s Mot. to Dismiss Ex. A).

In November 2005, they traveled from Washington, D.C. to Springfield, Missouri, but USMC-Springfield employees allegedly refused to allow Plaintiff Dianne Sledge and Teresa Sledge to see Woodland.[4] *Id.* ¶ 23. A USMC-Springfield employee allegedly told the visitors that although she could arrange a visit, she would not do so. *Id.*

Plaintiffs allege that because Plaintiff Dianne Sledge and Teresa Sledge were prevented from visiting Woodland, (i) Woodland suffered severe emotional distress, causing further deterioration of his health, *id.* ¶ 26, and (ii) Plaintiff Dianne Sledge suffered "severe emotional distress, including depression, dejection, hopelessness, sorrow, obsessive worry, sleeplessness, stomach pain, and headaches," *id.* ¶ 25.

Plaintiff Dianne Sledge never saw her son alive again, *id.* ¶ 23, and he died in federal custody on January 29, 2006, *id.* ¶ 27.

## PROCEDURAL HISTORY

On September 7, 2007, approximately sixteen months after commencing this action against the United States of America under the FTCA, Plaintiffs Steven Sledge, as Personal Representative of the Estate of Rico Woodland, and Dianne Sledge filed their Third Amended Complaint.[5] The Third Amended Complaint contains six counts.

Counts I and II, brought by Steven Sledge in his representative capacity, consist of a personal injury claim and a wrongful death claim for the alleged failure of Federal Bureau of

---

[4] Defendant contends that Dianne Sledge, Teresa Sledge, and Steven Sledge were approved to visit Woodland on July 16 and 17, 2005, *see* Memorandum from John Roberts, Mental Health Unit Manager, USMC-Springfield (July 11, 2005) (Def.'s Mot. to Dismiss Ex. J), failed to visit Woodland on those days, and arrived unannounced on November 12, 2005, *see* Inmate Visitors Log, USMC-Springfield (Nov. 12, 2005) (Def.'s Mot. to Dismiss Ex. K). *See also* Def.'s Mot. to Dismiss 3. Defendant alleges that because no one was available to provide constant and immediate visual supervision for the unannounced visit, as required by institution policy, their request for a bedside visit was denied. Rinker Decl. ¶ 4 (Def.'s Mot. to Dismiss Ex. Y); *see also* Def.'s Mot. to Dismiss 3. Defendant further alleges that a USMC-Springfield employee offered to arrange a visit sometime during the next several days, but that the Sledges refused to return. *Id.*; *see also* Def.'s Mot. to Dismiss 3-4.

[5] Between October 15, 2004 and June 14, 2007, Plaintiffs submitted six administrative tort claims with the BOP pursuant to 28 U.S.C. § 2675 (2006), 28 C.F.R. §§ 14.1-14.11 (2010), and 28 C.F.R. §§ 543.30-543.32 (2010). Compl. ¶¶ 28, 31-35. The BOP denied all of the claims. *Id.* ¶¶ 29, 31-35.

Prisons ("BOP") employees at FCI-Allenwood, Pennsylvania, to prevent or stop the October 15, 2002 attack on Woodland by Sparks and Ford-Bey. Compl. ¶¶ 7, 12-13, 36-53. Plaintiffs allege that BOP employees at FCI-Allenwood knew or should have known (i) that inmates, including Sparks and Ford-Bey, "posed a specific, concrete and immediate threat to Woodland's life," *id.* ¶¶ 40, 49; and (ii) that Woodland was being attacked by Sparks and Ford-Bey, *id.* ¶¶ 41, 50. Plaintiffs further allege that BOP employees at FCI-Allenwood had "a specific mandatory duty to take some action" and "specific duties to monitor activities," but failed to do so, *id.* ¶¶ 40-41, 50-52, thereby causing Woodland's injuries and death, *id.* ¶¶ 42, 51.

Count III, also brought by Steven Sledge in his representative capacity, is a personal injury claim and Count IV, brought by Dianne Sledge, is a wrongful death claim for the purported failure of BOP employees at USMC-Springfield, Missouri, to provide adequate sustenance and care. *Id.* ¶¶ 8, 18-19, 54-69. Plaintiffs allege that BOP employees caused Woodland to suffer further injuries, including severe pain, hunger, and illness, while he was at the medical center. *Id.* ¶¶ 19, 59.

Counts V and VI seek to recover for the emotional distress that Woodland and Plaintiff Dianne Sledge allegedly suffered when BOP employees at USMC-Springfield denied them the opportunity to see each other in November 2005. *Id.* ¶¶ 8, 25-26, 70-84. Plaintiffs allege that BOP employees at USMC-Springfield (i) knew that Dianne Sledge had permission to visit her son; (ii) was aware of the distance she had traveled and the expenses she had incurred; (iii) knew of Woodland's failing health; (iv) knew or should have known that Woodland might never again see his mother; (v) knew or should have known that refusing to allow Woodland to see his mother involved unreasonable risks to his emotional and physical health; and (vi) had no legitimate justification for denying the visit. *Id.* ¶¶ 73, 81.

