## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|                                    |     |                          |
|------------------------------------|-----|--------------------------|
| **TERESA SLEDGE, *et al.*,**       | *   |                          |
|                                    | *   |                          |
| Plaintiffs,                        | *   |                          |
|                                    | *   |                          |
| v.                                 | *   | Civil Case No.: RWT 06cv742 |
|                                    | *   |                          |
| **UNITED STATES OF AMERICA,**      | *   |                          |
|                                    | *   |                          |
| Defendant.                         | *   |                          |
|                                    | *   |                          |
|                                    | *** |                          |

## MEMORANDUM OPINION

Plaintiffs Teresa Sledge and Andrea Henson are the personal representatives of the estate of Rico Woodland, a/k/a Rico Sledge, and Dianne Sledge, his surviving mother, a statutory wrongful death beneficiary suing on her own behalf and on behalf of his children Angelic Higgins, Andrea Henson, and Eric Harper.[1]  They allege that the United States Bureau of Prisons ("BOP") negligently failed to detect and stop the assault of Woodland inflicted by another prisoner, which resulted in his hospitalization and his death.  On September 7, 2007, Plaintiffs filed a six-count Third Amended Complaint against the BOP asserting claims for (1) Pennsylvania personal injury, (2) Pennsylvania wrongful death, (3) Missouri personal injury, (4) Missouri wrongful death,  (5) Missouri intentional/negligent infliction of emotional distress, and (6) Missouri intentional infliction of emotional distress.  Doc. No. 22-2.  On July 13, 2010, this Court entered a memorandum opinion and order that granted in part and denied in part BOP's earlier motion to dismiss.  Doc. Nos. 41, 42.

---

[1] On September 30, 2010, Plaintiffs filed a suggestion of death as to Steven Sledge, the brother of Rico Sledge, an originally named Plaintiff.  On the same day, Plaintiff also filed a motion to substitute party, Doc. No. 48, which this Court granted on October 13, 2010.  Doc. No. 49.  The case captioned was changed to reflect Teresa Sledge and Andrea Henson as Plaintiffs.

The Court dismissed Counts III and IV and ordered "limited jurisdictional discovery concerning Counts I, II, V, and VI, to be strictly confined to establishing whether there is any evidence that: (i) mandatory directives exist, (ii) [BOP] employees at FCI-Allenwood and USMC-Springfield violated any mandatory directives; and (iii) BOP employees exercised discretionary judgments not fraught with public policy considerations with the October 15, 2002 attack and November 2005 visit."  Doc. No. 42 at 1-2.

BOP has moved to dismiss the remaining claims based on the Federal Tort Claims Act's discretionary function exception.  On May 7, 2012, this Court held a hearing on the motion.  For the reasons discussed below, BOP's motion will be granted.

## I.  Background Facts

### a.  FCI – Allenwood

#### i.  Physical Description of Unit 3-A

FCI-Allenwood has four buildings that house general population prisoners, each of which is divided into an A-side and a B-side.  Lyons Dep. 114:14-20.  Each unit has a triangle shape with two levels of inmate cells running along the perimeter.  *Id.* 96:14-16, 97:9-11; *see also* Doc. No. 69 Ex. 8.  In the center of the unit is the "common area," which can be viewed from all of the rows of cells.  Lyons Dep. 99:14-20; *see also* Doc. No. 67 Ex. 8.  The entrance to each unit is comprised of two doors, an outer and an inner.  The space between the doors, approximately seven to ten feet, is referred to as the sally port.  Lyons Dep. 96:18-20.

The open-air area outside of the housing units and other buildings, which is still located inside the prison's secure perimeter, is referred to as the compound.  *Id.* at 117:5-118:20.  There is a walkway outside of each housing unit that leads to the center of the compound and connects

with sidewalks from the other housing buildings. *Id.* at 116:4-11. The walkways are considered to be part of the compound, and thus, are not part of the area of the housing unit. *Id.* at 117:5-10

On October 15, 2002, approximately 156 inmates lived in Unit 3-A. Sweithelm Depo. 159:7-9. Woodland's cell, number 109, was on the lower level of the Unit, approximately halfway down the row of cells that forms the hypotenuse of the Unit's triangle. *Id*. at 74: 22-24; Doc. No. 69 Ex. 8. Units 3-A and 3-B were the only two designated nonsmoking units in FCI-Allenwood. Doc. No. 69 Ex. 2 at 3.

### ii. Prison Regulations

Correctional officers at FCI-Allenwood are subject to following specific prison directives and policies: (1) Program Statements, (2) Institution Supplements, and (3) Post Orders. Yates Depo. 25:11-15. Program Statements are issued by the BOP and cover all areas of responsibility for the agency, including inmate accountability, discipline, and visitation. Lyons Depo. 27:17-28:6. Institutional Supplements adapt the general Program Statements to a particular institution. *Id.* at 25:4-20. Post Orders apply to the specific position to which an officer is assigned. *Id.* at 23:3-24:21. "Each post order contains the following sections: (1) General Post Orders, which are guidelines applicable to any post in the institution; (2) Specific Post Orders, which are specific to a post and outline the timing of movements by inmates, equipment needed on the post, and approximate timeframes that certain procedures or activities should occur; and (3) Special Instructions, which describe a correctional staff member's responsibilities and expectations while serving on a particular post." Doc. No. 66 at 4.

The General Post Orders of FCI-Allenwood provide in the introduction that the information contained is "not expected . . . to cover every situation that a staff member will be confronted with . . . due in part to the fact that each situation has unique characteristics and may

place extraordinary demands on staff and the institution itself." Doc. No. 66, Ex. C at BOP 761.

The General Post Orders state that "[e]ach employee . . . is responsible for the custody, control,

supervision, and accountability of all inmates in their area of responsibility and supervision." *Id.*

at BOP 764-65; *see also id.* at BOP 798 ("In order to maintain inmate accountability, constant

and direct supervision of all inmates is required.  Supervision, when used correctly, assists staff

in maintaining order in their respective areas.").  The General Post Order requires that "[a]ll

officers are to maintain security and control of their area," which is "accomplished in part by

making patrols or rounds through [their] respective area." *Id.* at BOP 766.

The Post Orders provide in several sections that once an individual is on a post, he is not

permitted to leave until properly relieved or instructed to do so by his supervisor. *See, e.g.*, *id.* at

BOP 770 ("Once on a post, staff will not leave until properly relieved or instructed to do so by

the Shift Lieutenant.  Should a relief be needed, the Lieutenant's Office will be notified.  Staff

are advised that smoking is authorized only in designated areas.") (General Post Order);  *id.* at

BOP 802 ("Staff are not to leave their post without being properly relieved or instructed to do so

by the Shift Lieutenant.") (General Post Order); Doc. No. 67 Ex. 10 ("Staff will not leave a post

unless properly relieved.") (Specific Instruction).