On December 6, 2007, Defendant filed a Motion to Dismiss Third Amended Complaint or, in the Alternative, to Transfer. Defendant moves to dismiss Counts I, II, V, and VI under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction based upon the discretionary function exception of the FTCA, 28 U.S.C. § 2680(a). Def.'s Mot. to Dismiss 17-25, 34-38. Defendant also moves to dismiss all six counts under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. *Id.* at 16-17, 25-34. Alternatively, in the event the complaint is not dismissed in its entirety, Defendant requests that the Court transfer the case to the United States District Court for the Middle District of Pennsylvania or the Western District of Missouri. *Id.* at 38-41.

In June 2009, the Chief Justice of the United States assigned the case to the undersigned pursuant to 28 U.S.C. § 292(d). After the assignment and designation, the Court granted Plaintiffs leave to file a supplemental memorandum, granted Defendant leave to file a response, and conducted a hearing on Defendant's Motion to Dismiss Third Amended Complaint or, in the Alternative, to Transfer on January 26, 2010. No discovery has taken place.

## STANDARDS OF REVIEW

### I.     Federal Rule of Civil Procedure 12(b)(1)

A motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(1) presents a threshold challenge to the court's subject matter jurisdiction. A court may resolve a Rule 12(b)(1) motion in one of two ways.

First, if the defendant challenges the legal sufficiency of the plaintiff's jurisdictional allegations, then a court may address the challenge on the face of the complaint. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). "Although a court must accept as true all the factual allegations contained in the complaint when reviewing a motion to dismiss pursuant to Rule 12(b)(1), plaintiffs' factual allegations in the complaint will bear closer scrutiny in

resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Wright v. Foreign Serv. Grievance Bd.*, 503 F. Supp. 2d 163, 170 (D.D.C. 2007) (quotation marks, alterations, and citation omitted).

Second, if the defendant has challenged the factual basis of the court's jurisdiction, then a court may consider information extrinsic to the complaint and weigh conflicting evidence to determine its jurisdiction. *See Phoenix Consulting Inc.*, 216 F.3d at 40. The plaintiff has the burden of establishing jurisdiction by a preponderance of the evidence. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Moms Against Mercury v. FDA*, 483 F.3d 824, 827 (D.C. Cir. 2007); *Hollingsworth v. Duff*, 444 F. Supp. 2d 61, 63 (D.D.C. 2006).

Once a court "determines that it lacks subject matter jurisdiction, it can proceed no further." *Simpkins v. D.C. Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997). Correlatively, if a court is uncertain as to whether jurisdiction exists, it cannot proceed to consider the merits of the case. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *Bell v. Hood*, 327 U.S. 678, 682 (1946) ("Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy."); *United States ex rel. Settlemire v. District of Columbia*, 198 F.3d 913, 920 (D.C. Cir. 1999) (stating that Rule 12(b)(1) jurisdictional challenges should be addressed before Rule 12(b)(6) challenges).

## II.     Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss filed pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court must accept as true all of the well-pleaded factual allegations in the complaint but need not accept a plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). "To survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. See also Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level."). "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007).

## ANALYSIS

### I.     Counts I, II, V, and VI

Defendant moves to dismiss Counts I, II, V, and VI for lack of subject matter jurisdiction under the Discretionary Function Exception of the FTCA.[6] For the reasons articulated below, the Court will deny Defendant's motion without prejudice to renew and will order limited jurisdictional discovery.

#### A.     The FTCA and the Discretionary Function Exception

The United States, as a sovereign, may be sued only to the extent that it has consented to suit by statute. *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Kalodner v. Abraham*, 310 F.3d 767, 769 (D.C. Cir. 2002). The FTCA waives sovereign immunity in actions against the

---

[6] Defendant does not – and likely cannot – argue that the discretionary function exception applies to Counts III and IV because medical decisions made by government employees during the course of treatment involve professional discretionary decisions grounded in medical science, not governmental policy considerations. *See, e.g.*, *Hitchcock v. United States*, 665 F.2d 354, 363 (D.C. Cir. 1981) (finding that the Government's decision not to inform patients that a vaccine was recommended, not required, was made for reasons unrelated to public policy considerations); *see also Sigman v. United States*, 208 F.3d 760, 770 (9th Cir. 2000) ("[These cases stand for the] now well-established principle that the discretionary function exception is intended to shield the government from liability for the exercise of governmental discretion, not to shield the government from claims of garden-variety medical malpractice."); *Collazo v. United States*, 850 F.2d 1, 3 (1st Cir. 1988) ("[W]here only professional, nongovernmental discretion is at issue, the 'discretionary function' exception does not apply.").

United States for the negligent or wrongful act or omission of its employees acting within the scope of their employment. 28 U.S.C. § 1346(b)(1) (2006). *Cf. United States v. Muniz*, 374 U.S. 150, 153-66 (1963) (holding that federal prisoners may sue the United States under the FTCA for injuries sustained while incarcerated). The FTCA "does not create a cause of action against the United States; it allows the United States to be liable if a private party would be liable under similar circumstances in the relevant jurisdiction." *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 508 (D.C. Cir. 2009).

However, the FTCA's waiver of sovereign immunity is subject to several exceptions. Under the discretionary function exception, the United States does not consent to suit for claims (i) "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid" or (ii) "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Congress has explained that the purpose of the discretionary function exception is "to protect the ability of the government to proceed with decisionmaking in carrying out its unique and vital functions without 'second-guessing' by the courts as to the appropriateness of its policy choices." H.R. Rep. No. 101-1015, at 135 (1991). *See also United States v. S. A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984) (discussing legislative history).