Inmates at FCI-Allenwood are not permitted free access to all areas in the institution.

They are generally only allowed to move across the compound from one area to another during

"controlled movements," which occur at designated times of the day during ten minute intervals.

Lyons Depo. 132:4-21.   During a controlled movement, a unit officer is required to

"continuously monitor inmate traffic within and outside of the units." Doc. No. 66, Ex. C at BOP

811-12.  There is no directive that dictates exactly where a housing unit officer should position

himself or herself during a controlled move, however, an officer usually attempts to observe the

inmates and look for anyone who may attempt to improperly enter the housing unit. *See, e.g.*, Womeldorf Depo. 83:16-22 (stating that monitoring inmate movement involves "[j]ust being outside your office, standing in the common area, standing at your door during a move"); *id.* at 246:7-15 (maintaining that "it's just sound correctional judgment and technique to put yourself in a position whether you can see the most amount of people at any one time"); Lyons Depo. 140:5-10 (describing that an officer during a controlled move would typically observe inmates "coming in and out of the unit" and that "he can do that from within inside [sic], standing right in the sally port, or standing outside on the sidewalk").

The Specific Post Orders for Unit 3A Officers provide that a 10-minute controlled move is normally announced after the close of the dining hall after a meal is served. Doc. No. 66 Ex. G at BOP 883. After the controlled move is complete, the unit officer is directed to conduct a census of the inmates in the Unit. *Id.*; Ex. H, Institution Supp. ALM 5511.06(C) at 5. The census count lasts approximately forty-five minutes and is "a frequent, but irregular count conducted to ensure inmates are present in their assigned areas." Gen. Post Orders at BOP 768. The irregularity of the census count attempts to prevent inmates from growing used to a routine. Lyons Depo. 335:7-16.

### iii.  October 15, 2002 Attack

At approximately 12:00 p.m. on October 15, 2002, Officer Richard Sweithelm ("Sweithelm"), the assigned Unit Officer for housing unit 3-A at FCI-Allenwood assumed his post. Sweithelm Depo. 63:19-21. Sweithelm, the only correctional officer responsible for the unit at the time, stood on the sidewalk immediately outside the unit for the entirety of the controlled move that began at approximately 12:37 p.m. *Id.* at 168:9-12. He maintains that while outside he was "smoking a cigarettes [sic] and observing the outside move" while standing

approximately ten or fifteen feet from the exterior doors.  *Id.* 168: 7-17.  While outside, he was facing away from Unit 3-A "towards to compound."  *Id.* 168: 19-20.

While Sweithelm stood outside, Woodland was brutally attacked by inmate Jesse L. Sparks inside cell 109 of Unit 3-A.  *See* Third Amend. Compl. ¶ 9-11.  Sparks repeatedly kicked Woodland in the upper torso and head with boots, Lyons Decl. ¶ 7, while another inmate, Ishmael Ford-Bey, held the door of cell 109 closed in order to prevent escape.[2]  *Id.*; SIS Report at 5.  A third inmate, Preston Bryant, positioned the door of cell 107 at an angle to interfere with the view of the surveillance camera on that range.  Lyons Decl. ¶ 8; SIS Report at 5-6.  The exact duration of the attack is unknown, however, Woodland and Sparks entered cell 109 at approximately 12:37 p.m., Lyons Depo. 225: 7-13, and Sparks exited cell 109 at approximately 12:56 p.m.  Lyons Decl. ¶ 7.  Several inmates heard the attack taking place, but did nothing to intervene.  SIS Report at 5, 8; Lyons Depo. 441:6-444:14, 444:20-445:7, 429:7-430:7.

Sweithelm returned to Unit 3-A at approximately 12:48 p.m at the conclusion of the ten-minute move.  Lyons Tr. 467:21-468:16.  When he returned to the Unit, inmate Preston Bryant approached Sweithelm, at approximately 12:50 p.m., and asked him to retrieve a broom from a locked storage room.  SIS Report at 12.  Sweithelm obtained a broom and began the census at approximately 12:52 p.m. Yates Depo. 217:1-218:4.  Sweithelm found Woodland unresponsive in his cell at approximately 1:05 p.m.  Sweithelm Depo. 195:21-197:9.  The assault left Woodland in a months-long coma, inflicted brain damage, left him without full use of his arms and legs, and caused mental distress.  Third Am. Compl. ¶¶ 14-15.

---

[2] There had been an earlier altercation between Woodland and Sparks of which prison officials were not notified. Lyons Decl. ¶¶ 5-6.  Woodland appears to have cleaned up and changed his clothing to hide the fact from prison officials that an earlier fight had occurred.  Doc. No. 63 Ex. L.  BOP did not have any information that would have made them aware of a need for Woodland's separation from Sparks or Ford-Bey.  Dowell Decl. ¶ 6.  The Government criminally prosecuted Sparks and Ford-Bey for the attack.  Doc. No. 63 Exs. M, N.

### b. USMCFP Springfield

After receiving medical treatment at various hospitals and institutions, Woodland was transferred to the United States Medical Center for Federal Prisoners in Springfield, Missouri ("USMCFP Springfield"). The following facts go to the claims of negligent and intentional infliction of emotional distress alleged by Plaintiffs that occurred when the Plaintiffs were unable to visit Woodland when they traveled to Missouri and attempted to see him.

### i. Staffing, Policies, and Procedures

Each inmate at USMCFP Springfield is assigned to a unit that is staffed with a unit manager, case manager, counselor, and secretary. Banata Depo. 15:2-5. At the time of the Sledges' attempted visit, one case manager was assigned to each inmate. *Id.* at 16:19-23. Case managers are generally in contact with an inmate's family member, and there is no limitation on how often a family member may contact the case manager (assuming that a consent to release form was signed). *Id.* at 67:6-68:1. The duties and responsibilities at USMCFP Springfield are found in the BOP Program Statement and USMCFP Springfield Institution Supplements.

The BOP Program Statement notes that the BOP "encourages visiting by family, friends, and community groups to maintain the morale of the inmate." Doc. No. 63, Ex. O at 1. It directs the Warden to "develop procedures consistent with this rule to permit inmate visiting. The Warden may restrict inmate visiting when necessary to ensure the security and good order of the institution." *Id.* In accordance with the Program Statement, USMCFP Springfield developed an Institution Supplement to address visiting regulations. *Id.* Ex. P. Generally visits occur in the visiting room, but if the inmate is unable to go to the visiting room, which was the case for Woodland, the visit will occur at the inmate's bedside.