In determining whether the Government's conduct is protected by the discretionary function exception, a court must engage in a two-part inquiry articulated by the Supreme Court in *United States v. Gaubert*, 499 U.S. 315, 322-24 (1991). First, the court must decide whether the federal agency or employee had a choice in making the decision or taking the challenged

action.  *Id.* at 322.  If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," then the exception does not apply because no discretionary judgment is implicated.  *Id.*  *See also Cope v. Scott*, 45 F.3d 445, 448 (D.C. Cir. 1995) (explaining that if there is a mandatory directive, however, then "[t]he only issue is whether the employee followed the directive, and is thus exempt under the first clause [of 28 U.S.C. § 2680(a)], or whether the employee did not follow the directive, thus opening the government to suit").  In cases involving the safety of prisoners, courts have examined, for example, statutes, regulations, program statements, institutional supplements, manuals, and post orders to determine whether government agents could exercise their discretion.  *See, e.g.*, *Morales v. United States*, No. 08-50881, 2010 U.S. App. LEXIS 6421, at *9-18 (5th Cir. Mar. 29, 2010) (unpublished); *Enlow v. United States*, 161 F. App'x 837, 839-41 (11th Cir. 2006); *Garza v. United States*, 161 F. App'x 341, 344-45 (5th Cir. 2005); *Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997); *Buford v. United States*, No. 97-2263-JWL, 1999 U.S. Dist. LEXIS 7477, at *10-15 (D. Kan. April 28, 1999).

Second, if no mandatory directive exists, then the court must determine whether the agency or employee's judgment was "grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323.  *See also id.* at 324-25 ("For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime.").  Although "[d]etermining whether a decision is essentially political, social, or economic, is admittedly difficult, since nearly every government action is, at least to some extent, subject to policy analysis," *Cope*, 45 F.3d at 448 (quotation marks omitted), the discretionary function exception applies only to decisions that are "fraught with public policy considerations," *id.* at

449 (alternation omitted) (quoting *Sami v. United States*, 617 F.2d 755, 767 (D.C. Cir. 1979)). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S. at 325. Where a directive permits discretion, "it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Id.* at 324.

If the two-step test has been satisfied and the discretionary function exception applies, the court is divested of its subject matter jurisdiction. *See, e.g.*, *Shuler v. United States*, 531 F.3d 930, 935 (D.C. Cir. 2008).

### B.      Whether Discovery is Necessary

Plaintiffs argue that Defendant's Fed. R. Civ. P. 12(b)(1) motion to dismiss Counts I, II, V, and VI is premature because discovery is required to determine whether the discretionary function exception applies.

The D.C. Circuit has held that where facts are necessary to establish jurisdiction, plaintiffs must be given "ample opportunity" to obtain and present evidence before the court may grant a motion to dismiss for lack of subject matter jurisdiction. *Phoenix Consulting*, 216 F.3d at 40; *see also Loughlin*, 393 F.3d at 167; *Ignatiev v. United States*, 238 F.3d 464, 467 (D.C. Cir. 2001). "The district court retains considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction," but "[i]n order to avoid burdening a sovereign that proves to be immune from suit . . . jurisdictional discovery should be carefully controlled and limited." *Phoenix Consulting*, 216 F.3d at 40 (citations and quotation marks omitted). "[Discovery] should not be authorized at all if the defendant raises either a different jurisdictional or [another] non-merits ground such as forum non-conveniens or personal

jurisdiction the resolution of which would impose a lesser burden upon the defendant." *Id.* (alterations, citations, and quotation marks omitted).

Courts within this circuit have permitted limited discovery in FTCA actions where defendants have challenged the jurisdiction of the court under the discretionary function exception. *See, e.g.*, *Ignatiev*, 238 F.3d at 467 (reversing the district court's decision to prohibit discovery regarding whether mandatory guidelines existed); *Loughlin v. United States*, 286 F. Supp. 2d 1, 3 (D.D.C. 2003) (explaining that the court previously reserved judgment on the Government's discretionary function argument and "gave the claimants an opportunity to conduct discovery regarding the existence of rules, regulations, or directives that might bear on whether the exception applies here"), *aff'd*, 393 F.3d at 166-68, 172 (finding that the district court erred in suggesting that jurisdictional discovery is limited to the first prong of the discretionary function exception test but concluding that the court's discovery orders afforded the parties sufficient opportunity to pursue relevant information); *Singh v. S. Asian Soc'y of the George Washington Univ.*, 572 F. Supp. 2d 11, 13 (D.D.C. 2008) (stating that it previously permitted discovery to determine "whether there was a mandatory policy regarding the placement of security guards at the exits of the Old Post Office Pavilion").[7]

Limited jurisdictional discovery is warranted in this case. In order to determine whether the discretionary function exception applies to Plaintiffs' FTCA claims, the Court must consider factual matters outside the complaint. Plaintiffs have articulated a need for discovery regarding whether (i) there exists any mandatory directives; (ii) BOP employees violated any of these