The Institution Supplement mandates that

> Bedside visits must be prearranged by the inmate's unit team and approved by the Warden . . . . The inmate's Unit Manager will designate a member of his unit team to serve as supervising staff for the visit. Staff supervising beside visits in hospital wards must provide constant and immediate visual supervision of inmates and their visitors to prevent security violations.

Ex. P ¶ 14c(1),(4).   The Supplement provides the following caveat: "While visiting is encouraged, visiting arrangements must be consistent with the security and good order of the institution, with staff resources available, and with the well being of the patient in mind."  Ex. P ¶ 14c(6).

The procedures require visitors to contact the unit team in advance requesting approval from the Warden to arrange a bedside visit.  Banta Depo. 179:13-181:11.  After the visitor contacts the unit team, the inmate's case manager prepares a memorandum requesting approval for the bedside visit, which is then sent to the unit manager for approval.  *Id.* at 95:19-97:20; 101:3-11.  When deciding whether to approve a bedside visit, the unit manager will consider staff availability and the condition of the inmate, among other factors.  *Id.* at 101:24-102:10.  If medical staff does not object to the visit and the unit manager determines that staff is available, the unit manager will designate a member of the unit team to supervise the visit.  *Id.* at 103:23-104:14.

After the unit manager completes his or her review, the memorandum is sent to the Warden who is the "approving authority" whose signature indicates approval of the visit.  *Id.* at 106:17-18, 107:18-20.  After the memorandum is signed, copies are "forwarded to the captain's office, front entrance, control center, the officer in charge of whatever unit the inmate is housed on, [] the operations lieutenant, and the counselors" and a copy is placed in the inmate's file.  *Id.* at 107:22-108:1, 110:19-21.  Finally, the case manager would normally contact the inmate's

visitors to let them know that they are approved, but there is no policy on whether or how to notify approved visitors.  *Id.* at 111:4-23.

### ii. Sledges' Attempted Bedside Visitation

The Mental Health Unit Manager at Springfield, by memorandum dated July 11, 2005, presented to the Warden a request by Dianna Sledge, Teresa Sledge, and Steven Sledge for approval of a beside visit with Woodland from 9:00 a.m. to 10:00 a.m. and from 1:00 p.m. to 2:00 p.m. on Saturday, July 16, 2005 and Sunday July 17, 2005.  Doc. No. 63 Ex. Q.  None of the Sledges came to visit that day despite receiving approval.[3]  *Id.* Sledge Depo. 29:8-18.

On November 12, 2005, Dianne and Teresa Sledge arrived at USMCFP Springfield and requested a bedside visit with Woodland.  Doc. No. 63 Ex. R.  The parties dispute whether the Sledges had contacted staff for prior approval for the November visit.  BOP maintains that there was no record of authorization for a bedside visit by the Sledges that day.  Rinker Decl. ¶ 4. Crystal Rinker, the institutional duty officer on site that day, checked areas of the institution in an attempt to determine if the authorization form had somehow been misplaced; however, she could not find the preapproval paperwork necessary for a bedside visit.  She then informed the Sledges that they could not visit Woodland because they had not received the Warden's prior approval to visit and because no unit team staff members were available to provide constant and immediate visual supervision as required by institution policy.  *Id.*; Institutional Supplement, SPG-5267.07d ¶ 14(c)(1).  BOP further asserts that a USMCFP Springfield employee offered to arrange a visit sometime during the next several days, but that the Sledges refused, and they did not return to the facility.

---

[3] The Sledges admit that they did not travel to Springfield after receiving prior approval for the July visit because of financial constraints.

Teresa Sledge alleges that she arranged for the attorney working with the Sledges to contact Ms. Bennett to obtain approval for a November visit, Teresa Sledge Depo. 29:21-30:7, and that the case manager confirmed the visit. *Id.* at 54:22-24. However, she contends that staff failed to initiate the approval process.

Woodland died in federal custody on January 29, 2006, and the Plaintiffs never saw him alive again. Third Am. Compl. ¶¶ 23, 27. Plaintiffs allege that because Dianne Sledge and Teresa Sledge were prevented from visiting Woodland, (i) Woodland suffered severe emotional distress, causing further deterioration of his health, and (ii) Plaintiff Dianne Sledge suffered "severe emotional distress, including depression, dejection, hopelessness, worry, obsessive worry, sleeplessness, stomach pain, and headaches." *Id.* ¶ 25.

## II.    Procedural History

On April 24, 2006, Plaintiff Steven Sledge filed the original complaint. Doc. No. 1. On November 30, 2006, Plaintiff filed the first amended complaint. Doc. No. 13. On June 27, 2007, Plaintiffs Dianne Sledge and Steven Sledge filed a second amended complaint. Doc. No. 21. On September 7, 2007, Plaintiffs filed a motion for leave to file a third amended complaint, which was granted by a minute order on October 15, 2007.

On December 6, 2007, the BOP filed a Motion to Dismiss Third Amended Complaint or, in the Alternative, to Transfer. Doc. No. 25. The motion had been ripe for nearly a year and five months when in June 2009, the Chief Justice of the United States assigned the case to Judge Roger W. Titus, of the United States District Court for the District of Maryland, pursuant to 28 U.S.C. § 292(d). After the assignment and designation, the Court granted Plaintiffs leave to file a supplemental memorandum, Doc. No. 33, granted the BOP leave to file a response, Doc. No. 39, and scheduled a hearing on the motion to dismiss for January 26, 2010.

On July 13, 2010, this Court entered a Memorandum Opinion and Order that granted in part and denied in part BOP's motion to dismiss. Doc. Nos. 41, 42. The Court dismissed Counts III and IV and ordered limited jurisdictional discovery concerning Counts I, II, V, and VI. Doc. No. 42.

On January 31, 2012, after the completion of jurisdictional discovery, BOP filed a motion to dismiss Counts I, II, V, and VI of Plaintiffs' Third Amended Complaint. Doc. Nos. 63, 66. On March 21, 2012, Plaintiffs filed their opposition to the motion to dismiss, Doc. No. 68, to which the BOP replied on April 12, 2012. Doc. Nos. 69, 71.

### III.    Standard of Review

#### a.   Federal Rule of Civil Procedure 12(b)(1)

Fed. R. Civ. P. 12(b)(1) presents a threshold challenge to the Court's subject matter jurisdiction. The Court may resolve a motion to dismiss under 12(b)(1) in two ways.

First, the Court may address the jurisdictional challenge on the face of the complaint. *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002); *Smith v. United States*, 518 F. Supp. 2d 139, 145 (D.D.C. 2007). When resolving such a challenge, the Court "must accept as true the allegations in the complaint and consider the factual allegations of the complaint in the light most favorable to the non-moving party, just as it would on a motion to dismiss under Rule 12(b)(6)." *Smith*, 518 F. Supp. 2d at 145 (internal quotation marks and citation omitted).