---

[7] *See also Parrott v. United States*, 536 F.3d 629, 638-39 (7th Cir. 2008) (finding that the district court erred in granting summary judgment in favor of the Government on failure-to-protect claim because plaintiff should have been allowed discovery to determine whether a formal separation order existed); *Palay v. United States*, 349 F.3d 418, 431-34 (7th Cir. 2003) ("It remains for his [negligent-reassignment and failure-to-protect] claims to be fleshed out with evidence before the court can say whether the discretionary function exception applies."). *But see Freeman v. United States*, 556 F.3d 326, 343 (5th Cir. 2009) (affirming that limited discovery was not required because any mandatory directive could be found in the public domain and plaintiffs failed to justify their need for discovery).

mandatory directives; and (iii) BOP employees made discretionary judgments not grounded in the policy of the regulatory regime. If BOP employees violated a mandatory directive or made a discretionary decision not based on public policy considerations, then the discretionary function exception is inapplicable and the United States may be held liable under the FTCA. As discussed below, absent limited discovery, the Court cannot conclude on the face of the complaint that it lacks subject matter jurisdiction.

### 1. Mandatory Directives

Although in Counts I and II Plaintiffs do not explicitly allege that BOP employees at FCI-Allenwood violated any mandatory directive, they do assert that BOP employees breached their "specific mandatory duty to take some action" or "specific duties to monitor inmate activities." Compl. ¶¶ 40, 49. In a case such as this where the victim is deceased and the alleged tortious conduct occurred at a government institution behind locked doors, relevant information regarding the existence of any mandatory directives and whether those directives were followed will likely be in the exclusive control of the defendant. Under such circumstances, plaintiffs must carefully craft their complaint because they are "caught between their ethical obligations under Rule 11 and the demands of the FTCA," *Ignatiev*, 238 F.3d at 466. Plaintiffs' failure to explicitly allege in their complaint that BOP employees violated any mandatory directive is therefore of no moment.[8] *See id.* at 467 ("What is missing from the complaint is not a statement of the relevant facts – that the Secret Service failed to protect the Bulgarian Chancery – but a reference to applicable internal guidelines that rendered some protective actions

---

[8] Whether Counts I, II, V, and VI fail to state a claim under *Iqbal* and Fed. R. Civ. P. 8(a) is a question the Court cannot consider without first finding that it has subject matter jurisdiction. *Bell*, 327 U.S. at 682; *Settlemire*, 198 F.3d at 920; *Epps v. Capitol Police Bd.*, No. 09-1001, 2010 U.S. Dist. LEXIS 63607, at *7-9 (D.D.C. June 28, 2010).

nondiscretionary. . . . [W]ithout discovery, appellants have no way to know what mandatory policies may bind the Secret Service.").

Plaintiffs assert that they need discovery in order to determine whether binding directives are found in "program statements, institutional supplements, policy handbooks, guidelines, training manuals, work schedules, work assignments, policy memoranda, post orders, and other orders or instructions from the warden."[9] Pls.' Opp'n 22-23. Nevertheless, even without the benefit of discovery, Plaintiffs cite in their Supplemental Memorandum a number of directives received in response to FOIA requests that they argue are mandatory. However, although some of these directives appear on their face to be binding, others are ambiguous and the record does not reveal whether BOP employees violated them. Limited discovery is therefore required to determine the relevance of these directives, to uncover any other relevant directives, and to establish whether there is any evidence that they have been violated.

As for Counts V and VI, Plaintiffs allege that USMC-Springfield employees violated mandatory directives by refusing to allow Dianne Sledge access to her son in November 2005 even though she had purportedly received pre-approval for the visit. Pl.'s Opp'n 25-26. Specifically, Plaintiffs assert that BOP employees violated USMC-Springfield's Visiting Regulation ¶ 14(c)(1), *id.* at 26-27, which states that "[b]edside visits must be prearranged by the inmate's unit team and approved by Warden." USMC-Springfield, Institutional Supplement SPG-5267.07e: "Visiting Regulations" (July 13, 2006) (Def.'s Mot. to Dismiss Ex. L). Plaintiffs

---

[9] Under 18 U.S.C. § 4042(a), the BOP shall "provide for the safekeeping, care, and subsistence" and "protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3) (2006). Federal courts have consistently held that because § 4042(a) does not mandate a specific, non-discretionary course of conduct, plaintiffs must demonstrate that other mandatory directives were violated (or that a BOP employee made a discretionary judgment not grounded in the policy of the regulatory regime) in order to establish subject matter jurisdiction. *See, e.g.*, *Calderon*, 123 F.3d at 950 (holding that like § 4042(a), the regulations within 28 C.F.R. § 541 regarding inmate discipline and special housing units also provide general guidance to BOP employees).

argue that under this directive, once the warden has given his approval, no USMC-Springfield employee has discretion to later deny the visit. *Id.* at 27.

Plaintiffs' argument is misguided. Visiting Regulation ¶ 14(c)(1) does not prohibit a USMC-Springfield employee from revoking permission to visit an inmate; it simply does not address this issue.[10]

However, it is unclear whether the Visiting Regulations – dated July 13, 2006, relied upon by Plaintiffs, and attached to Defendant's Motion to dismiss – reflect USMC-Springfield's visitation policy in effect in November 2005. Plaintiffs should be afforded the opportunity to conduct limited discovery in order to determine whether any relevant mandatory directive existed in November 2005 and whether there is any evidence that USMC-Springfield employees violated any such directive by denying visitation.