Second, the Court may consider information extrinsic to the complaint and weigh conflicting evidence to determine its jurisdiction. *See Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000); *Herbert v. Nat'l Acad. of Science*, 974 F.2d 192, 197 (D.C. Cir. 1992). Plaintiffs must be given "ample opportunity" to obtain and present evidence,

but "[i]n order to avoid burdening a sovereign that proves to be immune from suit . . . jurisdictional discovery should be carefully controlled and limited." *Phoenix Consulting*, 216 F.3d at 40.

The plaintiff has the burden of establishing jurisdiction. *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once the Court "determines that it lacks subject matter jurisdiction, it can proceed no further." *Simpkins v. Dist. of Columbia Gov't*, 108 F.3d 366, 371 (D.C. Cir. 1997).

### b. Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "shown"—that the pleader is entitled to relief." *Id.* at 1950.

When deciding a motion to dismiss, the Court must construe the factual allegations in the complaint in the light most favorable to a plaintiff and must grant a plaintiff the benefit of all inferences that can be derived from the facts as alleged in the complaint. *Barr v. Clinton*, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Nevertheless, the "court need not accept inferences drawn by plaintiffs if such

inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal*, 16 F.3d at 1276.

### IV.    Analysis

#### a.  The FTCA Discretionary Function Exception

Defendant argues that the Court lacks subject matter jurisdiction over Counts I, II, V, and VI under the discretionary function exception of the Federal Tort Claims Act ("FTCA").

The United States, as a sovereign, may be sued only to the extent that it has consented to suit by statute. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994). The FTCA waives sovereign immunity in civil actions against the United States

> for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). The FTCA "does not create a cause of action against the United States; it allows the United States to be liable if a private party would be liable under similar circumstances in the relevant jurisdiction." *Hornbeck Offshore Transp., LLC v. United States*, 569 F.3d 506, 508 (D.C. Cir. 2009); s*ee also Richards v. United States*, 369 U.S. 1, 9 (1962) ("Congress has expressly stated that the Government's liability is to be determined by the application of a particular law, the law of the place where the act or omission occurred . . . .").

"This broad waiver of sovereign immunity is limited, however, by the exceptions in 28 U.S.C. § 2680(a)," *Cope v. Scott*, 45 F.3d 445, 447 (D.C. Cir. 1995), which provides that the United States does not consent to suit for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or

> regulation, whether or not such statute or regulation be valid, or
> based upon the exercise or performance or the failure to exercise or
> perform a discretionary function or duty on the part of a federal
> agency or an employee of the Government, whether or not the
> discretion involved be abused.

28 U.S.C. § 2680(a).  *See also Shuler v. United States*, 531 F.3d 930, 935 (D.C. Cir. 2008)

(emphasizing that the discretionary function exception immunizes even abuses of discretion).

"When an individual is injured by an act of the government or a government employee,

section 1346(b) allows him or her to bring suit unless the action that allegedly caused the injuries

is a discretionary function as defined under the FTCA." *Cope*, 45 F.3d at 447-48.  Congress has

explained that "[t]he purpose of the discretionary function exception is to protect the ability of

the government to proceed with decisionmaking in carrying out its unique and vital functions

without 'second-guessing' by the courts as to the appropriateness of its policy choices." H.R.

Rep. No. 101-1015 (1991).  "Discretionary function determinations are jurisdictional in nature."

*Cope*, 45 F.3d at 448.

The Supreme Court has established a two-part test to determine if a government

employee's action is exempt from suit under the discretionary function exception.

A court must "determine whether it is appropriate to analyze the action under the first or

the second clause of the exception." *Id.*  This inquiry requires a court to ask if a "federal statute,

regulation, or policy specifically prescribes a course of action for an employee to follow."

*United States v. Gaubert*, 499 U.S. 315, 322 (1991) (citing *Berkovitz v. United States*, 486 U.S.

531, 536 (1988)).  If a specific directive exists, the court proceeds under the first prong, and the

only issue for a court to decide is "whether the employee followed the directive, and is thus

exempt under the first clause, or whether the employee did not follow the directive, thus opening

the government to suit." *Cope*, 45 F.3d at 448.  "Because no choice is involved where a 'specific

prescription' exists, the discretionary function exception contained in the second clause is not applicable." *Id.* If, however, a specific direction does not exist and the employee had some discretion, the court must proceed to the second step of the analysis.

Under the second prong, "the 'basic inquiry' is whether the challenged discretionary acts of a government employee 'are of the nature and quality that Congress intended to shield from tort liability.'" *Id.* (quoting *United States v. S. A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 813 (1984)). The act for which a plaintiff seeks to impose liability must involve "an element of judgment or choice." *Gaubert*, 499 U.S. 322. The Supreme Court has explained that where a directive gives employees discretion,

> [f]or a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime. The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Id.* at 324-25 (suggesting that courts are to presume that actions are grounded in public policy in cases where the statute or regulation allows the government employee to exercise discretion). "Determining whether a decision is essentially political, social, or economic, is admittedly difficult, since nearly every government action is, at least to some extent, subject to 'policy analysis.'" *Cope*, 45 F.3d at 448. However, the discretionary function exception applies to decisions that are "fraught with . . . public policy considerations." *Id.* at 449 (citation omitted).

In sum, if the agency or employee exercised discretion and the decision was grounded in considerations of public policy, then the United States has sovereign immunity from suit under the discretionary function exception, and federal courts lack subject matter jurisdiction over any claim.

### i. The Discretionary Function Exception Bars Claims Arising Out of the October 15, 2002 Attack of Woodland at FCI – Allenwood

The BOP argues that mandatory directives do not prescribe a certain course of conduct for correctional officials to follow with respect to the protection of inmates at FCI-Allenwood. It maintains that under the second prong of the discretionary function exception inquiry, decisions made by correctional staff regarding the protection of inmates are grounded in public policy such that the United States is immune from suit. Plaintiffs contend that Sweithelm's decisions to stand outside and smoke cigarettes during the controlled move violated three mandatory directives, thus ending this Court's inquiry at step one of the analysis discussed above. In the alternative, Plaintiffs argue that even if Sweithelm's conduct did not violate a mandatory directive, his conduct fails step two of the analysis because his decision to leave the unit to smoke cigarettes is not grounded in policy.