## 2. Discretionary Judgments Grounded in Public Policy Considerations

The great weight of the case law suggests that if a decision regarding the protection, safety, and classification of prisoners is discretionary (i.e., there are no mandatory directives), then such a decision is grounded in public policy and the discretionary function exception applies. *See, e.g.*, *Montez v. United States*, 359 F.3d 392, 398-99 (6th Cir. 2004) (concluding that plaintiff failed to provide in his complaint sufficient factual support to "rebut the *Gaubert* presumption that the decisions by prison officials regarding his safety were based upon BOP policy"); *Santana-Rosa v. United States*, 335 F.3d 39, 44-45 (1st Cir. 2003) (asserting that the management of large numbers of potentially dangerous prisoners requires discretion and implicates difficult policy choices); *Alfrey v. United States*, 276 F.3d 557, 561-67 (9th Cir. 2002)

---

[10] In fact, Visiting Regulation ¶ 14(c)(6), cautioning that "visiting arrangements must be consistent with the security and good order of the institution, with staff resources available, and with the well being of the patient in mind," appears to support Defendant's argument that USMC-Springfield employees exercise discretion when deciding how to arrange inmate visits. USMC-Springfield, Institutional Supplement SPG-5267.07e: "Visiting Regulations" (July 13, 2006) (Def.'s Mot. to Dismiss Ex. L).

(finding that discretionary function exception applied to claims related to how to search a prison cell and how to investigate a threat); *Dykstra v. Bureau of Prisons*, 140 F.3d 791, 795-96 (8th Cir. 1998) ("These factors upon which prison officials base such decisions [regarding inmate protection] are inherently grounded in social, political, and economic policy."); *Cohen v. United States*, 151 F.3d 1338, 1344 (11th Cir. 1998) (vacating judgment after bench trial and dismissing case because "[d]eciding how to classify prisoners and choosing the institution in which to place them are part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons"); *Calderon*, 123 F.3d at 951 ("It is clear that balancing the need to provide inmate security with the rights of the inmates to circulate and socialize within the prison involves considerations based upon public policy."); *Buchanan v. United States*, 915 F.2d 969, 971-72 (5th Cir. 1990) (stating that Congress did not intend for the courts to second-guess difficult decisions made by prison officials during a riot). Pursuant to *Gaubert*, many of these cases reason that because 18 U.S.C. § 4042(a) "is an established governmental policy . . . [that] allows a Government agent to exercise discretion," 499 U.S. at 324, in providing for the safekeeping, protection, and care of inmates, it must be "presumed that the [BOP's] acts are grounded in policy when exercising that discretion," *id*. *See, e.g.*, *Calderon*, 123 F.3d at 951.

However, some circuit courts have suggested that not all discretionary decisions involving the safety of prisoners are necessarily fraught with public policy considerations. For example, the Fifth and Sixth Circuits have speculated that the type of discretionary judgment alleged in *United States v. Muniz*, 374 U.S. 150-66 (1963), where a guard "stood by" while an inmate was chased and beaten by twelve other inmates, would likely not be protected under the discretionary function exception. *Montez*, 359 F.3d at 398; *Santana-Rosa*, 335 F.3d at 44-45.

Similarly, in *Palay v. United States*, the Seventh Circuit recognized that prison officials generally enjoy discretion in matters of inmate safety, but declined to dismiss plaintiff's failure-to-protect claim because evidence obtained during discovery *might* demonstrate that the circumstances that made the fight possible did not involve the type of discretionary judgment that the statutory exception was designed to protect. 349 F.3d at 418, 431-32. Specifically, the court explained that if prison officials transferred plaintiff to a holdover unit without authority to make the transfer, then they would not have exercised "protected discretionary judgment." *Id.* at 430-3. Similarly, the Second Circuit in *Triestman v. Fed. Bureau of Prisons*, liberally read a *pro se* plaintiff's complaint to claim that a correctional officer "failed to patrol or respond diligently to an emergency situation out of laziness or inattentiveness" and held that the complaint's allegations were sufficient to survive a 12(b)(1) motion to dismiss because the "negligent guard theory is a theory of liability under the FTCA over which the district court clearly has subject matter jurisdiction." 470 F.3d 471, 475-76 (2d Cir. 2006).

Here, Plaintiffs in their Third Amended Complaint paint the circumstances surrounding the October 15, 2002 attack on Woodland in broad strokes. The only factual allegations in support of the claims in Counts I and II that BOP employees at FCI-Allenwood knew or should have known that Woodland was in danger, Compl. ¶¶ 40, 49, and that he was being beaten, *id.* ¶¶ 41, 50, is that the attack was proceeded by another altercation, *id.* ¶ 9, lasted approximately thirty minutes, *id.* ¶ 11, and involved two individuals, *id.* ¶¶ 10-11. Plaintiffs do not explicitly allege that BOP employees, for example, "stood by" while Woodland was being attacked. However, because the incident took place in a closely supervised and tightly regulated prison environment and was perpetrated by two attackers over the course of half an hour, the Court reads Plaintiffs' allegations broadly to include possible discretionary decisions of the type not

grounded in the policy of the regulatory regime. Discovery will reveal whether there is any factual support for these allegations to establish subject matter jurisdiction.