### 1. FCI-Allenwood Lacks Mandatory Guidelines That Require Correctional Staff to Follow a Particular Course of Action Regarding the Supervision of Inmates During Controlled Movements

Title 18, Section 4042 of the United States Code contains a statutory mandate that the BOP shall "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042 (a)(2-3). Courts have found that this statutory provision "does not indicate the manner in which the duty must be fulfilled." *Spotts v. United States*, 613 F.3d 559, 567 (5th Cir. 2010); *Cohen v. United States*, 151 F.3d 1338, 1342 (11th Cir. 1998) (maintaining that "even if § 4042 imposes on the BOP a general duty of care to safeguard prisoners, the BOP retains sufficient discretion in the means it may use to fulfill that duty to

trigger the discretionary function exception"). BOP has created program statements, institution supplements, and Post Orders to complete this statutory mandate.

BOP maintains that Plaintiffs have failed to "identify any statute, regulation, or policy that specifically prescribes a course of action with respect to the protection of inmates." Doc. No. 63 at 22. Plaintiffs contend that "Sweithelm's decision to leave Unit 3-A to smoke cigarettes" violated three commands contained in the Post Orders including: (1) orders requiring him to remain on post, (2) orders requiring him to continuously monitor traffic within the unit during the controlled movement, and (3) orders requiring him to monitor inmates inside the unit. Doc. No. 67 at 28.

First, Plaintiffs' argument that Sweithelm left the Unit is unpersuasive. The Post Orders provide in several sections, that once an individual is on a post, he is not permitted to leave until properly relieved or instructed to do so by his or her supervisor. *See, e.g.*, Doc. No. 66, Ex. C at BOP 770. The parties disagree over whether Sweithelm left his post without proper authority when he positioned himself outside the unit and smoked cigarettes during the controlled move. Both parties agree that the Post Orders do not mandate where a unit officer should position himself during the controlled move. *See* Doc. No. 69 at 5; Doc. No. 67 at 31. The deposition testimony and video footage submitted by the parties indicate that Officer Sweithelm positioned himself at the entrance of Unit 3-A to monitor inmates during the move. Thus, he did ***not*** leave his post.

For example, when reviewing video footage of the events giving rise to this claim, Lieutenant Lyons stated that Officer Sweithelm unlocked the door to the unit and "appear[ed] to be standing there monitoring his sidewalk, inmates attempting to enter his unit" during the move. Lyons Depo. 455:19-457:11. Officer Sweithelm stated: "normally I go outside and I observe the

movement, and then I would come inside after the move and then secure my doors and monitor the inside the unit." Sweithelm Dep. 109:3-6. Forrest Farmer, the captain of FCI-Allenwood at the time of the incident, testified that a correctional officer would not be considered to have left his post if he stood outside the unit during a controlled movement and that the area outside of the unit is considered to be part of the area to monitor during the controlled movement. Farmer Depo. 170:19-180:12. The fact that an officer is not mandated to position himself in a certain location indicates an element of choice.

Second, Plaintiffs' argument that by standing outside for the entirety of the movement Sweithelm violated the Special Instruction that "[d]uring all controlled movements, the Unit Officers will continuously monitor traffic within and outside of the units" is equally unavailing. Doc. No. 67 Ex. 10 at BOP 811-12. As discussed above, there is an absence of a mandatory Post Order that an officer must stand inside, outside, or patrol both inside and outside the unit during the controlled move. Stanley Yates, the Warden of FCI-Allenwood at the time of the incident, testified that he did not "think that the policies restrict an . . . officer from standing inside the door or outside the door. It's just being in a position to keep traffic moving." Yates Dep. 116:1-4. Again, the officers have reasonable leeway in deciding where to position themselves during a controlled move, and there is nothing in the record before the Court to indicate that that leeway was exceeded.

Plaintiffs' argument that by monitoring outside the unit "Sweithelm at most followed only half the directive" is unpersuasive. Such a tortured reading of the Post Order would place officers in a dilemma that would require that they position themselves inside the unit and outside the unit for an equal amount of time. This argument demonstrates that there is no binding directive that mandates an officer spend a certain amount of time in any specific location.

Finally, Plaintiffs' argument that Sweithelm violated the mandatory Post Order that he must provide constant and direct supervision of the inmates in his area of responsibility and supervision also fails.  Plaintiffs argue that Sweithelm failed to adhere to the Post Order that mandates: "In order to maintain inmate accountability, constant and direct supervision of all inmates is required." Doc. No. 67 Ex. 13 at BOP 798.  Plaintiff contends that by positioning himself outside of the unit during the controlled move, Sweithelm "did not provide constant and direct supervision of the inmates in his unit as required."  Doc. No. 67 at 33.  Plaintiffs do not direct this Court to a Post Order or policy that defines "constant and direct."  Plaintiffs concede that such a strict reading of the mandate would require "an impossible level of supervision."  *Id.*

Therefore, Plaintiffs fail to identify any statute, regulation, or policy that specifically prescribes a course of action with respect to the protection of inmates that Sweithelm violated. None of the regulations discussed above required officials at FCI-Allenwood to observe inmates from a specific location for a specific amount of time during movements.   The Court, then, must move to the second step of the discretionary function exception analysis and determine if the challenged actions are discretionary actions "fraught with . . . public policy considerations." *Cope*, 45 F.3d at 449.

### a. The Decisions of FCI-Allenwood Correctional Staff Regarding the Positioning of Staff Members During a Controlled Movement Are Grounded in Policy Considerations

The second step of the discretionary function analysis requires this Court to determine if Sweithelm's decision to position himself outside during the controlled move was a decision "'susceptible to policy judgment and involve[d] an exercise of 'political, social, [or] economic judgment.'"  *Cope*, 45 F.3d at 448 (quoting *Gaubert*, 499 U.S. at 325) (alteration in original). "The question is not whether there is any discretion at all, but whether the discretion is

'grounded in the policy of the regulatory regime.'"  *Id.* at 449 (quoting *Gaubert*, 499 U.S. at

325).  "The mere association of a decision with regulatory concerns is not enough; exempt

decisions are those 'fraught with public policy considerations.'"  *Id.* (quoting *Sami v. United

States*, 617 F.2d 755, 767 (D.C. Cir. 1979)).

The District of Columbia Circuit has emphasized that "[t]he mere presence of choice . . .

does not trigger the exception."  *Id.*  The court has found:

> No matter the level at which the decision was made, the nature of
> the decision, or the impact it had on others, we have consistently
> held that the discretionary function exception applies only where
> the question is not negligence but social wisdom, not due care but
> political practicability, not reasonableness but economic
> expediency.

*Id.* at 450 (quotation omitted); *see Shansky v. United States*, 164 F.3d 688, 692 (1st Cir. 1999)

("The critical question is whether the acts or omissions that form the basis of the suit are

susceptible to a policy-driven analysis, not whether they were the end product of a policy-driven

analysis.").  The Supreme Court has held that "*if a regulation allows the employee discretion*, the

very existence of the regulation creates a strong presumption that a discretionary act authorized

by the regulation involves consideration of the same polices which led to the promulgation of the

regulations."  *Gaubert*, 499 U.S. at 324 (emphasis added).