Similarly, with regard to the intentional/negligent infliction of emotional distress claims in Counts V and VI, Plaintiffs suggest that BOP employees at USMC-Springfield made discretionary judgments of the type not fraught with public policy considerations when they denied Plaintiff Dianne Sledge the opportunity to see Woodland in November 2005. If, as alleged, BOP employees (i) cancelled the pre-approved visit knowing that Dianne Sledge had incurred significant expense to travel from Washington, D.C. to Springfield, Missouri and that this might be her last opportunity to see her son due to his failing health, and (ii) told Dianne Sledge that they could arrange a visit but declined to do so, *see* Third Am. Compl. ¶ 23, then these judgments do not on their face appear to be based on policy considerations concerning the safekeeping, protection, and care of inmates. Of course, jurisdictional discovery may prove otherwise.[11]

Accordingly, the Court will deny without prejudice Defendant's motion to dismiss Counts I, II, V, and VI for lack of subject matter jurisdiction and, consistent with the law in this Circuit, order limited jurisdictional discovery to determine whether there is any evidentiary support to show that BOP employees violated mandatory directives or made discretionary judgments not grounded in the policy of the regulatory regime in connection with the October 15, 2002 attack at FCI-Allenwood and the November 2005 visit at USMC-Springfield.[12]

---

[11] Abuses of discretion based on policy considerations *are* protected discretionary judgments. *See Gaubert*, 499 U.S. at 325.

[12] Although the Court cannot decide whether Counts V and VI state a claim before it determines that it has subject matter jurisdiction, it is nonetheless worth noting that under Missouri law, in order to state a claim for intentional infliction of emotional distress, "a plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly causes severe emotional distress that results in bodily harm." *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997). "The conduct must have been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quotation marks omitted). The conduct must also be intended to cause extreme emotional

## II.     Counts III and IV

Defendant moves to dismiss Plaintiffs' personal injury and wrongful death claims regarding USMC-Springfield employees' alleged failure to provide adequate sustenance and care on the grounds that Plaintiff filed no certificate or affidavit of merit as required by state law. For the reasons discussed below, the Court will grant Defendant's motion and dismiss Counts III and IV.

### A.     Applicable Law

The parties disagree as to whether Pennsylvania or Missouri law governs. Because Counts III and IV concern the medical treatment that Woodland received at USMC-Springfield in Missouri, Missouri choice-of-law rules apply. *See Richards v. United States*, 369 U.S. 1, 9 (1962) ("Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred . . . ."). In determining which substantive law to apply under Missouri's "most significant relationship" test, the Court must consider "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered." *Stricker v. Union Planters Bank, N.A.*, 436 F.3d 875, 878 (8th Cir. 2006) (quoting *Goede v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 24 n.6 (Mo. Ct. App. 2004)).

Pennsylvania law clearly does not apply under Missouri's choice-of-law rules. The fact that Woodland would not have received medical treatment in Missouri but for the attack in Pennsylvania – which  occurred two-and-a-half years earlier – is irrelevant. Plaintiffs claim that USMC-Springfield employees failed to provide adequate sustenance and care *in Missouri* and

---

distress to the victim. *Id.* In light of these standards, it appears unlikely that Counts V and VI will ultimately survive a 12(b)(6) motion to dismiss.

that as a result, Woodland suffered injuries while *in Missouri*. Furthermore, during the relevant period, the relationship between Woodland and Defendant was centered *in Missouri*. Missouri law therefore governs.

**B.     Affidavit**

Under Missouri law, a plaintiff alleging inadequate health care services must file an affidavit of merit:

> In any action against a health care provider for damages for personal injury or death on account of the rendering of or failure to render health care services, the plaintiff or the plaintiff's attorney shall file an affidavit with the court stating that he or she has obtained the written opinion of a legally qualified health care provider which states that the defendant health care provider failed to use such care as a reasonably prudent and careful health care provider would have under similar circumstances and that such failure to use such reasonable care directly caused or directly contributed to cause the damages claimed in the petition.

Mo. Rev. Stat. § 538.225.1 (2010). "The purpose of § 538.225.1 is to eliminate at the early stages of litigation medical malpractice actions against health care providers which lack the color of merit and to protect the public against the costs of ungrounded medical malpractice claims." *Morrison v. St. Luke's Health Corp.*, 929 S.W.2d 898, 905 (Mo. Ct. App. 1996).

The affidavit must be filed within ninety days of the filing of the complaint, unless the court extends the deadline for good cause shown. Mo. Rev. Stat. § 538.225.5. The extension of time may not exceed an additional ninety days. *Id*. If no such affidavit is filed, the court must dismiss the action without prejudice. *Id.* § 538.225.6.

Plaintiffs concede that they have filed no affidavit, but argue that (i) the Missouri state certification statute is inapplicable in federal court; (ii) it cannot apply here because Defendant rendered compliance impossible; and (iii) even if it does apply, Counts III and IV survive

because they include claims for simple negligence as well as professional negligence. Pls.'
Opp'n 34-41. Plaintiffs' arguments have no merit.