The BOP argues that the correctional staff at FCI-Allenwood must balance the need of

providing security with the rights of inmates to socialize within the prison, which "clearly

involve considerations based upon public policy."  Doc. No. 63 at 26.  BOP further contends that

"Officer Sweithelm's decisions regarding the manner in which he monitored inmates during a

move necessarily required him to consider the risks posed by inmates moving about the

institution and to evaluate his ability to ensure the safety of inmates and prison staff."

Doc. No. 69 at 12.  Plaintiffs maintain that "[t]he relevant conduct" that this Court must consider

20

"is Sweithelm's decision to leave the unit's interior unmonitored in order to go outside and smoke cigarettes."  Doc. No. 67 at 36.  Plaintiffs maintain that Sweithelm's failure to prevent or disrupt the attack cannot be explained on policy grounds and cannot provide the BOP immunity under the discretionary function exception.

The question that the Court must address is whether Officer Sweithelm's decision to position himself outside of the unit during the controlled move was the type of decision fraught with policy considerations.   Case law and deposition testimony indicate that policy considerations are implicated by a correctional officer's decision where to strategically position himself during a controlled move.

This Court found previously that "[t]he great weight of the case law suggests that if a decision regarding the protection, safety, and classification of prisoners is discretionary (i.e., there are no mandatory directives) then such a decision is grounded in public policy and the discretionary function applies."  *Sledge v. United States*, 723 F. Supp. 2d 87, 96 (D.D.C. 2010); *see, e.g., Ashford v. United States*, No. 10-40804, 2012 WL 695132, *6 (5th Cir. Mar. 5, 2012) ("Maintaining order and security in prison is the type of policy-based decision that the discretionary function exception shields."); *Montez v. United States*, 359 F.3d 392, 398-99 (6th Cir. 2004) (concluding that plaintiff failed to allege sufficient factual support to "rebut the *Gaubert* presumption that the decisions by prison officials regarding his safety were based upon BOP policy"); *Santana-Rosa v. United States*, 335 F.3d 39, 44-45 (1st Cir. 2003) ("The management of large numbers of potentially dangerous individuals within a penal facility inevitably requires not only the exercise of discretion but decision-making within the context of various difficult policy choices."); *Alfrey v. United States*, 276 F.3d 557, 561-67 (9th Cir. 2002) (finding that discretionary function exception applied to claims related to how to search a prison

cell and how to investigate a threat); *Dykstra v. United States Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998) ("Prison officials supervise inmates based upon security levels, available resources, classification of inmates, and other factors.  These factors upon which prison officials base such decisions are inherently grounded in social, political, and economic policy.").  Under *Gaubert*, many of these cases reason that because 18 U.S.C. § 4042(a) "is an established governmental policy . . . [that] allows a Government agent to exercise discretion" in providing for the safekeeping, protection, and care of inmates, it must be "presumed that the [BOP's] acts are grounded in policy when exercising that discretion."  499 U.S. at 324; *see Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997).

Here, the decision regarding the positioning of a correctional officer during a controlled move is discretionary because there are no mandatory directives and there is a strong presumption that the protection of inmates and staff involves policy considerations that implicate protection and safety.  Officer Sweithelm's decision to position himself outside, rather than in the sally port, requires consideration of risks posed by inmates moving throughout the prison and requires safety and security calculations.  This process implicates public policy considerations. Therefore, this Court lacks subject matter jurisdiction over Counts I and II.

### ii. The Discretionary Function Exception Does Not Bar Claims Arising Out of the November 12, 2005 Visitation at USMCFP Springfield

The BOP argues that this Court should dismiss Counts V and VI pursuant to Federal Rule of Civil Procedure 12(b)(1) because the claims are barred by the discretionary function exception.  It contends that USMCFP Springfield employees were not bound to follow a particular course of conduct regarding the determination of visitation privileges.  Furthermore, the BOP maintains that the decision to bar the Sledges' visit was grounded in policy considerations.  Doc. No. 63 at 30-33.  Plaintiffs maintain that the staff did not have the

discretion to decide not to submit the Sledges' second visitation request through the proper approval process and that even if it did the decision to deny the Sledges the opportunity to visit was not fraught with policy considerations.  Doc. No. 67 at 38-41.

### 1. The USMCFP Springfield Employees Were Not Bound to Follow a Particular Course of Action When Approving or Denying a Visitation Request

As discussed above, the discretionary function analysis first requires a court to determine if a federal statute, regulation, or policy existed that required BOP employees to follow a particular course of action in determining whether a bedside visit could take place.  Although the BOP generally "encourages visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community," the Warden must "develop procedures consistent with this rule to permit inmate visiting" and he may "restrict inmate visiting when necessary to ensure the security and good order of the institution."   28 C.F.R. § 540.40; Doc. No. 63 Ex. O (BOP Program Statement 5237.07); Ex. P (Institution Supplement).

In accordance with the Program Statement, USMCFP Springfield developed an Institution Supplement to address visiting regulations.  *Id.* Ex. P.  Generally visits occur in the visiting room, but if the inmate is unable to go to the visiting room, which was the case for Woodland, the visit will occur at the inmate's bedside.

The Institution Supplement mandates that

> Bedside visits must be prearranged by the inmate's unit team and approved by the Warden . . . . The inmate's Unit Manager will designate a member of his unit team to serve as supervising staff for the visit.  Staff supervising beside visits in hospital wards must provide constant and immediate visual supervision of inmates and their visitors to prevent security violations.

Ex. P ¶ 14c(1), (4).  "While visiting is encouraged, visiting arrangements must be consistent with the security and good order of the institution, with staff resources available, and with the well being of the patient in mind."  Ex. P ¶ 14c(6).

Plaintiffs interpret the Institution Supplement requiring that "bedside visits must be prearranged" as mandating that "the case manager prepare[] an approval memo" in every instance of a visitation request.  Doc. No. 67 at 38.  Plaintiffs allege that BOP violated this mandate by not preparing a memorandum after the Sledges' requested to visit in November 2005.  BOP contends that "Plaintiffs' construction of the word must to remove any discretion from the prison staff on whether to prearrange a bedside visit, rather than mandating the conditions under which bedside visits may occur, is untenable."  Doc. No. 69 at 16.  The BOP argues that the Institution Supplement is "infused with discretion."  *Id.*

The Institution Supplement does not mandate the creation of memoranda every time an individual requests a visit.  For example, the Supplement provides that the "[s]cheduling of all bedside visits will take into consideration any medical treatment needed, (i.e. medication), and any recommendations that the physician may make (i.e. length of visit, limiting number of visitors, etc.)."  *Id.* Ex. P ¶14c(5).  Additionally, the Supplement ensures that visiting arrangements are determined with the security of the institution, available resources, and the well being of the patient in mind.  *Id.* ¶14c(6).  Rather than reading the directive as requiring the preparation of a memorandum for every visitation request, a more appropriate reading is that the visitation request process must begin with the inmate's team unit, regardless of whether a memorandum is initially prepared.  Then, if the individual overseeing the process approves the request, he or she must prepare a memorandum for final approval from the Warden.