First, federal courts in Missouri regularly apply Mo. Rev. Stat. § 538.225.1 in FTCA
actions. *See, e.g.*, *Thake v. United States*, No. 4:08CV653, 2009 U.S. Dist. LEXIS 24555, at *1
(E.D. Mo. Mar. 25, 2009) (dismissing FTCA medical malpractice claim for failure to adhere to
§ 538.225); *Brown v. Luckett*, No. 4:07CV00703-ERW, 2007 U.S. Dist. LEXIS 56073, at *16-19
(E.D. Mo. Aug. 1, 2007) (same); *Norman v. United States*, No. 1:04-CV-111, 2006 U.S. Dist.
LEXIS 5519, at *16 (E.D. Mo. Feb. 13, 2006) (same); *see also Havrum v. United States*, No. 95-
4207-CV-C-5, 1998 U.S. Dist. LEXIS 23609, at *13-16 (W.D. Mo. June 19, 1998) (concluding
that in FTCA action, plaintiff complied with the prior version of the affidavit rule). The Court
finds that the state certification statute does not conflict with the Federal Rules of Civil
Procedure and that it applies here.

Second, even if Plaintiffs initially were not able to comply with the certification statute
when they filed their Complaint, First Amended Complaint, and Second Amended Complaint
because Defendant allegedly failed to promptly produce medical records, they (i) received a copy
of Woodland's "entire medical file" (consisting of 3,810 pages) on or around January 15, 2008,
within 180 days of filing their Third Amended Complaint, *see* Pls.' Opp'n 38; *id.* Ex. 7, but did
not file an affidavit immediately thereafter; (ii) did not ask for an extension of time; (iii) did not
contemporaneously apprise the Court that Defendant was causing any delay; and (iv) did not file
the requisite affidavit after the statutory period had expired. In response to questions from the
Court during oral argument on January 26, 2010, counsel for Plaintiffs explained that it would
not be "feasible" to seek a medical opinion before discovery because (i) the medical records
provided by the Government are incomplete, contain inconsistencies, and appear to have been

altered; (ii) Woodland is deceased and therefore unable to provide any information himself; and (iii) Plaintiffs are proceeding *in forma pauperis* and legal counsel is providing its services *pro bono*.

Under these circumstances, the Court does not find that Defendant rendered compliance impossible or that Plaintiffs should be excused from the affidavit requirement. Plaintiffs have failed to explain how the voluminous medical records in their possession are incomplete or why a health care provider could not give an opinion based on these records. Furthermore, the plain language of § 538.225 does not permit the Court to waive the requirement simply because the victim is deceased or because a plaintiff lacks the financial means to secure the opinion of a health care provider.[13]

Third, an affidavit is required because Plaintiffs' "true claim" involving USMC-Springfield employees "relates only to the provision of health care services." *Mello v. Giliberto*, 73 S.W.3d 669, 679 (Mo. Ct. App. 2002). The Court declines Plaintiffs' invitation to split hairs and distinguish between professional negligence for medical malpractice and simple negligence for failure to provide adequate sustenance. Plaintiffs' claims for inadequate sustenance and care arise out of the health care that Woodland received or failed to receive at USMC-Springfield.

Because Plaintiffs have not filed the requisite affidavit pursuant to Mo. Rev. Stat. § 538.225.1, the Court will dismiss without prejudice Counts III and IV.

---

[13] In 2005, the Missouri legislature strengthened the affidavit requirement in § 538.225 by prohibiting any extension of time greater than ninety days and mandating that when no affidavit is filed, the Court "*shall*" – instead of "*may*" – "upon motion of any party, dismiss the action . . . without prejudice." H.B. 393, 93d Gen. Assem., 1st Reg. Sess. (Mo. 2005) (emphasis added). In light of these amendments, the Court is dubious that a waiver could ever be justified.

## III.  Transfer

In the event that the action is not dismissed in its entirety, Defendant moves the Court to transfer the case to the United States District Court for the Middle District of Pennsylvania or the Western District of Missouri.[14]

Pursuant to 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a) (2006).  Section 1404(a) "is intended to place discretion in the district court to adjudicate motions for transfer according to an individualized, case-by-case consideration of convenience and fairness."  *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (quotation marks omitted).

If venue is proper in another district, a court may transfer a case only if the balance of private and public interests weighs in favor of transfer:

> Private interest considerations include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendant; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses; and (6) the ease of access to sources of proof.  The public interest factors include: (1) the degree to which the courts in both venues are familiar with the governing laws; (2) the relative congestions of the calendars of the transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Nat'l Wildlife Fed'n v. Harvey*, 437 F. Supp. 2d 42, 46 (D.D.C. 2006) (citations omitted). Although "a trial judge must give considerable, but not conclusive, weight to the plaintiffs' initial forum choice," *Pain v. United Techs. Corp.*, 637 F.2d 775, 783 (D.C. Cir. 1980), a

---

[14] Defendant concedes that venue in the United States District Court for the District of Columbia is proper under 28 U.S.C. § 1402(b) because Steven Sledge resides in the District.  *See* 28 U.S.C. § 1402(b) (2006) (stating that a FTCA action "may be prosecuted only in the judicial district where the plaintiff resides or wherein the act or omission complained of occurred").

plaintiff's choice is entitled to less deference where "the connection between plaintiffs, the controversy and the chosen forum is attenuated," *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 561 F. Supp. 1238, 1239 (D.D.C. 1983). "[T]he burden is on the moving party to demonstrate that the balance of convenience of the parties and witnesses and the interest of justice are in its favor." *Armco Steel Co., L.P. v. CSX Corp.*, 790 F. Supp. 311, 323 (D.D.C. 1991) (alterations and quotation marks omitted).