Plaintiffs fail to identify any statute, regulation, or policy that specifically prescribes a course of action with respect to the creation of memoranda after a visitation request is made. Therefore, the Court must move to the second step of the discretionary function exception analysis and determine if the challenged actions are discretionary actions "fraught with . . . public policy considerations." *Cope*, 45 F.3d at 449.

### 2. USMCFP Springfield Employees' Failure to Process the Sledges' Visitation Request is Not Fraught With Policy Considerations

The BOP argues that "[i]nmate visitations necessarily implicate policy considerations pertaining to institutional security because, as the BOP's representative testified, 'you are bringing people from the outside into the institution, into the secure perimeter.'" Doc. No. 63 at 32-33 (quoting Banta Depo. 174:25-175:1). BOP maintains that "[t]he competing policy interests at play—the interest in maintaining inmate morale and strengthening familial and community relationships on the one hand, and the security and good order of the institution and the well-being of the patient, on the other—are explicitly reflected in the program statement and institution supplement." *Id.* Plaintiffs maintain that the BOP draws the incorrect level of specificity when considering the policy implications. They argue that the relevant inquiry is not the over-all policy of bedside visitation, but rather the failure here to process the Sledges' second request to visit.

The BOP has produced deposition testimony regarding the procedures that are normally followed after a bedside visitation request is made. After the family member contacts the unit team, the inmate's case manager prepares a memorandum requesting approval for the bedside visit, which is then sent to the unit manager for approval. *Id.* at 95:19-97:20; 101:3-11. When deciding whether to approve a bedside visit, the unit manager will consider staff availability and the condition of the inmate. *Id.* at 101:24-102:10. If medical staff does not object to the visit

and the unit manager determines that staff is available, the unit manager will designate a member of the unit team for the visit. *Id.* at 103:23-104:14.

After the unit manager completes his or her review, the memorandum is sent to the Warden who is the "approving authority" whose signature indicates approval of the visit. *Id.* at 106:17-18, 107:18-20. After the memorandum is signed, copies are "forwarded to the captain's office, front entrance, control center, the officer in charge of whatever unit the inmate is housed on, [] the operations lieutenant, and the counselors" and a copy is placed in the inmates file. *Id.* at 107:22-108:1, 110:19-21. Finally, the case manager would normally contact the inmate's visitors to let them know that they are approved, however, there is no policy whether or how to notify approved visitors. *Id.* at 111:4-23.

Here, the Plaintiffs maintain that there was a failure to process the Sledges' visitation request. Teresa Sledge alleges that she arranged for the attorney working with the Sledges to contact Ms. Bennett to obtain approval for a November visit, Teresa Sledge Depo. 29:21-30:7, and that the case manager confirmed the visit. *Id.* at 54:22-24. Considering the facts in a light most favorable to Plaintiffs, and assuming that her attorney contacted Ms. Bennett and the visitation was confirmed, the issue becomes whether BOP's failure to process a visitation request is based on considerations of public policy. It is not.

The Supreme Court has held that "[t]here are obviously discretionary acts performed by a Government agent that are within the scope of his employment but not within the discretionary function exception because these acts cannot be said to be based on the purposes that the regulatory regime seeks to accomplish." *Gaubert*, 499 U.S. at 325 n. 7. The Court gave the example of a government official who negligently operated a vehicle while on official business as a discretionary act that would not satisfy the discretionary function exception.

Here, Plaintiffs maintain that the BOP confirmed that the Sledges could visit in November, but it failed to process the request.  Case law indicates that laziness or carelessness such as the Plaintiffs allege here is not grounded in policy considerations.  *See, e.g.*, *Hartman v. Holder*, 00-cv-6107-ENV-JMA, 2009 WL 792185, at *7 (E.D.N.Y. Mar. 23, 2009) ("Assuming, as the Court does, that Sanders had discretion consistent with the policy objectives of the BOP over the manner in which she conducted rounds, her alleged failure—out of laziness or carelessness—to avoid profiling herself cannot be immunized merely by evoking that general discretion."); *Coulthurst v. United States*, 214 F.3d 106, 111 (2d Cir. 2000) ("An inspector's decision (motivated simply by laziness) to take a smoke break rather than inspect the machines, or an absent-minded or lazy failure to notify the appropriate authorities upon noticing the damaged cable, are examples of negligence fairly encompassed by the allegations of the complaint that do not involve 'considerations of public policy.'") (citing *Gaubert,* 499 U.S. at 323).

Therefore, the Court concludes that the discretionary function exception does not bar this Court from exercising jurisdiction over Plaintiffs' intentional and negligent infliction of emotional distress claims arising under Missouri law.  That does not, however, end the inquiry.

### b.  Plaintiffs' Negligent and Intentional Infliction of Emotional Distress Claims Fail to State a Claim Upon Which Relief can be Granted

Under Missouri choice-of-law rules, the substantive law to be applied is governed by the "most significant relationship test," *see Sledge*, 723 F. Supp. 2d at 99, which requires a court to consider "'(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.'"  *Stricker v. Union Planters Bank*, 436 F.3d 875, 878 (8th Cir. 2006) (quoting *Goede*

*v. Aerojet Gen. Corp.*, 143 S.W.3d 14, 24 n.6 (Mo. Ct. App. 2004)).   Accordingly, this Court

must apply Missouri law to Plaintiffs' emotional distress claims.

The BOP argues that the Third Amended Complaint fails to state a claim for negligent or

intentional infliction of emotional distress.   BOP contends that the Plaintiffs fail to allege

conduct that is so outrageous as to permit recovery.   Plaintiffs maintain that BOP knew

> (1) that Dianne Sledge had previously received permission for the
> visit; (2) were aware of the distance [she] travelled and the
> expenses she had incurred; (3) were aware of Woodland's failing
> health; (4) knew or should have known, in light of Woodland's
> health, that Dianne Sledge and Rico Woodland might never have
> another opportunity to see each other again; (5) knew or should
> have known that their conduct involved unreasonable risks to
> Woodland's emotional and physical health; and (6) had no
> legitimate justification for denying Dianne Sledge access to her
> son, or for denying Woodland the opportunity to see his mother.