Here, Plaintiffs could have brought this action either in Pennsylvania or Missouri because the "act[s] or omission[s] complained of occurred" in these states. 28 U.S.C. § 1402(b) (2006). Venue is therefore proper in the United States District Court for the Middle District of Pennsylvania and the Western District of Missouri.

Application of private and public interest factors does not tip the scales clearly in either direction. First, while Defendant asserts generally that the documents of record and witnesses[15] are located in Pennsylvania and Missouri, *see* Def.'s Reply 23-24, Plaintiffs specify that the following witnesses are believed to reside in the District of Columbia: Steven Sledge, Diane Sledge, Teresa Sledge, Rico Woodland's children, Ishmael Ford-Bey, Francis Jones (a former inmate patient care assistant at the Fort Worth Federal Medical Center), as well as BOP employees with knowledge of the relevant directives, *see* Pl.'s Opp'n 43. The Court cannot determine based on this limited information which forum would be most convenient to the witnesses[16] or permit the parties to access more easily other sources of proof. Second, the parties have provided no evidence concerning the relative congestions of the calendars of the transferee

---

[15] During oral argument, counsel for Defendant stated that there are at least seventeen potential witnesses at FCI-Allenwood and forty-six potential witnesses at USMC-Springfield.

[16] The convenience of the witnesses "is considered only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Mahoney v. Eli Lilly & Co.*, 545 F. Supp. 2d 123, 127 (D.D.C. 2008). The parties have not suggested that any witness would be unavailable.

and transferor courts. Third, although federal courts in Pennsylvania and Missouri are more familiar with their respective state's personal injury and wrongful death laws than is this Court, the legal concepts at issue are not overly complex. Furthermore, because Pennsylvania law and Missouri law govern different Counts, if this action were transferred, the transferee court would still have to apply the law of the other state.

However, other considerations upset the equilibrium. Factors weighing in favor of transfer include Defendant's preference to litigate in Pennsylvania or Missouri, the fact that the alleged tortious acts occurred in these states, and the local interest in having Pennsylvania and Missouri controversies decided at home.

Weighing heavily on the other side of the scale is Plaintiff's choice of forum and the convenience of the parties. Plaintiffs reside in the District of Columbia, *see Great Socialist People's Libyan Arab Jamahiriya v. Miski*, 496 F. Supp. 2d 137, 144 (D.D.C. 2007) ("Deference to the plaintiff's choice of forum is particularly strong where the plaintiff has chosen his home forum."), and their *pro bono* counsel are headquartered there and in Boston, *but cf. Islamic Republic of Iran v. Boeing Co.*, 477 F. Supp. 142, 143 (D.D.C. 1979) ("The inconvenience experienced by plaintiffs' counsel . . . is of minor, if any, importance under § 1404(a)."); *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 52 n.7 (D.D.C. 2000) (stating that the location of counsel "carries little, if any, weight"). The Central Office campus of the BOP is also located in the District of Columbia.

Placing all of the public and private interest factors on the scales, the Court finds that they are nearly evenly balanced. The Court's deference to Plaintiffs' choice of forum is strengthened, on the one hand, because they chose their home forum, *see Great Socialist People's Libyan Arab Jamahiriya*, 496 F. Supp. 2d at 144, but weakened, on the other hand,

because none of the relevant events occurred in the District of Columbia, *see Abecassis v. Wyatt,* 669 F. Supp. 2d 130, 132 (D.D.C. 2009). Ultimately, however, Defendant, as the moving party, has failed to meet its burden of establishing that the transfer of this action to another federal district is warranted.[17] The Court therefore declines at this time to transfer the case based on the evidence before it, but the issue could be revisited if, after limited discovery, additional facts are brought to the attention of the Court that would warrant a transfer.

## CONCLUSION

Consistent with the law in this Circuit, Plaintiffs shall be afforded the opportunity to conduct jurisdictional discovery to establish whether the Court has subject matter jurisdiction over the claims asserted in Counts I, II, V, and VI. However, in order to avoid burdening Defendant, the Court shall "carefully control[] and limit[]" discovery. *Phoenix Consulting*, 216 F.3d at 40. The scope of discovery shall be strictly confined to establishing whether there is any evidence that: (i) mandatory directives exist; (ii) BOP employees at FCI-Allenwood and USMC-Springfield violated any mandatory directives; and (iii) BOP employees exercised discretionary judgments not fraught with public policy considerations in connection with the October 15, 2002 attack and November 2005 visit. The Court urges the parties to carefully structure discovery so as to uncover relevant evidence as efficiently and economically as possible. *Phoenix Consulting*, 216 F.3d at 40. If any evidence is developed, the inquiry shall proceed no further without leave of Court. The discovery authorized is for the purpose of establishing jurisdiction and is not to be used as a vehicle for exploring the merits of the case.

As for the remaining claims, Counts III and IV must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to file the requisite health care affidavit under state law. Also, the Court

---

[17] Defendant dedicated only two-and-a-half pages of its forty-one-page Motion to Dismiss and three-and-a-half pages of its twenty-five-page Reply to the transfer issue. *See* Def.'s Mot. to Dismiss 38-41; Reply 22-25.

declines at this time to transfer this action because Defendant has failed to demonstrate that transfer would be in the interest of justice or is warranted for the convenience of the parties and witnesses.

A separate Order follows.


July 13, 2010
Date

_____/s/_____
Roger W. Titus
United States District Judge