Third. Am. Compl. ¶ 73, 81.   As such, Plaintiffs contend that they have pleaded the necessary

elements to survive a motion to dismiss.

### i.   Plaintiffs' Negligent Infliction of Emotional Distress Claim Fails to State a Claim Upon Which Relief Can be Granted

Under Missouri law, "[t]he general elements of a negligence action are (1) a legal duty of

the defendant to protect the plaintiff from injury, (2) breach of the duty, (3) proximate cause, and

(4) injury to the plaintiff."   *Pendergist v. Pendergrass*, 961 S.W.2d 919, 923 (Mo. Ct. App.

1998) (citing *Stark v. Lehndorff Traders Venture*, 939 S.W.2d 43, 45 (Mo. App. Ct. 1997)).   "To

recover damages for emotional distress, a plaintiff must show that (1) the defendant should have

realized that his conduct involved an unreasonable risk of causing the distress and (2) the

emotional distress or mental injury must be medically diagnosable and must be of sufficient

severity so as to be medically significant."   *Id.* (citing *Bass v. Nooney Co.*, 646 S.W.2d 765, 772

(Mo. 1983) (en banc)).  "A showing of a contemporaneous traumatic physical injury is no longer necessary."  *Id.* (citing *Bass*, 646 S.W.2d at 722).

Here, Plaintiffs' claim fails because the Complaint merely recites the bare elements of a claim for negligent infliction of emotional distress.  First, Plaintiffs fail to plead that the BOP should have realized that its failure to complete a visitation memorandum involved an unreasonable risk of causing distress.  There is no evidence to support Plaintiffs' assertion that the denial of the visit involved an unreasonable risk of causing Woodland distress.  Second, Plaintiffs fail to plead facts necessary to demonstrate that Woodland's emotional distress was "medically diagnosable" and was "of sufficient severity as to be medically significant."  *Id.* Plaintiffs allege that USMCFP Springfield officials' actions "caused Woodland severe emotional distress, including medically diagnosable and medically significant emotional distress, which in turn caused further deterioration in Woodland's physical health."  Third Am. Compl. ¶ 75.  This Court, however, "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations."  *Kowal*, 16 F.3d at 1276.

### ii. Plaintiffs' Intentional Infliction of Emotional Distress Claim Fails to State a Claim Upon Which Relief Can be Granted

Under Missouri law, to succeed on a claim of intentional infliction of emotional distress, a plaintiff must demonstrate that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme or outrageous; and (3) the conduct caused (4) severe emotional distress.  *See Boes v. Deschu*, 768 S.W.2d 205, 207 (Mo. Ct. App. 1989).  "To state a claim for intentional infliction of emotional distress, a plaintiff must plead extreme and outrageous conduct by a defendant who intentionally or recklessly causes severe emotional distress that

results in bodily harm." [4]  *Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (en banc) (citing *K.G. v. R.T.R.*, 918 S.W.2d 795, 799 (Mo. 1996)). "The conduct must have been 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (quoting *Warrem v. Parrish*, 436 S.W.2d 670, 673 (Mo. 1969)). Additionally, "[t]he conduct must be 'intended only to cause extreme emotional distress to the victim.'" *Id.* (quoting *K.G.*, 918 S.W.2d at 799).

Here, the BOP's alleged decision not to permit Dianne Sledge to visit her son after failure to complete a visitation memorandum is not "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Gibson*, 952 S.W.2d at 249. Furthermore, Plaintiffs fail to allege that BOP's failure to complete a visitation memorandum and its decision not to allow the Sledges to visit was either extreme, outrageous, or intentional.[5]

---

[4] Plaintiffs argue that "Missouri does not require that a plaintiff show bodily injury in claims of intentional . . . infliction of emotional distress." Doc. No. 67 at 43-44. Plaintiffs' reliance on *State v. Cunningham*, 182 S.W.3d 561 (Mo. 2006) for this proposition is misplaced. In *Cunningham*, the Supreme Court of Missouri addressed whether "the physician-patient privilege appl[ied] to an action seeking damages for emotional distress under the Missouri Human Rights Act for alleged sex discrimination and sexual harassment, or d[id] such an action always waive the privilege?" *Id.* at 563. In a footnote, the court rejected the Eighth Circuit's interpretation of the state's Human Rights Act as requiring expert medical testimony to support a claim of emotional distress when physical injury had not occurred. *Id.* at 566 n.4. The Supreme Court of Missouri analogized a violation of the Human Rights Act "to the tort of intentional infliction of emotional distress, for which medically documented damages need not be proven." *Id.* The Court, however, did not hold that a plaintiff alleging a claim of intentional infliction of emotional distress need not plead bodily harm. Furthermore, cases decided after *Cunningham* have required that a plaintiff must allege emotional distress that resulted in bodily harm. *See, e.g.*, *Diehl v. Fred Weber, Inc.*, 309 S.W.2d 309, 321 (Mo. Ct. App. 2010) (finding that a plaintiff must claim that "the conduct caused severe emotional distress resulting in bodily harm") (citing *Gibson*, 952 S.W.2d at 249); *Conway v. St. Louis Cnty.*, 254 S.W.2d 159, 165-66 (Mo. Ct. App. 2008) ("Intentional infliction of emotional distress requires the defendant to act intentionally or recklessly, the conduct must be extreme and outrageous, and *the conduct must be the cause of extreme emotional distress that results in bodily harm.*") (emphasis added).

[5] Plaintiffs' reliance on *Boes* for the proposition that BOP's conduct was outrageous because it was an "abuse of position" is unpersuasive. In *Boes*, the Missouri Court of Appeals discussed the abuse of position standard in intentional infliction of emotional distress claims as being "invoked where there is a preexisting legal relationship between the parties—employer-employee, creditor-debtor, landlord-tenant, insurer-insured—and the plaintiff claims the defendant has behaved intolerably in attempting either to assert or avoid his or her rights and obligations flowing out of that relationship." 768 S.W.2d at 207-08 (citation omitted). Plaintiffs do not demonstrate that such a relationship existed between the parties, and even if they did, Plaintiffs fail to allege that BOP "behaved intolerably in attempting either to assert or avoid [its] rights and obligations flowing out of that relationship." *Id.*

Additionally, Plaintiffs fail to allege how staff member's conduct was "intended to cause extreme emotional distress" as to Sledge or Woodland.  Finally, Sledge's claim must also fail because Sledge failed to plead that the emotional distress she suffered resulted in bodily harm.

**V.      Conclusion**

For the foregoing reasons, BOP's motion to dismiss will be granted.  A separate order follows.


July 13, 2012                                      _____/s/_____
Date                                                      Roger W. Titus
                                                              United States District Judge